Proceedings                                          1

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF NEW YORK

3        - - - - - - - - - - - - - X
         CARLOS OAXACA, HALIBUL ALAM :    13-CV-02698(ENV)(MDG)
4        AND JUAN ESPINAL,           :
                      Plaintiffs,    :
5                                    :        United States Courthouse
            -against-                :        Brooklyn, New York
6                                    :
         HUDSON SIDE CAFE INC.       :
7        (d/b/a "ZACK'S PIZZA AND    :
         PAPO'S CHICKEN"), MOHAMMAD  :    February 24, 2015
8        SAIN AND PERU KHAN          :    10:33 a.m.
                      Defendants.    :
9        - - - - - - - - - - - - - X

10

11                    TRANSCRIPT OF BENCH TRIAL

12                BEFORE THE HONORABLE MARILYN GO

13            UNITED STATES DISTRICT MAGISTRATE JUDGE

14

15       A P P E A R A N C E S:

16       FOR THE PLAINTIFFS,              JOSHUA ANDROPHY, ESQ.
                                          MICHAEL FAILLACE &
17                                        ASSOCIATES, PC
                                          60 East 42nd Street
18                                        Suite 2020
                                          New York, NY 10165
19                                        (212)317-1200

20
         FOR THE DEFENDANTS,              ANDREW MOULINOS, ESQ.
21                                        23-52 31st Street
                                          Astoria, NY  11105
22                                        (718)545-2600

23

24

25

Proceedings                                                    2

REPORTED BY:                        WENDY C. RICARD, RPR
                                    OFFICIAL COURT REPORTER
                                    225 Cadman Plaza East
                                    Brooklyn, NY
                                    (718)613-2622


Proceedings recorded by mechanical stenography.

Transcript produced by computer-aided transcription.

Proceedings                                              3

1          (Whereupon, the case was called prior; opening

2     statements occurred, but not reported.  The following took

3     place in open court:)

4          THE COURT: All right.  Just as a matter of

5     housekeeping, I had noted at our last pretrial -- the final

6     pretrial conference that there were no objections to any of

7     the exhibits offered in the exhibit list of -- except for the

8     pretrial order, but just to confirm that there are no dispute,

9     I asked the parties to exchange the exhibits; that's been

10    done, and I do have copies of the pre-marked exhibits.

11         Now, I want to confirm, again, that there are no

12    objections to these exhibits.

13         MR. ANDROPHY:  Plaintiffs have no objections to

14    defendant's exhibits.

15         MR. MOULINOS:  Same with defendant, Your Honor.

16         THE COURT:  So they've all been marked, and they are

17    all admitted to the extent that they are offered as part of

18    this trial.

19         Now, I know you have one witness who has some

20    personal matters that he needs to attend to, so we will take

21    the defendant's first witness now.

22         MR. MOULINOS:  Thank you.  May I call to the stand

23    Mr. Kabir, please.

24         THE COURT:  Come and sit in the witness seat right

25    here.

Proceedings                                    4

1    **M O H A M M E D   K A B I R,**

2              called by The Defendant, having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE DEPUTY CLERK:  Would you state your name for the

6    record?

7              THE WITNESS:  Mohammed S. Kabir.

8              THE DEPUTY CLERK:  Thank you.

9              THE COURT:  Would you spell your last name, please?

10             THE WITNESS:  K-A-B-I-R; "B" as in "boy".

11             THE COURT:  You may be seated.

12             THE WITNESS:  Thank you.

13             THE COURT:  You may proceed.

14   DIRECT EXAMINATION

15   BY MR. MOULINOS:

16   Q.  Good morning, Mr. Kabir.

17   A.  Good morning.

18   Q.  Are you a shareholder of Hudson Side Cafe, Incorporated?

19   A.  No, I'm not.

20   Q.  Are you in  way connected with Hudson Side Cafe,

21   Incorporated.

22   A.  No.  I'm not connected with it.

23   Q.  Are you a defendant in this case?

24   A.  No, I'm not.

25   Q.  Did there come a time that you met a gentleman by the name

Proceedings                                          5

1    of Halibul Islam, also known as Habibul Alam?

2    A.  Can I stand up here?

3              THE COURT: Sure.

4              THE WITNESS:  Thank you very much first to say to

5    give me the floor first in this case because I have a personal

6    matter, and I'm dearly glad for all of the parties and the

7    opposition, anyone that's here.

8              And his question, I'm going to make it clear, Mr.

9    Habibul Alam, I met him in 2009, beginning of 2009, because I

10   was moved to --

11   BY MR. MOULINOS:

12   Q.  Well, let me ask you the questions, Mr.  Kabir, so we do

13   this in an orderly way.  Okay.  Are you related to Mr.  Alam

14   in any way?

15   A.  No.  I'm not any relation with him because I don't have no

16   relation with him.

17   Q.  In 2009, would you please give us a brief description of

18   how you met Mr.  Alam?

19   A.  So 2009, in February, I moved in Sunnyside in 40th Street

20   in Queens Boulevard -- 4-0.  And that time, I was going for

21   walk in my working place, and when I get out by the subway at

22   40th Street, then I seen him on the fruit vendoring cart

23   there, and I used to stop by often there, and I buy the fruit.

24        And as a native, he come from my country, then I was

25   talking in my personal and anything -- like I was talking with

Proceedings                                                    6

1    him, and that's why I know him.

2    Q.  Is Mr.  Alam in the courtroom today?

3    A.  Yes.  He's in the middle in the blue yellow-colored jacket

4    and the black color.

5    Q.  Okay.  Now, beginning 200, what other -- how often would

6    you see Mr.  Alam?

7    A.  Almost like everyday in the summertime when he's  selling

8    the fruit; almost like everyday.  When I come back from my

9    work, then I see him.

10   Q.  When you say "see him", would he have a stand?  Would he

11   have a cart? Would he have sidewalk -- where would he be; what

12   would he be doing?

13   A.  He was exactly under the subway, he has a fruit vendoring

14   cart -- not in the cart, it's like cart, work cart.

15   Q.  Okay.  So you would see him --

16   A.  It's like a van I think.

17           THE COURT REPORTER:  It's like a "what"?

18           THE WITNESS:  It's like a four-wheel van.  He sell

19   the fruit on the van under the subway.

20   BY MR. MOULINOS:

21   Q.  And when you say "selling fruit", what do you mean by

22   "fruit"?

23   A.  Fruit.  All kinds of fruit like a strawberry, watermelon,

24   the fruit.

25   Q.  Inside the train station you mean?

```
                    Proceedings                    7
```

1    A.  No. No.  Under the train.  Under the subway.

2    Q.  Under the subway?

3              THE COURT: It is this an elevated subway?

4              THE WITNESS:  It is on Queens Boulevard, but the --

5              THE COURT: Is the subway raised?

6              THE WITNESS:  Yes.  The subway goes on there, but it

7    is under that.

8    BY MR. MOULINOS:

9    Q.  So he would be on the sidewalk of the street?

10   A.  It is not really on the sidewalk.  The sidewalk is

11   different.  I don't know what you call it because the subway

12   goes on the street, and he sits under the like -- on the

13   subway track.

14             THE COURT:  And are there roads?

15             THE WITNESS:  Roads, both sides.

16             THE COURT:  On either side of the tracks?

17             THE WITNESS:  Both sides.

18             THE COURT:  And then there's the center strip, and

19   then he's in the center strip under the tracks?

20             THE WITNESS: Exactly.  Exactly.  Yes.

21             THE COURT:  Okay.

22             THE WITNESS:  The road goes both ways, and he's the

23   center point like in the subway.

24   BY MR. MOULINOS:

25   Q.  So where he was located, was he exposed to the elements or

Proceedings                                              8

1   was he covered through a room of some sort?

2   A.   No.   It was open.

3   Q.   Open space?

4   A.   Yes.

5   Q.   Okay.   So how often would see you see him beginning 2009?

6   A.   I seen him a lot.   I cannot say exactly -- I did not

7   count, but I seen him a lot because most of the time, every

8   week I go home, then, I almost like three to four times, I

9   bought the fruit from him.

10  Q.   Okay.   And how long did this conversation, purchasing of

11  fruits, last overtime?

12  A.   I didn't understand your question.

13  Q.   Since 2009, how often -- how long would you see him

14  overtime?

15  A.   It's early -- it was beginning of 2012, winter, and until

16  he was here.

17  Q.   Before we get to the here, let's see what you and him

18  discussed, spoke about -- so give us a little bit of a flavor

19  -- when you purchased fruits from him and you said you had

20  conversations, give us the flavor of some of the

21  conversations.

22  A.   It's really -- when I stop by there when I have time like

23  when I come back from work, then when I have time when I seen

24  him, most of the time, I spend like five to 10 minutes with

25  him; like two, three minutes, five minutes until I bought the

Proceedings                                                      9

1    fruit, and I did my conversation like with myself and himself,

2    although, sometime I may question about him, his family and my

3    family like a friend.

4        So then I did share with him about his, and I share with

5    myself, also.  So it is like finally a year later, it was

6    going like a very good friend or something.  Sometimes I share

7    with him most important something, also, my family, also.

8    Q.  While you had these conversation, did Mr.  Alam ever

9    describe any past business affiliations?

10   A.  Yes, he did.

11   Q.  Would you please tell us the sum and substance?

12   A.  This happened like when I started talking with him that

13   time, he didn't say anything, but after like a couple of

14   months, he said to me, like he has a business.  He own a

15   business with his nephew, his own nephew, and it is -- I

16   believe he said it is in Park Avenue somewhere.

17       And when he opened the business with his nephew and his

18   friend, one of the friend was with him, they both was a screw

19   up with -- from his nephew, and because the nephew took the

20   business from them, and then just like -- I don't want to say

21   that kind of sentence, but it's like me -- like the guy,

22   nephew, he's seat with him does him in like that.

23           MR. ANDROPHY:  Objection to the this whole answer as

24   hearsay.

25           THE COURT: It's sustained.

```
                      Proceedings                    10
```

1   BY MR. MOULINOS:

2   Q.  Did he mention who his partner was?

3   A.  No.  At that time, I do not know.

4   Q.  However, he did mention that he was in business previously

5   together --

6   A.  Exactly.

7           MR. ANDROPHY:  Objection, again, on the hearsay.

8           THE WITNESS:  He was in the catering business.

9           THE COURT: It's overruled.

10  BY MR. MOULINOS:

11  Q.  It was in the catering business you said?

12  A.  Yes.  He used to work in the catering section somewhere in

13  Park Avenue.

14  Q.  Now, so was there any further conversation about going

15  into this business or in any way?

16  A.  Sometime he offered me, he's say to me, if you have any

17  good chance because I already get problem with my nephew, but

18  now I am working here, but some -- if I have any chance to

19  make a business or do business, I will do it.  If you have

20  anything, let me know.

21  Q.  And what did you say to that?

22  A.  Then I said, I'll let you know if you have any chance,

23  anything, if I know something, then I'll let you know.

24  Q.  Now, from 2009 all the way to 2012, did you suggest to him

25  in any way that there is some business available?

Proceedings                                    11

1    A.   No.   I did not say nothing.

2    Q.   Then what happened in 2012 if anything.

3    A.   In 2012 when the winter started, then I didn't see him a

4    long time, but one day I came from my work in front of my

5    house, when I came in front my house, he was standing there,

6    he was standing like that, and I asked him, Halibul, why are

7    you here?  He said he just came in the school, and my -- close

8    to my house has a school.  He want to pick up his son or

9    daughter.  That's what he say.  Maybe son or daughter he say.

10   He want to pick him up.  That's why he was just standing here.

11        And then I was standing here like around another 10

12   minutes, 10, 15 minutes, I was talking with him.  In the

13   meantime I said, why are you not working, I didn't see you

14   anymore?  Then he said, I don't have no work anymore because

15   winter time, I cannot work outside, so now I'm looking for

16   something to do.  If you know something, let me know.  And

17   then I said, okay, I have to rush.  I'm going home. So I just

18   finished my work.  Well, I'll let you know anything I have.

19   Q.   And when was this conversation about in the year 2012?

20   A.   It is was exactly -- that I cannot say because I don't

21   need to remember that, and it was March or April of 2012.  It

22   is almost like winter finished almost that time.

23   Q.   And did there come a time after that that you saw him

24   again?

25   A.   Sorry?

Proceedings                                        12

1    Q.  Did you see Mr.  Alam any time after that meeting with the

2    school picking up of the children?

3    A.  No.  I didn't see him anymore.

4    Q.  Did there come a time that you realized that there's some

5    business for sale or subleasing or something of that nature?

6    A.  Yes, I do.  Alam, when he told me about it -- actually, in

7    this thing, I'm going to tell you, Alam, I know him from 2009

8    and until this it's 2012, he been to me a very close friend,

9    and I know him and I treat him as my friend or my brother, and

10   I have a -- when I heard that his nephew did -- cheating with

11   him, then all I was trying to help him, and I keep in my mind,

12   if I have a chance -- as I told him, I explained to him, if

13   any time, if I have any chance to do for you, I'll do for you,

14   but I didn't promise you.  I cannot tell you, yes, I will do

15   it, but if I heard something, I'll let you know.

16       And then when I -- and in the meantime, he gave me his

17   cell phone number; I gave him cell phone number.  And when I

18   met him like in 2012, in February, and by my house, then he

19   was really looks like he was upset because he doesn't have the

20   work, and it's hard.  And then I said, okay, Alam, if I have

21   anything, I'll let you know.  Any problem, let me know.

22       Then after that, couple weeks or maybe months later, I

23   heard that Hudson Side Cafe, I introduced myself, my brother,

24   he is one of the partner of this business, and when I get my

25   baby couple of weeks, I was at my brother's house, and then

Proceedings                                        13

1    most of the time, I had that house going on with the business

2    because my wife, 2012, I got another baby, so I lived together

3    with my brother.

4         So then most of the time, my brother talking about they

5    are losing money, they cannot handle the business, they have a

6    lot of problem.  So then that time from my brother I had that

7    they wanted to sell this business or they if get some party

8    to do that, they wanted to do it.  This is the first time I

9    heard about the Hudson Side Cafe and about this matter.

10   Q.  And did there come a time that you communicated anything

11   of that sort to Mr. Alam?

12   A.  Yes, I did.

13   Q.  Would you please tell us what you --

14   A.  Yes.  When I heard that this is the thing that they want

15   to give us -- they want to sell this business.  The cannot

16   continue business because they are losing money.   Then I call

17   Alam and I offer Alam, Alam's own business came out in my

18   mind, and I know that guys.  They are completely clear, and

19   they don't have no problem, so if you want to buy this

20   business so you can see that business.

21        Then he reply to me, he is not able to buy this business

22   because he doesn't have no money because he got -- and he

23   said, I have another case in the court, so I don't have no

24   money.  I lost all the money.  I invest money in all of them.

25   So I don't have no money that I can buy the business.

Proceedings                                      14

1        So I  said, okay, so we're going to think about the
2    alternative if you have anything, if you save it.  He said,
3    okay.  Give me a chance, brother.  So I said what.  He said,
4    okay, give me a chance to operate this business.  I said, how
5    are you going to do that?  Because at that time, honestly, I
6    don't know even how they do it, that -- I didn't know.
7        Then I called him and he offered me.  Then I spoke to my
8    brother, and my brother he spoke with his partner and
9    everybody, and they say okay.  So we can sit down, how we can
10   do that because we are not able to do business.
11       So then Alam -- and I called Alam.  Alam, you can go on
12   the side, the business it's still running there.  You go
13   there.  You see first the location and the business policy,
14   how they are doing.  Keep your eyes on it, and keep going --
15   checking up, if you have time, morning, evening, any time when
16   they are open.  You go there and check that out, and if you
17   like it, then let me know.
18       And he went there -- I never seen him because after he
19   called me, I never go there again.  I don't know if he been
20   there or not, but he said to me, he been there morning,
21   evening, and daytime and many, many times within 15 days, and
22   then he said he is interested to take the business if they
23   rent it.  And I said, okay, then I'm going to talk to them,
24   and then I asked my brother, and they said, okay.  Let's do
25   it.

Proceedings                                               15

1    Q.  During this period of time, did you meet or know in any

2    way Mr.  Juan Espinal or Mr.  Carlos Oaxaca?

3    A.  No.  I'm not.  I do not know them.

4    Q.  So did you communicate with you brother and other people

5    in the Hudson Cafe place that Mr.  Alam is interested in some

6    --

7    A.  Yes, I did.

8    Q.  And what happened next?

9    A.  And, then, my brother, he was doing in class, like

10   computer class, course for the IT, and he said, brother, I

11   cannot handle this thing I am busy with that, and I am driving

12   taxi, I cannot go there most of the time.  So if you have time

13   so talk to the people and set it up on a schedule and sit down

14   with them, and how you can do that just help me out, and tell

15   them and my partner about how if they agree just help them out

16   to get out from there.

17   Q.  You mentioned Mr.  Paru.  Are you referring Mr.  Paru Khan

18   who is a defendant in this case?

19   A.  Yes.

20   Q.  This gentleman to my right?

21   A.  Yes.

22   Q.  Okay.  And then what happened next, was there a meeting?

23   A.  Yes.  Yes.  And then when he say -- Alam called me -- he

24   been to the store a couple times with his friend.  That time,

25   still, I don't know who was his friend or who goes with him,

Proceedings                                                16

1    and he said, I been there.  We are very satisfied with the
2    business location, and --
3              MR. ANDROPHY:  Objection.  Hearsay.
4              MR. MOULINOS:  Thanks what he said.
5              THE COURT:  It's not admitted for the truth.  I'll
6    permit it, but it's not admitted for the truth of the
7    statement.
8              THE WITNESS:  And then -- can I continue?
9              MR. MOULINOS:  Yes, please.
10             THE WITNESS:  Thank you.  So then he called me, and I
11   said, okay --
12   BY MR. MOULINOS:
13   Q.  He "Mr. Alam" or somebody else called?
14   A.  No.  Alam called me.
15   Q.  Alam.
16   A.  And then I passed -- was to the Alam.
17             THE COURT:  Was that Alam's statement you were saying
18   that he was satisfied with the business?
19             THE WITNESS:  Alam, Mr. Alam.
20             THE COURT:  Yeah.  But just before the objection, was
21   that Alam's statement?  I'm sorry.
22             THE WITNESS:  Alam statement.  Yea.  Alam didn't --
23   BY MR. MOULINOS:
24   Q.  The judge wants to know what Mr. Alam said to you whether
25   he was satisfied with the business or not?

Proceedings                                                    17

1    A.  That's what I'm explaining.  Yes.  That's what I'm

2    explaining.

3              THE COURT: I'll permit the statement.  I'm --

4              THE WITNESS:  So when he went there --

5              MR. MOULINOS:  The judge is talking, please.

6              THE COURT: I'm overruling the objection.  I'm sorry.

7    I misunderstood.

8              MR. ANDROPHY:  Okay.

9              THE WITNESS:  And when he called me, then my first

10   question was to him:  So you know what, like, if you want to

11   do this business how are you going to handle it? Why are you

12   satisfied with this place?  And so he said, he was laughing,

13   and he said, brother, I went there, and it is a really good

14   location and neither is better than this and good location, I

15   can keep the continued business because I have the food

16   business experience, number one.

17             Number two, I ask him completely one question:  I

18   said why are you interested in about the business?  Then he

19   said, when he went there, that Hudson Side Cafe has some

20   worker they made some food for the other customers in front of

21   them.  They were watching what how they make this food.

22             And my -- Hudson Side Cafe, one of the employees,

23   make the food for them without gloves.

24   BY MR. MOULINOS:

25   Q.  Without "what"?

Proceedings                                                    18

1    A.  Without gloves.

2    Q.  Gloves?

3    A.  Yes.  And they said it was most specifically they said a

4    chicken, grilled chicken salad.  That's what he explained it.

5    And without gloves, he made the salad, and then the customer

6    refused the food.  He said, I don't want to take this food

7    because you made this without gloves.  How you did that?

8        And then he said, this is the way they make the food.

9    They cannot -- continue the business.  So we know we can

10   progress.  We got the problem.  They say they cannot do that.

11   There's the problem they cannot do that business.

12   Q.  Who is "they"?  Or meaning the owners Hudson Cafe?

13   A.  I'm sorry.

14   Q.  You mentioned the word "they" could not continue this

15   business.

16   A.  Hudson Side Cafe.

17   Q.  The employees --

18   A.  No.  Employees, however, they make this salad, the Hudson

19   Side Cafe cannot keep this business continue because they are

20   totally wrong way they made it.  I was standing there about

21   15, 20 minutes, they did not even ask me may I help or

22   something.  I said, okay, you have a good point.  If you can

23   do that, I can go for work for you.

24   Q.  So the point that I think you're making is that Mr.  Alam

25   was sure he would improve the business.

Proceedings                                          19

1    A.  Exactly.

2           MR. ANDROPHY:  Objection.  Objection to --

3           THE COURT: It's overruled.  Please don't lead the

4    witness, and please don't make speeches.  What happens in

5    these proceedings is that the attorney can ask you questions,

6    and you'll answer the question that's asked by the attorney.

7           THE WITNESS:  Thank you.

8           THE COURT:  So rephrase, counselor.

9    BY MR. MOULINOS:

10   Q.  So please continue the conversation you had with Mr.  Alam

11   regarding his interest in this business of Hudson Side Cafe.

12   A.  Yes.  When he finished that, then I said, okay, if you

13   interested about this business, then it's for my -- as a

14   friend, for his interest and my brother's interest, I was in

15   the middle person now.

16       So I gave him another two weeks.  I said, see that,

17   another two weeks.  If you feel better, if you think, yes, you

18   want to take this business, after two weeks, talk to me,  call

19   me, but right now, whatever you seen, what whatever you sent

20   me, I don't know because you see little bit more time.  If you

21   have confidence, if you know that, yes, you can do that, then

22   you let me know.

23   Q.  And what happened then?

24   A.  Then after another two weeks -- actually, it was three

25   weeks past, then he called me, yes.  He want to sit down with

WCR     OCR     RPR

Proceedings                                              20

1   like the partner and anyone, Hudson Side Cafe, he want to talk

2   to the.  I said, okay.  I'm going there.  I'm going to talk to

3   them.  I'm going to call them, and we can sit down about it,

4   but you asking to pay them or do that or how you're going to

5   do that, and I'm going to talk in front of them how they want

6   to do that.

7   Q.  And was there a meeting, if any, ever set-up?

8   A.  There was the first meeting, and there was me and Paru and

9   Alam -- and now I know him, this guy, he was there.

10  Q.  You're referring to Mr. Juan Espinal?

11  A.  That's the first time I meet with him.

12          THE COURT: Who is this?  Can you describe the person

13  you're pointing to?

14          THE WITNESS:  So he's the blue shirt and the glass

15  --

16          THE COURT: With the striped -- blue shirt with the

17  stripes in it?

18          THE WITNESS:  Exactly.  Yea.  That's the first time I

19  meet with him.  I never seen him.

20          THE COURT:  Okay.

21          THE WITNESS:  I never seen him in the past --

22          THE COURT:  And is that gentleman Mr. Espinal?

23          THE WITNESS: Yes.

24          THE COURT:  Okay.  Thank you.

25  BY MR. MOULINOS:

WCR       OCR       RPR

Proceedings                                          21

1    Q.  And by the way, you referred yourself as a middle man.

2    Were you ever paid for anything here?

3    A.  Who pay?

4    Q.  You.  Did anybody pay you for any services?

5    A.  No.

6    Q.  Did you receive any money from anybody for --

7    A.  No.  No.

8    Q.  -- engaging in this --

9    A.  In this matter, a single thing I did not -- I did not

10   receive -- even for this matter, I already explained Alam, I

11   am the middle person, now.  My brother is on one side; you are

12   on the other side.  I do not even want to handle with any

13   case, you handle it with them.  That I make it clear.

14   Q.  So was there a first meeting where Mr.  Alam and you and

15   others met?

16   A.  Uh-huh.

17   Q.  Would you please tell us clearly who appeared at the first

18   meeting and where it took place?

19   A.  There was first meeting Mr.  Alam and him -- at that time,

20   I know his name.  He told me it's Carlos, but I don't know his

21   name it's still Espinal or something else.  I know him as

22   Carlos, and that he told me his name is Carlos, and I meet

23   with him in the Hudson Side Cafe in the basement and with Paru

24   Khan.

25   Q.  Okay.  And please tell us what happened in that meeting?

Proceedings                                                    22

1    A.   That meeting, the first time I was -- I would say like I

2    asked Paru, Paru, what do you want because you are the partner

3    of this business, and then my brother's side because you are

4    going to give this business to them because you spend money

5    for the business.  In business money, you know how to do the

6    business because how are you going to operate.

7        Then Paru then asked them $4,000 a month, the rent, and

8    it's not rent, like $4,000 they give from them to Hudson Side

9    Cafe to operate this business, and that's Paru Khan asking

10   for, and all the rent, the store rent, and all the utility,

11   they will pay.

12   Q.   Who's "they"?

13   A.   Alam and Espinal.

14   Q.   And so tell us what else happened.

15   A.   And then Alam said, no, my brother, this is my pastime,

16   I'm coming here, and you know the business, your business is

17   going down, so to make this business improve, we need more

18   time.  So we got to take this business, but we cannot do it

19   like right away, we cannot pay you that much money.  So this

20   business is not doing good, so I think we cannot do better,

21   but we will consider it later, but, now, give me a break.

22       So I say, what do you want?  He said, $3,000.  I said, no.

23   It's not 3,000, it's not 4,000.  Go in the middle.  It's

24   3,500.

25   Q.   So what was the understanding about the 3,500?

Proceedings                                                    23

1    A.   What do you mean?

2    Q.   Was this a sum of money that was to be paid on top of all

3    the expenses or something else?

4    A.   Oh, no.   That was like every month, they're going to pay

5    him $3,500.

6    Q.   Who is "him"?

7    A.   The Hudson Side Cafe, Paru -- I mean Hudson Side Care.

8    And they're going to may pay Hudson Side Cafe $3,500, and they

9    will pay all the rent to the landlord and to the other expense

10   for what they need, plus they agreed to pay all the inventory,

11   whatever Hudson Side Cafe had.

12   Q.   Was there any understanding regarding the profits of the

13   business?

14   A.   The 3,500?

15   Q.   No.   Was there any understanding or discussion regarding

16   the profits for the business for the month?

17   A.   Oh, 3,500, only they're going to take, give it to them,

18   and the rest of money, they say we can make good money from

19   here.   So we can make good money, so they stop the money.   No

20   profit.   They're going to give it to them, but the rest of the

21   money is for them.

22   Q.   Who's "them"?

23   A.   Alam and Espinal.

24   Q.   Okay.   And what else transpired at that first meeting?

25   A.        And there was at all the first meeting, it was like

WCR      OCR      RPR

Proceedings                                    24

1    it was deep.  So then I said, okay, keep -- continue to think

2    about it -- them have any problem, and they talk to their

3    partner if they all agree and, also, then call me, and then

4    we'll sit down again how we can keep continuing.

5    Q.   Was there a follow-up meeting of any sort?

6    A.   The next meeting, we -- I remember that the next time, we

7    also meet with the same -- it was in the month or the end of

8    the month, we sit down in the Burger King because Paru Khan,

9    he called his partner and take the permission about that, and

10   now him and my brother and me, Carlos, and Juan Espinal and

11   Alam, we sit down in the Burger King in the same 40th Street

12   -- in between maybe it's 40 and the 41 in the Burger King in

13   Queens Boulevard.

14            (Whereupon, there was a brief pause in the

15   proceedings; thereafter, court resumed as follows:)

16            MR. MOULINOS:  Should I continue, Judge?

17            THE COURT: Yes.  Go ahead.

18   BY MR. MOULINOS:

19   Q.   You said Burger King; you mean a physical chain --

20   A.   It was in Burger King between 40 and 41 in Queens

21   Boulevard, and it's close to his --

22   Q.   Who is "his"?

23   A.   Like Alam working there when he sell the fruit.

24   Q.   Close to fruit stand?

25   A.   Very close, exactly.

Proceedings                                                    25

1    Q.   Is the fruit stand close to the location of the business

2    that Mr. Alam had?

3    A.   No.  No.  No.  This is not close to his business, no.

4    Q.   But Burger King of the meetings is close to his home?

5    A.   Yes.  It was most convenient for him -- me because I live

6    in 40th Street.  He works in 40th Street, and Paru he live in

7    Queens Boulevard and 43rd or 42nd.  I don't now.  It was more

8    convenient, that's why we call the meeting there.

9    Q.   Is there any reason why the meeting took place in Burger

10   King instead of the location of the business?

11   A.   That's the reason I said it was more convenient for

12   everybody to come there.  For me, it was in the evening time,

13   after I finish work, we cannot anywhere because we are

14   retired.  So it's make that very convenient for everybody.

15   Q.   This meeting took place during what month in the year of

16   2012 if you recall?

17   A.   Most possible, it was in May.  It was in May.

18   Q.   In 2012?

19   A.   Yes.

20   Q.   So please now describe for us what transpired at that

21   meeting at Burger King.

22   A.   And then all the deals that we was talking with Mr. Alam

23   and Espinal and Paru and that -- oh, that other guy, he was

24   there, too.

25   Q.   Who, Mr. Sain?

```
                        Proceedings                        26
```

1    A.   Yes.  He was there, too.  And my brother, him, him, and

2    them two.

3              THE COURT:  Okay.

4    BY MR. MOULINOS:

5    Q.   When you say "him, him" --

6    A.   Like Paru and Mr.  Sain.

7    Q.   Mr. Khan; Mr. Sain; your brother --

8    A.   My brother, me.

9    Q.   And anybody else from the defendants' side?

10   A.   No.  No one else.

11   Q.   And from the plaintiffs' side?

12   A.   But Espinal and Alam.

13   Q.   Okay.  Was Mr.  Carlos Oaxaca anywhere throughout all this

14   period?

15   A.   I do not -- I do not have no idea about him at the

16   meeting.

17   Q.   Okay.  He was not in any part of the meeting?

18   A.   No.  No. Not at all.

19   Q.   By the way before today, have you ever met this gentleman?

20   A.   No.  I never seen him.  I never met him. I never know him.

21   Q.   So please go back and tell us what transpired at that

22   meeting at Burger King?

23   A.   At that meeting, whatever we discussed at the Hudson Side

24   Cafe in the basement in the same place, that's what we

25   described in front of him, and my brother and him and

Proceedings                                                    27

1   everybody was there.

2   Q.  Do not say "him".  Please describe the name.

3   A.  Mr.  Alam.

4   Q.  There's no "him" around here.

5   A.  Paru Khan and Mr. Alam and me.

6   Q.  Okay.

7   A.  We was -- spoke about it, what about the offer, mean like

8   Alam offer and what about Paru offer.  Everything we discussed

9   in front of them, and if they are agree about it, then they

10  can make the deal to do that.

11  Q.  So what was the outcome?

12  A.  And then they said -- okay.  So for six months, they was

13  agreeable at the $3,500, and Mr.  Alam said six months, I have

14  to take time to progress this business because this is the

15  losing business.  So six months later, we're going to consider

16  and we're going to see what's going on.

17      Six months later, we're going to pay you 4,000, but right

18  now they give me a break 3,000.  All the partners were angry,

19  and they said, okay, take this business, keep it working, and

20  go.  We all expect you're going to do better, but you can take

21  the six months, and you're going to give us 3,500.

22  Q.  When you say 3,500, what do you exactly mean?  Who's

23  paying who and for what purpose?

24  A.  This $3,500 that Alam and Carlos Espinal, they're going to

25  pay for the Hudson Cafe.

Proceedings                                                    28

1    Q.  And get what in exchange?

2    A.  So they're going to operate this business, but all the

3    business they're going to operate and they -- what about the

4    sale, and that doesn't matter, forfeit a loss, it doesn't

5    matter.  They're going to pay Hudson Side Cafe $3,500 straight

6    and all the rent and the utility.

7    Q.  And was there any discussion at all about any security or

8    any --

9    A.  Yes.  It has.  It has like -- they're going to pay like

10   three months advance like 3,500 times three.  It's like

11   10,500, and then I says 500, forget about.  Make it $10,000 --

12   $10,000 deposit and the inventory, plus, one month rent like

13   the $3,500.

14   Q.  And what happened to that?

15   A.  And then like weeks or two weeks after, Alam called me.  I

16   wanted -- to do it.  Okay.  Come.  He went to my working place

17   in Brooklyn downtown, and he said -- he explained me, brother,

18   we was all agreed to pay the debt, but right now I feel that I

19   don't -- I have $10,000.  I can give it to you -- to them, but

20   if I give them $10,000 in funds like a deposit, but then I

21   cannot keep functioning in this business.

22       I said, why?  He said, I don't have -- I've got the

23   10,000.  What about you need the money for the inventory or

24   supporting money, they don't have enough money.

25       Espinal and him make 5,000 and 5,000; 10,000.  But after

WCR      OCR      RPR

Proceedings                                    29

1    that, he cannot function in this business.  I said, what do

2    you want to do, then?  Tell me what is your problem, how I can

3    help you.  Then he said, okay.  So do me a favor.  So forget

4    about -- tell them to don't take this money advance, 10,000.

5    I say it is nothing like I can sell them, but I can ask them.

6       And we have to think -- you have to think about how you

7    can do that, and he said, okay.  Talk to them.  Then, I talk

8    to Paru.  I called Paru.  This is the matter they don't want

9    to pay $10,000 in funds, but they don't have enough money

10   because I know Alam from -- actually, that was my condition

11   for this $10,000, and I seen actually Alam's interest because

12   I seen him.  I spoke with him.  I thought I'll do that and get

13   the benefit from this place, and that's all what I was

14   thinking.

15       I said, okay.  Paru, how are you go to solve this

16   problem?  How do you want to say - I said, okay.  And then I

17   offer because -- Alam is going to operate this business, so

18   he's going to give you this 3,500 and inventory, and rest of

19   the $10,000, he's going to give you every month $1,000.

20       So $3,500 plus $1,000, there was able to pay; $3,500

21   for Hudson Side Cafe; $1,000 for that advance like a deposit,

22   and 10 months, they said 10 months, we're going to keep

23   continue to pay the 10,000 -- 1,000, 1,000, 1,000.  And then I

24   -- it was not finished.  Then I said, okay, no, make that

25   $5,000, and then I can request for them, and they said, no, we

Proceedings                                                    30

1    cannot do that right now.  Then I asked him -- they said,

2    okay, if you recommend him like that, so you can continue and

3    --

4    Q.  What do you mean "if you recommend him"?

5    A.  Like I say, he's a good guy.  I know him from 2009, and as

6    I know him, he's a good guy, so I think you can keep going, so

7    let's try to help him out.

8    Q.  And what happened next in terms of the deal and the

9    understanding?

10   A.  And after that they in the meantime when they was agree

11   about everything, then I remember the health department, they

12   closed this Hudson Side Cafe, and then Paru, in the meantime,

13   he called me and said Hudson Side Cafe is already closed.  I

14   said, why?  He said, health department closed this business.

15         I said, okay, so what are you going to do.  So there

16   was literally like what they going to do now.  So I call Alam,

17   Alam, this is the thing, Hudson Side Cafe is closed by the

18   health department, and this didn't happen.  Then, he said,

19   okay.  So, then, we didn't say nothing.  Then I said, Paru,

20   what are you going to do?  He said, we're going to open the

21   business, but, in the meantime, we can tell Alam, we can keep

22   the store until open.  He can -- if he need to do anything,

23   renovation or anything, they are interested, Alam and Espinal.

24   If they're interested, they want to do renovation or anything

25   else they want to change, they can change it, and then when

Proceedings                                                     31

1    they open, they're going to open like a new management or new

2    store just like that, and I thought this is a good idea, if

3    they are angry, then they can take it, yes.

4    Q.  Then, what happened next?

5    A.  Then I called Alam and I spoke with him, and he said, yes,

6    this is a good idea.  So when we opened the business, it

7    looked like new management or newer store, so we can do

8    something as we want to do it.

9         And, in the meantime, other things that I'm going to add

10   that, they said they want to do some furnishings inside.  They

11   want to change --

12   Q.  Some what --

13   A.  They want to change something inside the store because

14   they don't like the Hudson Side Cafe, how it was decorated,

15   they don't like it. I said, okay.  So in the meantime when

16   this business is closed, do it, and you can do that.

17   Q.  Then what happened then?

18   A.  Then they bought one cooler, and they made the counter.

19   His friend like the Carlos, he told me, this is his friend.

20   He bring him there to make the counter and everything.  He

21   bought the cooler and everything, and they redesigned the

22   store, the counter.

23   Q.  Before we get to the redesigning of the counter and other

24   things, was there a time where you saw if at all any keys

25   being given over to Mr.  Alam, to Mr.  Espinal?

Proceedings                                                    32

1    A.   Keys?

2    Q.   Was there any possession turned over to them or no?

3    A.   No.   They didn't get -- like when they made the deal like

4    -- I remember it's like they made them pay money to Paru,

5    whatever it was the deal, and $4,000 or something, $4,500.

6    They gave it to him, and then they took that key.

7    Q.   And --

8    A.   But that time, I was not there.   When they took the key

9    and they pay him, that time I was not there.

10            MR. ANDROPHY:   Ask that that last answer be stricken.

11   He didn't personally witness any of that.

12            THE COURT: Yes.   You can only testify as to what you

13   know.   Now, how did you know that?   You didn't personally see

14   that?

15            THE WITNESS:   When they gave the key?

16            THE COURT:  Yes.

17            THE WITNESS:   That, personally, I didn't see that. I

18   didn't see that when they gave the key, and that time I was

19   not personally present because I have my work, so I was unable

20   to go then.

21            THE COURT:   And you were not there when the 4,500 was

22   paid?

23            THE WITNESS:   That I didn't -- I was not there at the

24   4,500 exchange or something, I was not at that time there, but

25   I went there when they was --

```
                            Proceedings                          33

 1    BY MR. MOULINOS:
 2    Q.  I'm not there yet, Mr. Kabir.  I'm still trying to finish
 3    up what happened at that evening at the Burger King.  Let's
 4    finish that up.
 5    A.  Okay.
 6    Q.  Tell us what else happened there so we move to the next
 7    event.
 8    A.  At the Burger King finished up like that.  So they're
 9    going to pay them money, the $4,500, and they want to take the
10    store.  They're still interested to do it, and they're going
11    to do it, and they made the appointment to go take the key and
12    payments and the inventory, too.
13    Q.  Okay.  When is the next time you had any conversation or
14    any activity with Mr. Alam or Mr. Espinal?
15    A.  When there was -- I know they already took that store, and
16    they are going there, and Alam told me, yes, they are there.
17    They started to buy the stocks and everything, then I visit
18    there with my family.
19    Q.  So the next time you saw Mr. Alam, was that with Mr.
20    Espinal or just by himself?
21    A.  No.  Alam and Espinal both was there in the store.
22    Q.  Okay.  You saw them at the store?
23    A.  The store, yes.
24    Q.  And what did you see them do?
25    A.  They was doing like redecoration.  Like change the -- all
```

Proceedings                                                      34

1    the improvements.  They change all the counters and

2    everything, where they was doing there.

3    Q.  And did you speak to him?  Did he speak to you?  Was there

4    any conversation in any way?

5    A.  That time I was -- I just went there and I seen them,

6    and I said, okay, thank you.  You're going to do better.  And

7    then I come back.  I used to go to Vernon Boulevard,

8    Riverside, with my family.

9            THE COURT REPORTER:  Go where?  I'm sorry.

10           THE WITNESS:  Vernon Boulevard.  Riverside.

11   BY MR. MOULINOS:

12   Q.  Is this the location of the store?

13   A.  Yeah.  By the store, right.

14           MR. ANDROPHY:  Vernon Boulevard.

15           THE COURT:  Oh, Vernon.  Vernon.

16           THE WITNESS:  Vernon Boulevard.  It was actually in

17   the Riverside.  It's called Pepsi Park or something like that.

18   BY MR. MOULINOS:

19   Q.  Now, when is the next time you saw Mr. Alam or Mr.

20   Espinal?

21   A.  Then after like a couple of days later, I went there and I

22   see him, and Espinal was in the counter working, and Alam,

23   too.  They was working.

24   Q.  Did you have any conversation with either one of these two

25   gentlemen?

                          Proceedings                        35

1    A.  No.  Just to say "hi", "hello", and I bought some food.  I

2    paid.  I leave.

3    Q.  After that Burger King meeting, how many times all

4    together did you visit the store?

5    A.  After visit who?  Me and --

6    Q.  You, yourself.

7    A.  Around -- I been there, I seen him around five to six,

8    seven times.

9    Q.  And who did you see while you visited the store?

10   A.  All I seen him -- most of the time, I seen Espinal there,

11   and he was working like -- he said he knows everything.  So he

12   was working there mostly, and Alam, I missed maybe one or two

13   times, Alam, but most of the time, I seen them both working.

14   Q.  And the period of time after the Burger King meeting went

15   up to what month or what year?

16   A.  It was like -- in there, I seen him -- end of this was

17   2013 -- 2013, I seen them, that they was working there.

18   Q.  The store deal was in 2012.  Does that refresh your

19   recollection?

20   A.  So that store -- they took it and -- exactly when, but I

21   cannot remember.  It was 2013 and -- yes, it was 2013.

22   Q.  How many months after the Burger King deal was the last

23   time you saw either one of these two gentlemen?

24   A.  So it was like around another six months maybe, five, six

25   months.

Proceedings                                                36

1    Q.  Now, throughout all of your visits at the Hudson Side
2    Cafe, did you every see anybody from the prior ownership of
3    the Hudson Cafe, Incorporated people?
4    A.  No.  I didn't see them there.  When I was there,
5    especially, in the evening time, I didn't see nobody there.  I
6    seen them -- not these two persons there.
7              MR. MOULINOS:  I have no further questions, Your
8    Honor.
9              THE COURT: Okay.  Thank you.
10             MR. ANDROPHY:  If I may have just a couple minutes to
11   --
12             THE COURT:  All right.  You can sit and rest.  You
13   can just sit instead of standing.
14             THE WITNESS:  Thank you.
15   CROSS-EXAMINATION
16   BY MR. ANDROPHY:
17   Q.  Good morning, Mr. Kabir.
18   A.  Good morning.
19   Q.  You mentioned several times in your testimony that your
20   brother is one of the shareholders of Hudson Side Cafe, Inc.;
21   is that correct?
22   A.  Exactly.
23   Q.  And what is his name?
24   A.  M.D.(Phonetic) Asaduzzaman
25             THE COURT REPORTER:  I'm sorry.  Can you repeat that?

```
                        Proceedings                        37
```

```
 1              THE WITNESS:  M.D. --

 2    BY MR. ANDROPHY:

 3    Q.  I think if you would --

 4    A.  I'm going to explain that like.

 5    Q.  You want to spell it for the court reporter?

 6    A.  A-S-A-D-D-U-Z-A-M-N.

 7    Q.  How often did you speak with your brother about how the

 8    business at Hudson Side Cafe was doing?

 9    A.  We was often speak about it.

10    Q.  And over what period of time did you discuss how the

11    business was doing?  Like starting in what year would you have

12    discussions with your brother about the Hudson Side Cafe

13    business.

14    A.  Not on the Hudson Side Cafe, my brother has business from

15    2010.  I know that from 2010, he would talk like his business

16    going this way and this way and this way.  So he gave me the

17    information.

18    Q.  So you would discuss with him since approximately 2010

19    about the --

20    A.  Yeah.

21    Q.  I'm sorry.  Let me finish.  About the Hudson Side Cafe

22    business.

23    A.  Yes.

24    Q.  And did you get an understanding of how the business was

25    doing in those years?
```

Proceedings                                                    38

1    A.   Yeah.   That the business was doing bad, so they cannot --

2    they was losing money from there.   From that was like 2012, he

3    informed me, but 2010 to 2011, they didn't loose or business

4    was bad, they didn't tell me about it.   They continue the

5    business.

6    Q.   Did you have any discussions in 2010 or 2011 with your

7    brother about how the business was doing?

8    A.   Yes.   They said they were doing good at that time because

9    my brother, at that time, was still working there.   That's why

10   business was doing good.

11   Q.   And your brother worked at the restaurant; is that

12   correct?

13   A.   Yeah.   He did like that -- beginning of the time, he did

14   work there.

15   Q.   Did you visit the restaurant when your brother was

16   operating it?

17   A.   Very, very, very little.

18   Q.   You mentioned that there was a time that the health

19   department closed down the Hudson Side Cafe business, correct?

20   A.   Yes.

21   Q.   Do you recall when that was, what month and year?

22   A.   It was like June or maybe -- May or June like

23   approximately this time, but I don't know exactly because I

24   was not related with that.

25   Q.   Is that 2012?

Proceedings                                             39

1    A.  Yeah.

2    Q.  Did this happen before or after the meetings that you

3    testified about, the two meetings that you testified about;

4    one at Hudson Side Cafe, the other at Burger King?

5    A.  After that.

6    Q.  Okay.  Now, you were not a partner of Hudson Side Cafe,

7    Inc.?

8    A.  No, I'm not.

9    Q.  You were not a shareholder?

10   A.  No.

11   Q.  Why were you at the meetings with Mr.  Alam and Mr.

12   Espinal and with Paru?

13   A.  Because Alam he was interested to take the business to do

14   that, that's why I could tell them to, okay, if you were

15   interested to call the meeting and tell them whatever you want

16   to purchase, offer them, and talk to them because I'm not the

17   partner of this business.  I don't know about that.  So if

18   they're interested, then you can go ahead.

19   Q.  And I know you gave a lot of testimony about how the

20   parties discussed what the deal would be.  I want to make sure

21   I understand your testimony about what the final agreement

22   was.  Can you tell us what the final agreement was?

23   A.  It was like a verbally agreement like -- I can add that

24   one thing like what happened there.  So they was saying they

25   wanted to pay $10,000 deposit and the 3,500 and all the rent

Proceedings                                                    40

1    and utility.

2        Then both parties was to able to make an agreement about

3    it, but when Alam offer went to me and said his position, like

4    how he doesn't have money, then he said he want to pay $1,000

5    a month, and then he said -- the position like that Hudson

6    Side Cafe, they said, no.  Until they pay the $10,000, we

7    cannot make -- I'm not going to make, we are not going to make

8    any agreement with them.

9        So when they pay the $10,000, then we are going to make

10   the agreement because there is no deposit here, so I cannot

11   make him any agreement without money.

12   Q.  So was there no final agreement?

13   A.  There was no reach an agreement, but it was final

14   agreement how they want to take this business.

15   Q.  So what was that final agreement of how they would take

16   that business if you know?

17   A.  So as I say pay $3,000 they're going to pay them to -- for

18   acquiring this business and then  rent and the utilities,

19   they're going to pay.

20   Q.  Was there any agreement about who would pay to purchase

21   food that the restaurant would need to prepare food?

22   A.  Then, all -- like further inventory, the Hudson Side Cafe,

23   they operated -- they don't want take anything.  We don't want

24   to come here.  We cannot see -- anything you need, you buy and

25   you cell, it is yours.  That was the deal.

Proceedings                                            41

1    Q.  Do you know if the restaurant was making money in the

2    first six months of 2012?

3    A.  I do not know about it.  I do not know.

4    Q.  Did you ever write anything down about the terms of the

5    agreement?

6    A.  I did not write nothing about it?

7    Q.  Never wrote any notes?

8    A.  No.  I did not.  By myself, I did not.

9    Q.  Do you know if anyone else wrote any notes about what the

10   agreement was?

11   A.  The agreement -- no.  It was not written agreement

12   anything there.  Only the things they tell me I know was

13   inventory, and Paru said he was there, and that's inventory

14   they paid for that.  That's only the reason --

15   Q.  Do you have personal knowledge of that, the inventory that

16   was written?

17   A.  I knew that from Paru because they already gave the money.

18   Q.  But you only know that from Paru telling you?

19   A.  And Alam told me, also.  They are to pay for the inventory

20   and the money -- the advance one month, and then they're going

21   to take about the business.  That's only -- the things I know

22   that's anything was not written, any agreement. Because the

23   Hudson Side Cafe refused that.  Until $10,000 they paid

24   deposit, they didn't want to make any agreement with them.

25   Q.  Do you have any personal knowledge of anything that was

Proceedings                                                      42

1    written having to do with this agreement?

2    A.  Personal written?

3    Q.  Do you have any personal knowledge of anything being

4    written down to memorialize the agreement?

5    A.  No.  I do not.  I don't know.  I didn't see anything

6    written, anything, about the agreement.

7    Q.  Okay.  And the inventory that you mentioned seeing

8    something written about that, did you personally see something

9    written down or is that --

10   A.  Yeah.  That I seen, yes.  That I seen.

11   Q.  Have you discussed this matter with any of the defendants

12   before coming here today?

13   A.  With who?

14   Q.  Have you discussed this matter with -- well, let's do it

15   one-by-one.  Have you discussed this matter with Paru Khan

16   before coming here today?

17   A.  No.  I did not discuss anything.

18   Q.  Have you discussed this matter with Mohammed Sain before

19   coming here today?

20   A.  No.  No.

21   Q.  Have you discussed this matters with your brother, Mr.

22   {sas} as {doos} man?

23   A.  No.  I did not.

24   Q.  Have you discussed this matter with the defendants'

25   attorney?

```
                        Proceedings                      43
```

1   A.  No.  I did not.

2   Q.  You haven't met with the defendant's attorney before

3   today?

4   A.  No.  I did not.

5           MR. ANDROPHY:  I have no further questions.

6           MR. MOULINOS:  Judge, I have no further questions

7   either.  Thank you.

8           THE COURT: You may step down.  Thank you.  Good luck.

9           THE WITNESS:  Thanks again for giving me this time.

10          THE COURT: Yes.  Good luck.  And congratulations.

11        THE WITNESS:  Oh, thank you.  Thank you.  Thank you.  So

12   am I --

13          THE COURT: You're excused.

14          MR. MOULINOS:  You may go.  Thank you.

15          THE WITNESS:  Thank you very much.

16          MR. ANDROPHY:  Plaintiffs call Carlos Oaxaca.

17   **C A R L O S    O A X A C A**

18          called by The Plaintiff, having been

19          first duly sworn, was examined and through the

20          interpreter, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. ANDROPHY:

23   Q.  Good morning, Mr. Oaxaca.

24   A.  Good morning.

25   Q.  Did you ever work for a business known as Papo's Fried

Proceedings                                                      44

1   Chicken and Zack's Pizza?
2   A.  I'm sorry.  Again, the question?
3   Q.  Did you ever work for a business known as Papo's Chicken
4   and Zack's Pizza?
5   A.  Yes.
6   Q.  And what is Papo's Chicken and Zack's Pizza?
7   A.  Well, are you referring to with the question.
8   Q.  What kind of business is that?
9   A.  They would sell pizza; fried chicken; fries; hamburgers;
10  salads.
11  Q.  Where is it located?
12  A.  It's located on 4811 Vernon Boulevard, LIC.
13  Q.  Can you describe the physical appearance of Papo's
14  Chicken?
15  A.  Can you repeat the question as far as how it appeared?
16  Q.  Yes.  Can you describe the physical appearance or layout
17  of the restaurant?
18  A.  Okay.  When you enter the restaurant, you enter the front.
19  It used to be, I don't know if it still is.  It was the place
20  where you would place the pizza.  On the left-hand side would
21  be where the cash register was at and where they would put the
22  salads.  On the back end on the left side was the machine that
23  would churn the dough for the pizza.  And then next to that
24  was the refrigerator for the chicken -- I'm sorry -- the fryer
25  for the chicken.  And then after that the fryer for the French

Proceedings                                                      45

1   fries that we would fry each day.  After that was the grill,
2   and on the right-hand side was the place where they would wash
3   the dishes.
4   Q.  Okay.  Thank you.  How did you find your job at Papo's
5   Chicken?
6   A.  I was passing by looking for work.  I passed by many
7   locations, gave my information.  I was waiting for them to
8   respond, and when I passed by that location, I gave my
9   information and waited for them to call.
10  Q.  Who did you give your information to?
11  A.  I gave my information to Mr. Espinal.  Because at that
12  moment, he was the person I saw out front.
13  Q.  And did you have conversation with Mr. Espinal?
14  A.  Yes.  The conversation I had with him about the bit of
15  experience that I had.
16  Q.  And did Mr. Espinal offer you a job, then?
17  A.  No.  No.  He told me he was going to give the information
18  to the owner of the business, and then I would have to wait to
19  see what he decided.
20  Q.  What happened next in terms of your attempt to get a job
21  at Papo's Chicken?
22  A.  If I remember correctly like two or three days later, they
23  spoke to me by phone, and he said, yes, the job was available
24  for me.
25  Q.  What happened next regarding your work at Papo's Chicken?

Proceedings                                                    46

1    A.  When I showed up that day we agreed on to go to work, the

2    -- that man was present, Mr.  Khan Paru, the owner, the person

3    who's the owner of the business and Juan Espinal.

4    Q.  How do you know that Mr.  Paru Khan was the owner of the

5    business?

6    A.  Because Mr.  Espinal told me he was the owner of the

7    business, and it was he, he asked.

8    Q.  Is Mr.  Khan here in the courtroom today?

9    A.  Yes.  He is here.  He's at the end back there.

10   Q.  Did you meet with Mr.  Khan on that day that you came to

11   work at the restaurant?

12   A.  Yes.

13   Q.  And was anyone with you while you met with Mr.  Khan?

14   A.  Yes.  Mr.  Espinal.

15   Q.  Did you discuss the terms of your employment with Mr.

16   Khan?

17   A.  Yes.  It was spoken about the job I was going to carry

18   out.

19   Q.  What was Mr.  Espinal doing in this conversation?

20   A.  Mr.  Juan Espinal translated what Mr.  Khan Paru was

21   saying.

22   Q.  So who hired you to work at Papo's Chicken?

23        MR. MOULINOS:  Objection.  Calls for conclusion.

24        THE COURT: It's overruled.  It's overruled.

25        THE WITNESS:  Mr. Khan Paru.

```
                        Proceedings                    47
```

1    BY MR. ANDROPHY:

2    Q.  What job did he hire you to perform?

3    A.  The job he hired me for was to cook, simply to do the

4    kitchen work.

5    Q.  Is that the job that you did throughout your employment at

6    Papo's Chicken?

7    A.  No.

8    Q.  Did something change in the job that you did?

9    A.  Yes.  It changed totally, the work.

10   Q.  And what was the change?

11   A.  The change was that I started doing deliveries.  I would

12   cook.  I would wash.  I would do the cleaning.  And then after

13   months, I started cooking pizza.

14   Q.  Did Mr.  Khan tell you at your first meeting what your

15   schedule would be?

16          MR. MOULINOS:  Objection.  Leading, Your Honor.

17          THE COURT: I'll permit it at this point.

18          THE WITNESS:  I'm sorry.  The question, again.

19   BY MR. ANDROPHY:

20   Q.  The question was if Mr.  Khan told you what your schedule

21   would be?

22   A.  Yes.  He told me about my work schedule.

23   Q.  And what schedule did he tell you would work?

24   A.  I was going to work seven in the morning until 11 o'clock

25   at night, seven days of the week.

Proceedings                                                48

1   Q.  And is that the schedule that you actually worked?

2   A.  Yes.

3   Q.  Did that schedule ever change while you were working at

4   Papo's Chicken?

5   A.  Yes, the schedule did change.

6   Q.  When did the schedule change?

7   A.  The schedule change at the end of January, that's when the

8   schedule changed.

9   Q.  And how did it come about that your schedule changed?

10  A.  Because I asked for a raise in my salary because I felt

11  already it was way too many hours for everything I was doing.

12  That's why I spoke with him so he could increase a little more

13  the money, but that was not the case, he then cut my time.  He

14  changed my schedule from when I started working.

15  Q.  You said "he" in this conversation.  Who was this

16  conversation with?

17  A.  At that moment, it was Mr.  Paru and Mr.  Espinal who

18  translated for me because I did not know how to speak.  I

19  don't speak English much, and I did not understand too much at

20  that moment.

21  Q.  Did you always work the hours that you were scheduled to

22  work at Papo's Chicken?

23  A.  Yes.

24  Q.  Did you ever have to begin work earlier or stay at work

25  later than usual?

                        Proceedings                    49

1    A.  Yes.  Staying later than what I was scheduled, yes.

2    Q.  Were you compensated anything extra if you worked

3    additional hours?

4              MR. MOULINOS:  Objection.

5              THE COURT: I'll permit it.

6              THE WITNESS:  No.  It was always the same salary I

7    was given.

8              THE COURT: What was the salary?

9              THE WITNESS:  The salary was from $600 a week for all

10   seven days.

11   BY MR. ANDROPHY:

12   Q.  And was that your pay throughout your employment?

13   A.  Yes.

14   Q.  And who -- did you have a discussion at the time you were

15   hired about what your pay would be?

16   A.  Yes.  At the beginning when I presented myself to Mr.

17   Paru, he told me what he was going to pay me per week.

18   Q.  And was that during the same discussion that you told us

19   about earlier where your schedule was discussed?

20   A.  Yes.

21   Q.  Did the restaurant keep track in any way of the hours you

22   worked?

23              MR. MOULINOS:  Objection.

24              THE COURT: I'll permit that.

25              THE WITNESS:  No.  There was no control of the time I

```
                        Proceedings                    50

 1    was working there.

 2    BY MR. ANDROPHY:

 3    Q.  Did you enter your time on the time clock?

 4    A.  No.  There was nothing to like punch in, nothing, or write

 5    in a book, nothing.

 6    Q.  Did you receive any break times during your work hours?

 7    A.  No.  They did not give me any specific time for break

 8    because the restaurant was moving.  It was something to do;

 9    many things to do.

10    Q.  Did you ever eat during the day?

11    A.  Yes.  I would eat things during my work hours, but I would

12    just eat  while I was working.

13    Q.  How were you paid your salary each week?

14    A.  In cash.

15    Q.  And who paid you?

16    A.  Mr.  Paru.

17    Q.  Was there -- strike that.  When you say "Mr.  Paru" paid

18    you, was he the one that gave you the money?

19    A.  Yes.  Directly into my hand he would deliver the money.

20    Q.  Was there a regular day of the week that he would do that?

21    A.  Yes.  He would pay me -- he started paying me first on

22    Saturdays, then he started paying me on Sundays.

23    Q.  How often did Mr.  Paru come to the restaurant?

24    A.  Everyday.

25    Q.  How long would he usually be at the restaurant?
```

Proceedings                                                        51

1    A.  He would normally stay two, three, four hours.

2    Q.  What did he do when he came to the restaurant?

3    A.  The men would sit off to one side.  He would see how the

4    business was doing and chat with Mr.  Juan Espinal and Mr.

5    Alam.

6    Q.  Is there anything else that you saw him do?

7    A.  No.  Just that.

8    Q.  Did you meet any other owners of Hudson Side Cafe, Inc.,

9    aside from Mr.  Paru?

10   A.  No.  No.  At the beginning, I only knew that it was him.

11   Q.  During the time that you worked at the restaurant, did you

12   meet anyone else who wasn't an owner of the restaurant?

13   A.  Yes.

14   Q.  Do you remember the name of the person?

15   A.  Yes.  The name of man, I can't exactly say it, but they

16   would call him "Shahin".

17   Q.  During the time that you worked at Papo's Chicken, how

18   many other employees were there?

19   A.  It was just three employees.

20   Q.  Is that including you or in addition to you?

21   A.  No counting myself.  Until I left.  After those gentlemen,

22   more people came.

23   Q.  Okay.  Who worked with you when you started working there?

24   A.  I by myself in the morning, and then by 10 in the morning

25   is when Mr.  Juan Espinal will arrive and Alam.

Proceedings                                                    52

1    Q.  And what were Mr.  Espinal's responsibilities at the
2    restaurant?  What was his job at the restaurant?
3    A.  He his job, Mr.  Espinal, was making pizzas, taking calls
4    for deliveries, and on some moments, I would see him charge
5    clients.
6    Q.  And what was Mr.  Alam's job at the restaurant?
7    A.  Mr.  Alam's job was making salads, and he would also
8    charge at the cash register, and he would also take orders
9    from the phone, whoever would arrive at the restaurant, he
10   would also take their orders.
11   Q.  Among yourself, Mr.  Espinal, and Mr.  Alam, were one of
12   you in charge of the others?
13   A.  No.
14   Q.  So who was in charge of the restaurant?
15   A.  Mr.  Paru.
16   Q.  Did you see what would happen to the money that was in the
17   cash register at the business?
18   A.  Yes.  Many times I noticed, yes.
19   Q.  What would happen to it?
20   A.  When Mr.  Paru arrived and the time that he would be there
21   about a half hour before he would leave, it would take -- they
22   would take out the money while Mr.  Alam, Espinal and Khan
23   Paru was present.  They would count whatever was sales to
24   that point of the day, and they would give them to Mr.  Paru,
25   he would be the one to pick up the money everyday.

Proceedings                                                    53

1    Q.  Did you ever deposit money from the restaurant into the
2    bank?
3    A.  Yes.   There were some occasions where I would deposit
4    some money to the bank; it wasn't frequent.
5    Q.  And why would -- why would you deposit money into the
6    bank?
7    A.  As an employee, they would send me to go deposit.
8    Q.  Who would send you?
9    A.  He would give the order.  Mr.  Khan Paru  would speak on
10   the phone that someone had to be sent to deposit into the
11   bank.
12   Q.  Did you ever personally write any checks for the
13   restaurant?
14   A.  No.  No.  I had nothing -- any manner or permission to do
15   song some kind of check, no.
16   Q.  Okay.  Did anyone ever ask you to sign an employment
17   agreement?
18   A.  No.  No one.  Never.
19   Q.  Did anyone at Papo's Chicken ever give you a document
20   stating how much you would be paid?
21   A.  No.  Nothing.  Nothing written; everything was verbally.
22   Q.  When you received your pay, did you ever receive a written
23   statement listing how much you were being paid?
24   A.  No.
25   Q.  Did you ever see at the restaurant any posters about the

WCR        OCR        RPR

Proceedings                                           54

1   minimum wage laws?

2   A.  No.  Never.

3   Q.  Do you still work for Papo's Chicken?

4   A.  No.  No.

5   Q.  When did you stop working there?

6   A.  The last day was April 24th when I suffered an accident

7   inside the pizzeria.

8   Q.  What kind of accident?

9   A.  I burned the left side of my face with hot oil.

10  Q.  Did you apply for worker's comp?

11  A.  Yes.  It's in the process, yes.

12          MR. ANDROPHY:  No further questions for this witness.

13          THE COURT: I just want to get the right year.  When

14  you say you stopped on April 24th, is it of 2014 or 2013?

15          THE WITNESS:  No.  No.  It was 2013; April 24th,

16  2013.

17          THE COURT:  Okay.  You may proceed, Mr. Moulinos.

18  CROSS-EXAMINATION

19  BY MR. MOULINOS:

20  Q.  Good morning, Mr. Oaxaca.

21  A.  Good morning.

22  Q.  What is your first day of work at this pizza place?

23  A.  Can you specify what you mean by my first day of work?

24  Q.  It means exactly what I asked:  The first day he entered

25  the story as an employee.

WCR      OCR      RPR

```
                        Proceedings                        55
```

1    A.   The work I started to perform?

2    Q.   I don't know.  What's the first day at work?  How

3    difficult could this be?

4    A.   It was hard the first day in the fact that the business

5    would move around a lot and with the passing of the days, and

6    my work would increase, and it wasn't hard, but little bit

7    more work than what I thought was for me.

8    Q.   Is this what the attorney prepared you to say today, sir?

9         MR. ANDROPHY:  Objection.  He's asking for attorney/

10   client privilege discussions.

11        THE COURT: I'll permit that question.

12        THE WITNESS:  No.

13   BY MR. MOULINOS:

14   Q.   Then what is the first day of work, sir, so simple?

15   A.   Like every job when you enter, they give you the

16   instructions on what you have to do and you start working.

17        THE COURT: When did you start working at Papo's?

18        THE WITNESS:  I started working the very exact day,

19   no, but it was the second week of August.

20        THE COURT: Second week of August?

21        THE WITNESS:  Second week of August of 2012.

22        THE COURT: What day of the week?

23        THE WITNESS:  It was the beginning of the week.  It

24   was a Monday I start working.

25        THE COURT: 2012?

Proceedings                                              56

1          THE WITNESS:  2012, yes.

2   BY MR. MOULINOS:

3   Q.  And how did you find this particular job, sir?

4   A.  I became aware of the job because days before I was

5   without a job, and I went looking for work precisely in that

6   area, looking for work.  I passed by that store just like

7   various stores that were nearby, and I left my information

8   just like the stores that I passed by previously today.

9   Q.  Previously, you said that you went about the area giving

10  out leaflets in search for a job.

11          MR. ANDROPHY:  Objection.  It's mischaracterizing

12  testimony, specifically, leaflets.  I don't think that's what

13  he testified to.

14          THE COURT: That's what he testified to.

15          THE WITNESS:  No.

16  BY MR. MOULINOS:

17  Q.  Sir, did you any give out any paperwork in search for a

18  job as you visited these various stores?

19  A.  No paperwork.  Just that the person would take down my

20  information and the previous work that I had done.  They would

21  write it down.

22  Q.  Before you even approached the defendants' Chicken, slash,

23  pizza place, how many doors of other stores did you enter in

24  order to ask for a job?

25  A.  I entered like five, six stores.

```
                        Proceedings                    57

 1    Q.  And what were the nature of their business?

 2    A.  It was a pizzeria.  Previously, a deli that was there.

 3    Further up, there was a restaurant.  And there was another

 4    deli where I entered working for work.

 5    Q.  So altogether approximately how many doors did you knock

 6    in search for a job?

 7              MR. ANDROPHY:  Asked and answered.

 8              THE WITNESS:  I answered that question already.

 9              THE COURT:  I would have permitted the question.

10    Please don't make spontaneous comments.  If you want to, you

11    can object.

12              MR. ANDROPHY:  Okay.  I apologize.

13              THE COURT:  Can you answer that question, please?

14              THE WITNESS:  Yes.  From five to six stores that I

15    passed by.

16    BY MR. MOULINOS:

17    Q.  And during how long of a period of time did it take you to

18    go through this process of knocking at the doors in search of

19    a job?

20    A.  It was a question of 15, 20 minutes while I would give my

21    information and then walk out and look for next store.

22    Q.  And how long of a space of time from the first time you

23    went to the first store to August, the second week, 2012?

24    A.  Can you repeat the question?

25    Q.  How long did you search for a job before you found this
```

Proceedings                                                    58

1    job?

2    A.  More or less, around an hour.  After there, I continued

3    looking at other businesses, and I walked everything that was

4    Vernon Boulevard.

5    Q.  So did you take one day to cover these five stores?  Did

6    you take a month or did it take a year prior to August 2012 to

7    search for a job in that area?

8    A.  No.  I just passed by one day, not months like he says,

9    no.  Just one day, I passed by that one area.

10   Q.  And, sir, why did you pick this very specific area to

11   search for a job?

12   A.  I didn't specifically pick this area.  I previously was

13   looking to the Jackson Heights area which is where I live.  In

14   lower -- I guess you could say it's lower Manhattan because I

15   had worked on 25th Street and Lexington Avenue.  I looked

16   around that area, as well.

17   Q.  My question, sir, is this:  What made you go to Long

18   Island City in the area of that block of Vernon Boulevard

19   where the restaurant is located in search for a job?

20   A.  Yes.  Because a friend of mine worked in that area

21   previously, and when I spoke to that friend and he found out I

22   did not have work, he told me to go that area looking for

23   work.

24   Q.  Could you now tell us very clearly exactly what day and

25   what year was this day you were looking for a job?

```
                          Proceedings                        59
```

1   A.   What day; what date -- not exactly.

2   Q.   Give us any clue.

3   A.   I could say you're asking me about this area of work, this

4   location.

5   Q.   Correct.

6   A.   Once again, I was a little confused.  Can you repeat the

7   question.

8   Q.   Okay.  Let's move on.  Before you found this job, how long

9   had you previously been looking for work anywhere?

10  A.   I was for like a month, month-and-a-half, looking for

11  work.

12  Q.   And what did you do prior to that month,

13  month-and-a-half.

14  A.   I was working at a deli that was located on 37th Avenue

15  and 99th Street in Jackson Heights.

16  Q.   And how long did you work there?

17  A.   I worked there approximately like four-and-a-half months I

18  worked there.

19  Q.   And what were your duties there?

20  A.   My responsibilities were making sandwiches, stocking sodas

21  in the fridge, everything that was sold there.  Sold there.

22  Q.   Were deliveries included in that description?

23  A.   Yes.  Because it was only one or two blocks where they

24  would do the deliveries, and they would deliver only beers.

25  Q.   Did you make pizza by any chance in that store?

Proceedings                                                    60

1   A.  No.    It wasn't a pizzeria, it was a grocery.

2   Q.  And prior to those job, sir, what was the previous job to

3   that?

4   A.  I was at a deli, which was located between 25th and

5   26th on Lexington Avenue.  The name of the place is Deli 71.

6   I would also stock soda, beer, and I also helped the young man

7   that worked with me at that deli.

8   Q.  So other than stocking the entire day, sorting the

9   refrigerator, what other responsibilities did you have at that

10  job?

11  A.  No.  Other responsibilities just stocking the soda, the

12  beers or whatever that I had to do there and helped my

13  co-worker whenever he needed it, but there was no other

14  responsibility.

15  Q.  And how many hours a day did you work at that job?

16          MR. ANDROPHY:  Objection.  These other jobs aren't at

17  issue.

18          MR. MOULINOS:  I was very specifically referring to

19  these stocking jobs, Judge.

20          THE COURT: I'll let you just ask a couple more

21  questions, put you're really way past the scope of cross-

22  examination.

23          MR. MOULINOS:  I'm testing his creditability, Your

24  Honor.

25          THE COURT: All right.  Well, I'll permit a little

Proceedings                                    61

1    more.  I understand where you're getting at, but let's not go

2    down too many side roads.

3              MR. MOULINOS:  Okay, Judge.  Fine.  I'll move to

4    another area quickly.  Can I have an answer to that question,

5    please?

6    A.  Can you repeat the question?

7    Q.  How many hours per day would he have his job stocking

8    soda, and you as a --

9    A.  I would work 10 hours.

10   Q.  Okay.  Now, let's get back to how you found this job that

11   is part of this lawsuit.  Tell us at what time did you first

12   enter the door of Zack's pizza, which is Hudson Side Cafe

13   property?

14   A.  I can't say exactly the time.  What do you want me to tell

15   the man.

16   Q.  Was it the morning, the afternoon, or the evening or the

17   night?

18   A.  No.  It was in the morning.

19   Q.  Was it the early part of the morning?  Was it in the later

20   part of the morning or what's your best recollection?  A.

21   No.  A little bit like close to noon.

22   Q.  Okay.  And the first time you entered, what did you say

23   and to whom?

24   A.  When I entered, I was in front of Mr. Juan Espinal, and I

25   asked him if they needed someone to work for them.

Proceedings                                                    62

1    Q.  And what else did you ask?

2    A.  I just asked -- I just asked that if they need someone to

3    work because I was searching for work.

4    Q.  And did Mr.  Espinal tell you something?

5    A.  Mr.  Juan Espinal told me leave me your information, and

6    when my boss comes, he said, I will give him your information,

7    and then if there is something, some work to offer you or give

8    you, I'll let you know.

9    Q.  Did Mr.  Espinal ask you what background you had in the

10   field?

11   A.  Yes.  He asked me what did I know to do.

12   Q.  And what did you say?

13   A.  My answer was -- I answered I know how to work on the

14   grill.  I know how to make different types of sandwiches.  I

15   know how to stock, organize, soda -- in this case, they sold

16   soda and juices.

17   Q.  Anything else?

18   A.  And what had to do with cleaning, which is what I did in

19   the previous business, as well.

20   Q.  Did you say you know how to make pizza?

21   A.  No.  At no moment did I say that I know how to make pizza.

22   Q.  Did you say that you could that you make deliveries?

23   A.  No.  I did not say that.

24   Q.  And how long did this first meeting last?

25   A.  Fifteen to 20 minutes while I gave my information.

Proceedings                                                63

1    Q.   So what else did you discuss in this 15 to 20 minutes

2    other than these few things you just mentioned?

3    A.   I had mentioned that I had passed by through various

4    locations, but still haven't had the luck of finding some

5    work.

6    Q.   And after you left this particular store, did you go to

7    knock at other doors in search of a job?

8    A.   Yes.

9    Q.   How many?

10   A.   I tell you that I was walking up to -- I walked to Queens

11   Plaza Street.   I got up to there.

12   Q.   So all together how many stores did you enter in search of

13   work on that particular day?

14   A.   I entered from five to six stores looking for work, and I

15   walked that whole street, and when I turned on this other

16   street, I just walked towards the train looking at what

17   businesses are there, but, then, I no longer entered looking

18   for work because I was already tired of searching for work.

19   Q.   So on that day, this particular store was the last door

20   you entered in search of a job; is that what I understand?

21   A.   It was not the last store, no.

22   Q.   I'm trying to understand.   How many stores did you go

23   enter before this particular one and how many after on that

24   particular day.   Can you give us the breakdown, please?

25   A.   I entered first were three stores before.   From there, I

Proceedings                                                        64

1    then went to the pizzeria.  From there, I went to the next

2    corner, which I believe is a restaurant, and then after there,

3    I went to a deli that was right before a restaurant where they

4    do Chinese food.

5    Q.  The next day, did you go to another place in search for a

6    job?  What happened the next day?

7    A.  No.  I no longer went to that area for work.

8    Q.  Did you go to another area for work?

9    A.  No.  I no longer went to another area for work because

10   previously I had already gone to other stores, other places,

11   and the only other thing left to do was wait at that time.

12   Q.  And "wait", you mean wait, maybe, possibly get this job?

13   A.  Not that job specifically, but wait for a call from

14   another place that I had dropped off my information at.

15   Whether it was this area, lower Manhattan, or in Jackson

16   Heights where I was searching.

17   Q.  And this job that you finally landed ended in April 24th,

18   2013.

19            THE INTERPRETER:  2015?

20            MR. MOULINOS:  Thirteen.

21            THE WITNESS:  2013.  Yes.  That's when I stopped

22   working.

23   BY MR. MOULINOS:

24   Q.  And why did you stop working at that location?

25   A.  I stopped working because this is when the accident

Proceedings                                                          65

1    happened.  I was a day-and-a-half at the hospital.  When I got

2    out of the hospital, I transported to -- I went home by taxi,

3    and I called Mr.  Khan Paru to talk about the situation

4    regarding him owing me a week of work and explaining that I

5    needed the money because I wasn't going to be able to go to

6    work, and since I have my family far from this country, and I

7    have to send them money.

8        And that's the reason I called Mr.  Paru to pay me what he

9    owed me.  As a matter of fact, after the day-and-a-half I was

10   in the hospital, the next day after getting home, Mr.  Paru

11   spoke to me.  That Mr.  Shahin wanted to speak to me and that

12   he was going to come to my house, to please be ready to

13   receive him.

14       And that's exactly happened, the gentleman came to the

15   house.  I spoke to him outside in the street because he did

16   not enter my home.  No.  And he told me not to worry, that he

17   was going to help me with everything he could, that they were

18   going to pay for that time I was out and questions of

19   recuperation and that he was go going to give me, pay me

20   weekly what he was paying me, and whatever I needed juice,

21   water, milk, food, whatever I needed, to let him know and that

22   he was going to bring these things to me.  As a matter of

23   fact, he was coming with his wife and told me not to worry,

24   that they were going to help me.

25   Q.  This meeting took place in the hospital or in your house?

WCR     OCR     RPR

Proceedings                                         66

1    A.  No.  In the street, outside of my house.

2    Q.  How long did this meeting last?

3    A.  More or less about a half an hour because I couldn't  stay

4    outside for too long because of the air or the particles that

5    could contaminate that part of my face.

6    Q.  And this meeting took place after you had been released

7    from the hospital or before?

8    A.  No.  After they discharged me from the hospital.

9    Q.  And that other conversation you had with Mr.  Paru from

10   the hospital, was it by telephone?

11   A.  In the hospital -- no.  When I had the conversation with

12   Paru is when I got out of the hospital, and it was by phone.

13   Q.  And how long did that conversation last in time?

14   A.  It could have been five, 10 minutes that would be a lot,

15   not long.

16   Q.  And these two meetings were in the Spanish language or in

17   English?

18   A.  No.  It was English because I've had already passed a few

19   months, and I tried to improve to speak and understand the

20   best as possible as I can.

21   Q.  So that conversation -- these two conversations you had

22   were in English?

23   A.  Yes.  Because they -- the gentleman don't speak Spanish,

24   and I don't speak their language.

25   Q.  However, two months before and three months before during

Proceedings                                                    67

1    your employment, at this location, you needed Mr. Espinal to

2    translate for you?  What happened for the three months?

3    A.  Yes.  Because I did not understand totally what they said.

4    I would understand part of what they were telling me.

5    Q.  Sir, you just testified for a half an hour you had a

6    rather sophisticated conversation in English regarding all the

7    benefits that Mr. Paru was going to provide you.

8    A.  Not Mr. Paru, it was Mr. Shahin.

9    Q.  Fair enough.  But you understood Mr. Shamim, correct? And

10   by the way, who is Mr. Shahin?

11   A.  Mr. Shahin, the name I don't know really what is his

12   name, but it was the man who came before me.

13   Q.  And did you know him as being a worker at the pizza place?

14   A.  Not as a worker, like owner.

15   Q.  As a what?  And by the way, did you have conversations at

16   the restaurant with Mr. Shahin before the accident?

17   A.  Not conversations, just arriving and greeting, and many of

18   them from their country now speak a little Spanish greeting

19   saying:  Hello, friend.  How are you? (Spoke in

20   Spanish/English) Exactly.  And that was just the conversation

21   I had with him or just what he would tell me.  That's all.

22   Q.  I'm trying to understand this, Mr. Oaxaca.  Why would Mr.

23   Shahin go for half-an-hour to visit you in the middle of the

24   street to discuss issues since you never spoke before in

25   essence?

Proceedings                                                    68

1            MR. ANDROPHY:  Objection.  Calls for speculation.

2            THE COURT:  It's sustained.

3            MR. MOULINOS:  Okay.  Let me rephrase, Your Honor.

4      BY MR. MOULINOS:

5      Q.  Do you have an idea why Mr.  Shahin would come to meet you

6      in front of your house in the street to discuss future

7      benefits to be provided?

8      A.  Yes.  I understand now why the man came to my house that

9      day.

10     Q.  And what did you understand?

11     A.  Now, I understand that he, perhaps, or I think that maybe

12     he was afraid for me to sue because of the injury I had in my

13     face.

14     Q.  Do you know if he's any owner of this Hudson Side Cafe

15     corporate entity?

16     A.  Yes.   With the people that I worked with days before the

17     accident, they told me that he was the owner.  He and Mr.

18     Paru were the owners of the business.

19     Q.  All right.  Let's go back to the first days that you got

20     this job.  Do you remember that day?

21     A.  What day?

22     Q.  The first day you started to work at the pizza place.

23     A.  Yes.  My first day of work, yes.

24     Q.  Okay.  So tell us what time did you arrive there.

25     A.  I arrived there at that job at seven in the morning.

Proceedings                                    69

1    Q.  Before you said it was close to the afternoon, now it is
2    seven in the morning.
3          MR. ANDROPHY:  Objection.  Mischaracterized his
4    testimony.
5          THE COURT:  It's sustained.  Are you talking about
6    the first day he went to the restaurant or the first day that
7    he worked at the restaurant?
8          MR. MOULINOS:  He worked at the restaurant.  Did I
9    miss something?  I apologize.  Withdrawn then.  Okay.
10         THE COURT: He didn't say that he arrived in the
11   middle of the afternoon.
12         MR. MOULINOS:  Then I misunderstood.  My apologies.
13   BY MR. MOULINOS:
14   Q.  So you arrived at seven o'clock that morning, correct?
15   A.  Yes.  To work at the time they told me to present myself
16   to work.
17   Q.  And that was roughly the second week of August 2012,
18   correct?
19   A.  Yes. The second week of August 2012.
20   Q.  And the one who greeted you there was Mr.  Juan Espinal?
21   A.  I was greeted by Juan Espinal and Mr.  Khan Paru who was
22   present at that moment.
23   Q.  So on that meeting, the first time you went to work, Mr.
24   Paru was present with Mr.  Espinal?
25   A.  Yes.  And Mr.  Alam, as well.

Proceedings                                                      70

1   Q.  And that was at seven o'clock that morning?

2   A.  Yes.  Those were the first two days that they were there

3   at that time.

4   Q.  Okay.

5   A.  Because afterwards, I would see them later.

6   Q.  Okay.  After this first day of work until April of 2013,

7   how many times ever did you see Mr. Paru be there at seven

8   o'clock in the morning?

9   A.  No.  None after that day, I never -- I would never saw him

10  at that time until the afternoon when he would arrive.

11  Q.  Then is there any reason that maybe you saw Mr. Paru that

12  morning at seven o'clock?

13  A.  Yes.  To give me the instruction of what I was going to do

14  as my job, what I to do.

15  Q.  And Mr. Paru spoke to you directly?

16  A.  He spoke to me directly, but since I did not understand

17  him, Juan Espinal was who translated what he was telling me.

18  Q.  You don't know what Mr. Paru said then, you only knew

19  what Mr. Espinal told you.

20  A.  Yes. exactly.

21  Q.  So let's take it one-by-one.  What did Mr. Espinal tell

22  you your duties were according to the supposed translation

23  from Mr. Paru?

24  A.  Okay.  Mr. Juan Espinal told me that my job was going to

25  be cooking, and little by little, he would teach me how to

Proceedings                                                  71

1    make the dough for pizza because I did not have any experience

2    in doing that.  And that -- well, the job I was going to do:

3    Cook fries; pizzas that were supposed to be combined for

4    whatever order was made.

5    Q.  What else did he tell you you were going to do?  That's

6    it?

7    A.  Yes.  That was all that I was told that I was going to do

8    at the beginning.

9    Q.  All right.  Let's take each one at a time, sir.  You

10   mentioned your job, primary job was cooking.

11   A.  Yes.

12   Q.  Cooking what?

13   A.  Cook hamburgers; making sandwiches.

14   Q.  I'm sorry.  What else?

15   A.  Cook, making sandwiches, frying fries, frying chicken

16   wings that were sold, and that was what I started doing at the

17   beginning.

18   Q.  Now, as far as you understood this conversation, you came

19   with experience in cooking or they were going to teach you to

20   cook these things?

21   A.  No.  I already had some experience cooking because I

22   repeat: I worked at a deli previously.  I worked at a grocery

23   where they only did sandwiches.  So I had -- that was the

24   little bit of experience that I had doing that.

25   Q.  Other than making sandwiches, what other cooking

Proceedings                                              72

1    experience did you have prior to that day?

2    A.  That was all my experience, making sandwiches; frying

3    French fries, hamburgers.  That was the only experience I had

4    regarding cooking.

5    Q.  Okay.  Fair enough.  And the understanding was Mr.  Paru

6    was going to teach you eventually to also do pizza, correct?

7    A.  No.  Not Mr.  Paru, put Juan Espinal commented that if I

8    wanted to learn how to make pizza and since I always want to

9    push forward in all the jobs I've had, he started little by

10   little how to make pizza; how to prepare the dough for the

11   pizza, the sauce for the pizza.  In the course of the months,

12   he taught me how to do that.

13   Q.  When Mr.  Paru was talking, did you understand any words

14   spoken in English?

15   A.  One -- another word, but not in total.  Not everything;

16   some words.  Because, previously, the owner of the deli where

17   I worked at was from the same place that they are from.

18   Q.  How do you know whether what Mr.  Paru had said was

19   accurate translation by Mr.  Espinal?

20   A.  Okay.  I think that what Mr.  Paru said and Mr.  Espinal

21   translated was true because whatever I responded to Juan

22   Espinal, he would tell Mr.  Paru, and Mr.  Paru would say

23   "yes".  That's why I think that they were saying the truth.

24   Understand?

25   Q.  Yes, I do.  There was never at that early day a discussion

Proceedings                                                        73

1    about making deliveries as part of your duties?

2    A.  No.

3    Q.  There was never any discussion about washing dishes that

4    day?

5    A.  That day, yes.  Regarding -- since the business just

6    started up again -- well, they told me depending on how the

7    day would turn out, I would help out the few dishes that would

8    come up and continue cooking.

9    Q.  Was there any discussion about cleaning at the end of the

10   day?

11   A.  Yes.  That there was.

12   Q.  Oh.

13   A.  That the business had to be cleaned.  Once you finished

14   your shift of work, leave everything clean and organized to

15   start up the next day.

16   Q.  So except for you, Mr. Espinal, and Mr. Alam, who else

17   was around to do the same functions?

18   A.  At the beginning there was this person from their same

19   country who was the person that helped us -- helped them --

20   make deliveries.  I don't know the person's name.  Honestly, I

21   don't know because the young man was there for a few days, and

22   I did not see him anymore.

23   Q.  So when you were hired, the job description was more

24   cooking and doing chicken and fries besides than doing side

25   peripheral work, such as, deliveries, cleaning, washing

Proceedings                                                    74

1    dishes, and whatnot; is that correct?

2    A.  Yes.  Exactly.  That is correct. Cooking.

3    Q.  So you were hired as an expert in food making?

4            MR. ANDROPHY:  Objection.  Expert characterization.

5            MR. MOULINOS:  As knowledgeable in food making.  I'm

6    sorry.

7            THE WITNESS:  Can you repeat the question?

8    BY MR. MOULINOS:

9    Q.  So the function for your being hired was to perform

10   substantive cooking functions and not peripheral work, such

11   as, cleaning, washing dishes?

12   A.  Yes.  Exactly.  It was just for cooking when they hired

13   me.

14   Q.  And the cooking was comprised of making sandwiches and

15   making hamburgers, correct?

16   A.  Of course.  Exactly.  French fries and whatever food that

17   was sold there.

18   Q.  What else was sold there?

19   A.  They sold fried chicken.

20   Q.  Except for frying the chicken, the French fries, what

21   other cooking did you do?

22   A.  Well, that was everything that I cooked:  Fries; chicken

23   wings; sandwiches; hamburgers.  That's what I would make

24   there.  That's what I was doing at the beginning.

25   Q.  And what sandwiches did you ever make there?

                      Proceedings                          75

1    A.   Sandwiches that were sold there, which turkey, cheese,

2    lettuce, tomato, mayonnaise.   There was other type of meats

3    that was sold.

4    Q.   Such as what other meat was sold?

5    A.   Roast beef, steak; what they sold.   From what I remember,

6    the sandwiches that were there.

7    Q.   The steak was part of a sandwich or was it grilled?

8    A.   No.   It was grilled.   You would prepare it on the grill.

9    Q.   And that was on the menu?

10   A.   It was on the menu, yes.

11   Q.   When is the next time after this first day that you met

12   Mr.  Paru?

13   A.   Specifically, when I encountered the man, no, but the man

14   would come to the business every afternoon.

15   Q.    Every afternoon?

16   A.   Yes, every afternoon.   I saw him until the day I stopped

17   working April 24th, 2013.   Yes.   When I finished April 24,

18   2013, that's when I stopped seeing him.

19   Q.   I'm going to repeat this to make sure we understand the

20   language, sir:   Everyday from the middle of August 2012 until

21   April of 2013, you saw Mr.  Paru at the store?

22   A.   Yes.

23   Q.   And how many hours each time?

24   A.   I'll repeat: There were times he would stay two hours,

25   three hours, up to four hours maximum, the man was there.

Proceedings                                          76

1    Q.  And what did he do when he was there?

2    A.  There were days that only for two hours, he would stay,

3    and then the man would leave.

4    Q.  Okay.  What did he physically do during those two to four

5    hours everyday for these months he visited the store?

6    A.  Well, the little I saw was him chatting with Juan Espinal

7    and Alam, and they would chat about the business; how it was

8    moving; how he wanted them to work; giving instructions of

9    work.

10   Q.  Would it be fair to say that Mr. Paru was socializing

11   with Mr. Alam and Mr. Espinal?

12   A.  No.  Not being -- it's not the answer you're saying.  No.

13   Because we were workers, and he would give the order of what

14   each of us had to do, but never that they were having some

15   type of -- how can I say, some type like if they were

16   associating or they were business partners, no.

17   Q.  Okay.  Then let's see if I understood you correctly.  Mr.

18   Paru for two to four hours would give orders to whom?

19   A.  To who?  He would talk to Mr. Alam.  He would talk to --

20   he would chat to Mr. Espinal, and then Espinal would call me

21   to tell me what he wanted to me, what he wanted me to do

22   through him is how he told me.

23   Q.  Then for the rest of the hours that you worked, how would

24   you know what you had to do when Mr. Paru was not there?

25   A.  Because he would leave the instruction every afternoon he

Proceedings                                                    77

1   would come.  He would say for tomorrow we're going to do this

2   and this.  Whatever was done in the restaurant.

3   Q.  And when Mr. Paru was no there, who gave you any

4   instructions, what to do for that day?

5   A.  No one would give me instructions because the day before

6   when he would arrive, he would give the instructions and, one,

7   as a worker would already know what you had to do.

8   Q.  All right.  So let's see if we got the math together.

9   Your shaft was for seven o'clock in the morning until 11

10  o'clock at night; is that correct?

11  A.  Yes.

12  Q.  That would make it 11 plus five -- 16 hours a day

13  religiously working at this store everyday of the week; is

14  that correct?

15  A.  It's correct.  Yes.

16  Q.  Mr. Paru visited, according to your testimony, between

17  two and four hours everyday.  Are we correct so far?

18  A.  Can you repeat it again to be able to understand it

19  correctly?

20  Q.  Mr. Paru visited everyday the store between two to four

21  hours.

22  A.  Yes

23  Q.  Let's assume the maximum of four hours; if we subtract a

24  16-day shift from four hours, that makes it 12 hours he was

25  not there.

Proceedings                                           78

1    A.  Yes.  He wasn't.

2    Q.  Can you tell us what instructions were given to you for

3    things to do for 12 hours everyday of the week?

4    A.  Okay.  The instructions he gave me was to cook, to

5    perform the best as possible because based on that, that's how

6    they were going to get the clients and that everyday we should

7    leave clean everything that was not used so that the next day,

8    we could start the day.  Everything clean.

9    Q.  So everyday, he had too repeat the same message during

10   these two to four hours.

11   A.  He wouldn't repeat everyday.  He -- the order he would

12   give was to be done everyday, and, one, as a worker, I'll

13   repeat again:  You would do the performance and already knew

14   what was the job you had to do.  It wasn't necessary for me to

15   be told everyday cook this, clean there, no.  Because I

16   already knew what my obligation was as my job.

17   Q.  Isn't it true that you rarely saw Mr. Paru and you're

18   manufacturing on the stand this scenario today, sir?

19           MR. ANDROPHY:  Objection.  Argumentative.

20           THE COURT:  I'll permit this one question, but I'll

21   draw my credibility findings myself.  You can answer that

22   question.

23           THE WITNESS:  Where do you want me to start?  Yes.

24   Can you repeat the question again?

25   BY MR. MOULINOS:

Proceedings                                                    79

1    Q.  Yeah.  I will rephrase it.  How many times did Mr.  Paru
2    have to give instructions to you to repeat the same thing over
3    and over again over the months?  I'm just trying to get an
4    answer to that?
5    A.  What he would tell me some two to three times a week, he
6    would tell me what had to be done.
7    Q.  That's it?
8    A.  Yes, that's it.  Of course, in the passing of the days
9    when I started to cook fried chicken, he would tell me the
10   manner on how to wash the chicken, how to prepare the chicken,
11   so as to then cook it afterwards.
12   Q.  That was in English or Spanish?
13   A.  No.  That was in English through the translation of Mr.
14   Juan Espinal.
15   Q.  In other words, Mr.  Espinal had an additional function at
16   this job, translating Mr.  Paru for you, correct?
17   A.  Regarding translating, yes.  Because regarding work, each
18   one knew what they had to do, and he did not give me
19   instructions of anything.
20   Q.  If I understood you correctly, when Mr.  Paru was not
21   there at the store, you had no boss, correct?
22   A.  I did not have a boss you can say in quotations because no
23   one gave me orders because I already knew because the order
24   was given to me previously by him, and I knew he was my boss.
25   Q.  And Mr.  Espinal never gave you an order outside of Mr.

Proceedings                                                80

1    Paru; is that your testimony?

2    A.  No.  Mr.  Juan Espinal did not give me any order when Mr.

3    Paru was not there.

4    Q.  How about Mr.  Alam, did he ever give you any order during

5    these six to eight months?

6    A.  No.  No order.

7    Q.  How did you know where you had to go to make deliveries?

8    A.  When I started doing deliveries when they told me I was

9    going to start to do deliveries, it was really hard for me

10   because I really did not know the area of that area, Long

11   Island City.  It took me a week to learn part of the streets

12   so that I would be able to do the deliveries.

13       As a matter of fact, there were days, sometimes I would

14   bring back the deliveries because I would take too much time

15   because I couldn't find the address.

16   Q.  Sir, my question was who gave you the order to make a

17   specific delivery?

18   A.  Well, in this case, Mr.  Juan Espinal would tell me here's

19   the delivery that has to be done.  He would give me the

20   address, the number, the information of the house, and that's

21   how I would go.

22   Q.  And when Mr.  Paru was not there, how would you know how

23   much fried chicken to make for a specific order?

24   A.  Because he -- I'll repeat -- he would come everyday, and

25   he would tell me what was the procedure of cooking and the

Proceedings                                                    81

1    amount that would be placed in the fryer.

2    Q.  For the rest of the 12 hours for the day, correct?

3    A.  Yes.  For the other 12, he would give me the instructions.

4    I'll repeat, it wasn't necessary for him to tell me everyday,

5    two, three times a week, what had to be done.

6        When I started cooking the fried chicken, yes, everyday,

7    he would tell me, no.  If he saw me make a mistake, he said,

8    no, wash it like this or like this that or like that that.

9    Q.  So if I went into a Zappo's(Phonetic) Pizza and I ordered

10   fried chicken, would I be seeing you or would I be seeing Mr.

11   Juan Espinal or Mr.  Alam?

12   A.  No.  Mr.  Juan Espinal and Alam were the ones in the front

13   part assisting people.

14   Q.  So would they tell you what to cook?

15   A.  Yes.  They would pass over the order to me.  They would

16   say there's an order for hamburger that will have lettuce and

17   tomato, ketchup.

18   Q.  So isn't it fair to say that throughout the day that all

19   of the orders that you filled had came from Mr.  Alam and Mr.

20   Espinal?

21   A.  Can you repeat the question, again?

22   Q.  Throughout the day when orders needed to be filled, these

23   were given to you either by Mr.  Espinal or Mr.  Alam; isn't

24   that correct?

25   A.  Yes.  He would pass me the paper or the note where he

Proceedings                                                              82

1    would write down the delivery and what he wanted me to do.

2    Q.  I thought you were a cook of chicken.

3    A.  I'll repeat:  I would cook hamburgers, fries.  I would

4    cook fried chicken.

5    Q.  And who would tell you what to cook, Mr.  Paru or the

6    other two gentlemen?

7    A.  I don't understand the question regarding what to cook;

8    what are you referring to?

9    Q.  I'm trying to understand what Mr.  Paru instructed you to

10   do for 12 hours when he was not there.  What cooking did you

11   do pursuant to his orders?

12   A.  No.  What he would tell me, you have to do the job right.

13   I'll repeat again:  You have to do job well.  Whatever the

14   guys ask you for deliveries, you have to do it as fast as

15   possible, the best possible, because that way we will have a

16   lot of clients.

17   Q.  Did that happen between two to four hours on a daily

18   basis, correct?

19   A.  How?  The instruction the man was giving?  I don't

20   understand.

21   Q.  Yeah.  That's exactly right.

22   A.  Yes.  The instructions, but not the four hours, the three

23   hours, or the two hours was he on top of me.

24   Q.  And the conversation with Mr.  Paru was uniformly went

25   through the translation of Mr. Espinal?

Proceedings                                                    83

1    A.  He would translate with the three people present.

2    Q.  And Mr.  Espinal speaks English well; is that correct?

3    A.  He doesn't speak -- well, from what I know, he doesn't

4    speak good, good, but he would translate what Mr.  Paru would

5    tell him.

6    Q.  And how do you know the translation was accurate?

7    A.  Well, I'll repeat once again:  When he would tell me what

8    Mr.  Paru was saying and I would answer Juan, any answer that

9    I gave, Mr.  Paru would say it's fine.

10   Q.  All right.  Let's move to another area, Mr.  Oaxaca.  The

11   business was transacted, essentially, in cash; is that

12   correct?

13   A.  Yes.  Correct.

14   Q.  And you were paid daily or weekly in cash?

15   A.  Weekly in cash.

16   Q.  What day was the payment made to you?

17   A.  Saturdays or Sundays.

18   Q.  At what time, if any?

19   A.  Yes.  There was a time, before closing the business;

20   before starting the cleanup.

21   Q.  And if you worked up to 11 p.m. everyday of the week,

22   roughly what time was the cash payment made to you for the

23   weekly salary on a Saturday or a Sunday?

24   A.  Saturday, Sunday, more or less 10 o'clock in the night.

25   That's when he would pay me.

Proceedings                                                        84

1   Q.  So Mr.  Paru was at the store every Saturday or Sunday at
2   10 p.m.; is that correct?
3   A.  Yes.  He would come and give me what my payment was
4   because he would pay me directly.
5   Q.  And, also, he was at the store every two to four hours in
6   the afternoon everyday?
7   A.  Yes.
8   Q.  Why would he have to come back at 10:00 p.m. to give you
9   the salary when he was there at 2:00 p.m.?
10  A.  Okay.  He had to return because he had to put together --
11  well, I don't know specifically if what he put together in the
12  course of the night before closing if that's what he paid me
13  with, I can't specify.
14  Q.  But he was there religiously every Saturday or Sunday at
15  10:00 p.m.?
16  A.  Yes.  To give me what was mine.
17  Q.  And he paid $600 every week from day one to April 2013.
18  A.  Until -- yes, exactly.  Until April 24 when I left.  Well,
19  when my accident happened.  That's when he paid me.
20  Q.  Now, was the 600 given ordinarily in hundreds or something
21  else?
22  A.  No.  The bills would vary.  He would not always give me
23  $100 bills; dollars; ten's; 20's.  That's why I was saying I
24  don't know if he was taking it all from the register or he
25  brought some from someone else.  I don't know.

Proceedings                                                    85

1    Q.  Now, let's make sure I understood you right.  From day to

2    the last day of work, it was always at $600 a week for the

3    hours of 7:00 a.m. to 11:00 p.m.; correct?

4    A.  Yes.  The payment he gave me up to the last day, yes.

5    Q.  I understood earlier you said that around January 2013,

6    Mr.  Paru slashed your hours in half.

7            MR. ANDROPHY:  Objection.  Mischaracterizes

8    testimony.

9            THE COURT: Did he reduce your hours?

10           THE WITNESS:  Well, no, he did not tell me this

11   before -- well, the attorney did not say this before until I

12   heard him now and, precisely, Mr.  Paru cut my hours at the

13   end of the month of January up to the 24th of April when I

14   stopped working at that place.

15   Q.  So what hours did you work then after January 2013?

16   A.  After January, he gave the schedule 10 to the morning to

17   11 at night.

18   Q.  So there was a reduction of only three hours; is that it?

19   A.  Yes.  Three hours from work were cut.

20   Q.  And the salary stayed the same?

21   A.  Yes.  It stood the same.  He cut my hours because I asked

22   him for a raise, and he said, you know what, I'll cut the

23   hours of work.

24   Q.  I didn't hear the last answer.  I'll cut the hours in

25   half?

Proceedings                                                    86

1   A.  I'll cut the hours of work.

2           THE COURT: I'll cut the hours of work.

3           MR. MOULINOS:  Oh, okay.

4   BY MR. MOULINOS:

5   Q.  Do you have any records, anything in writing, showing your

6   version of the hours that you worked at this place?

7   A.  No.  Written, I have nothing.  Everything was orally  from

8   the day I entered and was hired, it was all orally.  There was

9   no contract.  That's why I don't have no paper that would say

10  that I worked this hour to this hour.  I don't have any paper.

11  Q.  And the days that you worked at this pizza place, who else

12  worked with you if anyone?

13  A.  What day specifically or what time are you trying to tell

14  me?

15  Q.  Everyday of the week from August 2012 to April 2013.

16  A.  No.  Until the day that Mr.  Alam, another worker from

17  their same country arrived, and when Mr.  Juan Espinal left,

18  the sister of Mr.  Paru came to work, Mr.  Paru's niece, and

19  another -- how can I say -- from their country.

20  Q.  All right.  Let's rephrase it slightly.  Can you tell us

21  as far as you recall, Mr.  Espinal worked with you from when

22  to when?

23  A.  When I entered to work, he worked with me up to February.

24  I remember correctly the first week of February, he stopped

25  working with me.

Proceedings                                                87

1   Q.  So was he with you everyday of the week?

2   A.  Everyday of the week, Juan Espinal was there, and Mr.

3   Alam.  We were the three ones who worked there until Alam

4   left, and then until Juan Espinal left.

5   Q.  All right.  You told us when Mr. Espinal left, the first

6   week of February 2013?

7   A.  If I remember correctly the first or second week, but it

8   was in February, the beginning of the month.

9   Q.  Fair enough.  And when did Mr. Alam left the pizza place?

10  A.  Alam left, if I'm not mistaken, in the month of October.

11  Q.  Of 2012.

12  A.  Of 2012, yeah.

13  Q.  So he was there roughly August, September, and the middle

14  of October, correct?

15  A.  Yes.

16  Q.  Do you know why Mr. Alam left?

17  A.  No.  I'm not aware of the motive why he had left.

18  Q.  Are you aware why Mr. Espinal left?

19  A.  No.  I don't know that either because I'm not used to

20  asking the motives, why they left, this and that.  I just

21  dedicate myself --I only worry about what's mine.

22  Q.  And when in February 2013 Mr. Espinal left, how did you

23  communicate with Mr. Paru?

24  A.  I said it before, and I'll repeat it again:  With the

25  passing of the months, I made myself able because I did not go

Proceedings                                                      88

1    to school, made myself able to speak -- to study English with

2    some books that I have at home, and that is why I learned to

3    communicate with Mr. Paru, and Mr. Paru, when he would

4    speak to me, some words here and there, he would say in

5    Spanish, so that he would help me understand.

6    Q.  Oh, let me see if I understand:  Did you say you started

7    listening to tapes to learn English?

8            MR. ANDROPHY:  Objection.  Mischaracterizes.

9            MR. MOULINOS:  I misunderstood what he said.

10       THE COURT:  He didn't say that.

11   BY MR. MOULINOS:

12   Q.  Could I get -- how did he start learning English, the

13   books he said or something like that?

14   A.  Yes.  Books and with the passing of days listening to

15   people and asking as well as with friends what does this word

16   mean or how can I pronounce this word.  That's how I learned

17   the little bit that I've learned til now because the majority

18   of jobs I have been with, you can say -- how do you say with

19   people who speak my language.

20   Q.  But didn't you say you started using books to learn the

21   language; did I understand you right?

22   A.  Yes.  I started -- I'll repeat again.  I used books with

23   the help of friends that I would ask questions to -- how do

24   you say "X" word.

25   Q.  And this would be a systematic method of learning English?

Proceedings                                                              89

1          MR. ANDROPHY:  Objection.

2          THE COURT: Why don't you rephrase, Mr.  Moulinos.

3          MR. MOULINOS:  All right.  Let me get to point

4    quickly.

5    BY MR. MOULINOS:

6    Q.  When did you find the time to read books to learn English?

7    A.  When I would get -- once my -- once I would finish my time

8    at work, I would stay awake one, two hours, not everyday to

9    study a bit these books.

10   Q.  So you would come out of work at 11 o'clock at night --

11   how long did it take you to get home?

12   A.  Yes.  Travel home, I would take half an hour.

13   Q.  And at home, 11:30, let's say, you would start reading

14   books to learn English?

15   A.  No.  Not precisely 11:30.

16   Q.  What time?

17   A.  I would start 12, 12:30.

18   Q.  And then you would say one, two hours whenever you studied

19   to learn English?

20   A.  Yes.  I would stay.  As a matter of fact, I would finish

21   very tired because of the shift at work, and sometimes I would

22   end up just falling asleep with the book on my chest.

23   Q.  And then seven o'clock in the morning, you'd be back at

24   work in order to do your usual functions?

25   A.  Yes.

Proceedings                                                      90

1    Q.  And when did you start this mode of study?

2    A.  I started studying the books when I started working at the

3    deli -- I'm sorry -- at the grocery that's located on 37th

4    Avenue and Ninth Street.  There I met a friend who told me

5    that I should learn English, and he was the one that brought

6    me those books.

7    Q.  Have you worked after the accident?

8    A.  After the accident -- after a month-and-a-half that I was

9    home without working, yes, I started working because I saw the

10   need to support my family and support myself from my expenses.

11   Q.  Oh, are you married?

12            MR. ANDROPHY:  Objection.  Relevance.

13            MR. MOULINOS:  Creditability is the issue here.

14            THE COURT: I'll permit that question.

15   BY MR. MOULINOS:

16   Q.  Do you have a family, sir?

17   A.  Yes.  I have family far from here.  They are in Mexico.

18   Q.  Do you have any family here living with you on a daily

19   basis?

20   A.  No.  That live with me daily, I don't have family.  I have

21   brothers who are in Connecticut.

22   Q.  Okay.  And what is the next job you found after the

23   accident?

24   A.  The next job I found was a bakery that presently is where

25   I'm working now.

```
                        Proceedings                      91
```

1    Q.  And what do you do there?

2              MR. ANDROPHY:  Objection as to relevance.

3              MR. MOULINOS:  I'm finishing it up, Judge.

4              THE COURT: Just finish it up quickly.

5    BY MR. MOULINOS:

6    Q.  Okay.  What do you do there, sir?

7    A.  I started cooking like pastries filled with fruit, and

8    then the opportunity presented itself for me to cook bagels.

9              MR. MOULINOS:  Okay.  No further questions, Judge.

10             MR. ANDROPHY:  Brief redirect.

11             THE COURT:  Okay.  Let's finish up, then.

12   REDIRECT EXAMINATION

13   BY MR. ANDROPHY:

14   Q.  You testified you worked at a deli in Jackson Heights

15   before working at Papo's Chicken, correct?

16   A.  That I work previously at a deli?

17   Q.  Yes.

18   A.  Yes.  My last job -- well, before the deli, it was a

19   grocery, and from the grocery, I went to -- I found that job

20   at the pizzeria.

21   Q.  Okay.  Thank you for that correction.  That last job

22   before at Zack's Pizza and Papo's Chicken, was that the job in

23   Queens?

24   A.  Yes.  It was in Jackson Heights.

25   Q.  And how long did you work there?

Proceedings                                                    92

1   A.  For four-and-a-half years I worked at that grocery.

2   Q.  Okay.  Thank you.  Now, when you worked at Papo's Chicken,

3   did your job regularly change from day-to-day or did it stay

4   the same?

5   A.  Yes.  With the passing of the days, my job changed a lot,

6   what my responsibilities were.

7   Q.  Okay.  You gained more responsibilities?

8   A.  Yes.  More responsibilities were given to me, yes.

9   Q.  When the customer came and let's say ordered fried

10  chicken, did you need to be instructed every time on how to

11  make the fried chicken?

12  A.  No.  Because since I kept getting experience at the

13  beginning, yes.  They gave me instruction, but with the time,

14  I gained experience, so I no longer needed anyone to make it.

15  Q.  When Mr. Paru Khan would come to the restaurant,

16  approximately how much time would he spend with you?

17  A.  With me, you could say 15 -- 10, 15 minutes while he gave

18  me instructions through Mr. Juan Espinal who would help me

19  with the translation, and that would be the time that I would

20  be standing next to them.

21          MR. ANDROPHY:  Okay.  Thank you. I have no further

22  questions.

23          THE COURT: Thank you.  I think this is probably a

24  good time to take a lunch break.

25          MR. MOULINOS:  Judge, may we leave our stuff here?

Proceedings                                                      93

1            THE COURT: Yes, you may.  And if there's anything
2      valuable that you need, we can lock it in the closet.
3            MR. MOULINOS:  No just papers.
4            MR. ANDROPHY:  I'm okay.  I'll trust no one will run
5      off with the computer.
6            THE COURT:  Okay.  Or we can even lock the courtroom,
7      and then you can report to chambers, and we'll unlock or if
8      you want to leave it opened, that's fine.  It's up to you.
9            MR. MOULINOS:  What time do you want us back, Judge?
10           THE COURT:  I'll give you until 2:30.
11           MR. MOULINOS:  Whatever you say goes.
12           THE COURT:  I eat in chambers so I'm happy with a
13     short of time as the rest of you can live with.
14           MR. ANDROPHY:  2:30.  And if we're here before, we'll
15     let the Court know.
16           MR. MOULINOS:  Okay.
17           THE COURT:  That's fine.
18           MR. MOULINOS:  Thank you.
19           (Whereupon, the lunch recess was taken at this time;
20     1:20 p.m; thereafter, court resumed as follows:)
21           (Continued on the following page.)
22
23
24
25

Proceedings                                                  94

1

2                    AFTERNOON SESSION

3           (In open court.)

4           (Judge MARILYN D. GO enters the courtroom.)

5           THE COURT:  All right.  Are we ready to proceed?

6           MR. ANDROPHY:  Yes.

7           Just one housekeeping matter we were discussing just

8    before.  I wanted to know if Your Honor has any sense of if

9    you intend to, at the end of trial, rule from the bench or if

10   you would want us to submit any post-trial briefs or order a

11   transcript.  We want to know so we can order the transcript in

12   sufficient time that it suits all your purposes and at the

13   same time, both sides, if the transcript is not needed

14   immediately, would rather save a little money.

15           THE COURT:  Sure.  If I feel I need post-trial

16   briefs and proposed findings of fact, I will give you enough

17   time to order the transcript at a leisurely pace and I think

18   our court reporters would appreciate that, too.  So, we will

19   discuss this again tomorrow.

20           I assume we are on schedule for completion tomorrow?

21           MR. ANDROPHY:  I would expect, so.

22           THE COURT:  Okay.  Then let's proceed.

23           MR. ANDROPHY:  Plaintiffs call Mr. Alam.

24           (Witness takes stand.)

25           THE COURTROOM DEPUTY:  Please, raise your right

VB        OCR        CRR

```
                         Proceedings                    95
```

1    hand.

2    **H A L I B U L    A L A M,**

3                  called by The Plaintiff, having been

4                  first duly sworn, was examined and testified

5                  as follows:

6                  THE COURTROOM DEPUTY:  Please, state your name for

7    the record.

8                  THE WITNESS:  Halibul Alam.

9                  THE COURTROOM DEPUTY:  Thank you, have a seat.

10   DIRECT EXAMINATION

11   BY MR. ANDROPHY:

12   Q    Good afternoon, Mr. Alam.

13   A    Good afternoon.

14   Q    Do you know the gentleman Mohammed S. Kabir who testified

15   earlier today?

16   A    Yes, I know him.

17   Q    And how do you know him?

18   A    I used to selling the fruit and vegetables in the

19   40th Street and Queens Boulevard under the subway.  So, he's

20   my customer, he's always come.  And sometimes coming to buy

21   the fruits of me.

22   Q    Did you ever discuss with him your business?

23   A    No.

24   Q    Did he ever discuss with you businesses that he was

25   involved in?

Proceedings                                                                96

```
 1    A    Yes.  He always ask for me, he has two, three business
 2    here, he always tell me about the one, is I think two business
 3    Brooklyn, one in the Vernon Boulevard in Points.  He always
 4    tell me about that business.
 5    Q    Is the business he discussed with you on Vernon
 6    Boulevard, is that the Hudson Side Cafe business?
 7    A    Right.  Papo's Pizza and Papo's Fried Chicken.
 8    Q    And when was the first time he spoke with you about the
 9    Papo's chicken business?
10    A    He -- I know -- he always tell me he has a business, so
11    that's -- I didn't know his business.  But like a before, like
12    end of the 2012, I know he has a business.
13    Q    Did there come a time --
14    A    Sorry, no end of the, beginning of 2012.
15    Q    Okay.  Did there come a time that you had discussions
16    with him about you possibly going to work for Papo's Chicken?
17              MR. MOULINOS:  Objection.
18    A    He always need to look for the good person, nice person
19    to work for him.
20              THE COURT:  Overruled.
21    A    So he saw like, how I treat my customer.  That's why he
22    always offer me to work for him.
23    Q    Do you recall when the first discussion was that you had
24    with Mr. Kabir about working for Papo's Chicken?
25    A    Like June.  2012.
```

Proceedings                                                97

1    Q     And where was that conversation?

2    A     That's my fruit stand.

3    Q     Was anyone part of that conversation?

4    A     No, only me and him.

5    Q     And do you recall what he said to you?

6    A     He say his store not doing too good, around the business

7    that people no were good.  So, he say I need a good person to

8    work for me, so can you find out, you and other people for me.

9    Q     And describe what kind of work he would want you to do.

10   A     Like, pizza and like, fried chicken and selling like,

11   salad, coffee, everything.

12   Q     Did you have another meeting with --

13            MR. ANDROPHY:  Strike that.

14   Q     Did you have another discussion with Mr. Kabir at any

15   point about working at Papo's Chicken?

16   A     No, no anywhere.

17   Q     So, what happened next regarding you possibly working at

18   Papo's Chicken?

19   A     He take me to -- one day he say -- I say I don't know

20   what.  One day he take me to his store and he show me how they

21   working, the people.  So, then at that time I saw the people

22   working in the -- like, without gloves, lot of dirty things.

23   So I tell him the people really was no good.  So, after that,

24   he offer me to please help to me and come to work here,

25   please.

Proceedings                                                      98

1    Q    Did there come a time that you began to work at

2    Papo's Chicken?

3    A    After that, I think Health Department problem shut down

4    they store.  So, he come to me to my fruit stand to tell me to

5    please come work my store.

6    Q    And then what happened next with regard to you working at

7    Papo's Chicken?

8    A    Yeah, then I start working there like June, July, August,

9    middle of the August, I was start working with him.

10   Q    Did you have any more discussions with him before you

11   started working?

12   A    No.  I have only talk with him the how, how many hour,

13   what I do.  That the work I talk to him.

14   Q    Did you have discussions with anyone else before you

15   started working at Papo's Chicken?

16   A    Before that one guy, the Paru, he's also there.

17   Q    So, did you meet with Paru separately --

18   A    No.

19   Q    -- or together with Mr. Kabir?

20   A    No, together.  He bring him to my fruit stand.

21   Q    Do you recall when that meeting was?

22   A    Like June.  The end of the June, I think.

23   Q    And did you meet with Mr. Paru any other times before you

24   started working?

25   A    No.

Proceedings                                                    99

1    Q    You mentioned you had a fruit stand in Queens.  When did
2    you start operating that fruit stand?
3    A    2007.
4    Q    When did you stop operating that?
5    A    Before I go work in the chicken.
6    Q    Okay.  Was it like a day before, a week before?
7    A    No, like weeks two weeks before.
8    Q    Okay.  So, do you recall what your first day of work at
9    Papo's Chicken was?
10   A    Excuse me?
11   Q    Do you recall the date or the month that you started
12   working at Papo's chicken?
13   A    The middle of the August, I think second week of the
14   August.
15   Q    And did you meet with anyone on your first day at
16   Papo's Chicken?
17   A    Yes.
18   Q    Who did you meet with?
19   A    The Paru is there.
20   Q    And what, if anything, did you discuss with Paru when you
21   started working?
22   A    No, because the nearest store, I go near there so they
23   can show me how I work, what I work, what I do.
24   Q    Was anyone else there?
25   A    At that time, the other co-worker, like, Espinal, Juan

Proceedings                                                    100

1    Espinal at that time.

2    Q    Had he been working at Papo's Chicken before or was that

3    also his first day?

4    A    No, we start together, same thing.

5    Q    You mentioned the Health Department had closed down the

6    restaurant.  Do you recall when that was?

7    A    Before we join there.  After, they have a new inspection,

8    and thing pass.  Then we start work.

9    Q    Do you know if the restaurant had any renovations before

10   you started?

11   A    When the Health Department shut down.  So that time

12   they're doing little bit renovation inside, the owner doing

13   this one.

14   Q    Did you pay for any of those renovations?

15   A    No.

16   Q    Did you oversee those renovations?

17   A    No.

18   Q    Did you direct how those renovations would be carried

19   out?

20   A    No.

21   Q    Did you ever discuss with Mr. Kabir any other businesses

22   that you were involved with?

23   A    No.

24   Q    Did you ever, were you ever a partner in the business in

25   a catering business?

```
                        Proceedings                    101
```

1    A    Never, ever.

2    Q    Were you ever a partner in any business with your nephew?

3    A    No.

4    Q    Did Mr. Kabir ever tell you that you would be purchasing

5    the business of Papo's Chicken?

6    A    No.

7    Q    Did Mr. Khan ever say anything like that?

8    A    No.

9    Q    When you began working at Papo's Chicken, did anyone

10   discuss with you the hours that you would work?

11   A    The payroll man coming, he's tell me what time we open,

12   what time we close.

13   Q    Did Paru discuss with you what you would be paid?

14   A    How much getting I'm?

15   Q    How much you would be paid?

16   A    He's tell me the beginning he give the 350 and the

17   business going up, so he giving more money to my salary.

18   Q    Were you paid 350?

19   A    Yes, wage.

20   Q    And is that $350 per week?

21   A    $350 per week, yes.

22   Q    Did your pay ever change?

23   A    Excuse me?

24   Q    Did your pay ever change while you worked at Papo's

25   Chicken?  Did the amount of your pay ever change?

Proceedings                                                    102

1    A    That's a fixed amount they pay me, but they pay me like,

2    you know, mixed money to always to keep me there, in the

3    envelope every week.

4    Q    Okay.  Were you paid the same amount each week?

5    A    Yes.

6    Q    Did you ever ask for a raise?

7    A    Went little bit, so then I ask them.  They don't address

8    me, then I left the store.

9    Q    And when was that?

10   A    October, middle.

11   Q    Of what year?

12   A    2012.

13   Q    How were you paid?

14   A    How they pay?

15   Q    Was it check or cash?

16   A    Cash.

17   Q    When you were paid, did you receive any statement of how

18   much you were being paid?

19   A    No.

20   Q    What hours did you typically work at the restaurant?

21   A    I work like, 7:00 in the morning and like, 11:00 the

22   night.

23   Q    What days did you work those hours?

24   A    I work six days.

25   Q    Which day of the week did you not work?

Proceedings                                      103

1   A     Saturday I'm not work.

2   Q     Did your hours change during the time you worked there?

3   A     No, because I working like, two months there and they

4   never change my hour.

5   Q     What was your job at Papo's Chicken?

6   A     I do mostly the counter work like, make salad, coffee and

7   take the money, too.  Cashier job.

8   Q     What did you do as the cashier?

9   A     I take the money to customer pay me the food, they buy

10  it.

11  Q     What would happen with the money that would be in the

12  cash register?

13  A     Like after 3:00 o'clock, I sat down make a G, and how

14  much money I make a money to lunch.  I put in the one in

15  envelope and mark down how much there, and I keep in the draw.

16  My boss coming, I give him.

17  Q     So, what would you do with the envelope?

18  A     I keep it, the money in the envelope, to wait for my boss

19  to come and pick the money.

20  Q     Okay.  And then would anything happen in the evening with

21  the money in the cash register?

22  A     No.  And we also, same way I do, and keeping the money

23  for next day.  He pick it up, that money, also.

24  Q     When you say your boss would pick it up, who are you

25  referring to?

Proceedings                                                    104

```
 1    A    My boss in the Paru that time is around the business.
 2    Q    How often would he come to the restaurant?
 3    A    Most probably, every day.
 4    Q    Usually, around what time would he come to the
 5    restaurant?
 6    A    Like afternoon, evening.  Most of the time afternoon,
 7    evening.
 8    Q    And how long would he stay at the restaurant?
 9    A    One, two hours.  Sometimes less, sometimes more.
10    Q    Okay.  What would he do at the restaurant?
11    A    He coming, he check the all the stuff coming, what's
12    coming store, everything he check and how much money we make
13    morning to afternoon.  He check everything.  And how we cook,
14    how much food we have.  Next, there were any to order.  So, he
15    fix everything.
16    Q    Were there other people who worked at the restaurant when
17    you did?
18    A    So, when I start that time, other guy work also with us.
19    He's from Bangladesh guy.  His name, I think, Shamin.  He stay
20    like, two weeks, then he left.
21    Q    So, two weeks when you started?
22    A    After I start, then I saw him two weeks.  Then after
23    that, I don't see him any more.
24    Q    Okay.  Did anyone else work with you when you started?
25    A    Yeah.  I work with the Juan Espinal and the other guy,
```

Proceedings                                                        105

1    this guy, Carlos Oaxaca.

2    Q    Okay.  Was Carlos there on your first day?

3    A    No.  He coming like, I think one, two days after.

4    Q    Okay.  What was Mr. Espinal's job at the restaurant?

5    A    He making pizza and take the order for the people to the

6    coming to order for us.

7    Q    Did you know Mr. Espinal from before Papo's Chicken?

8    A    No, we working together.  So, before that one day we work

9    together, that's why I knew him.  So I selling the fruits,

10   sometimes he is in the driving van, so help me to the, bring

11   the fruits and help me little bit.

12   Q    Had you ever been business partners with Mr. Espinal?

13   A    Never, no.

14   Q    Did you ever form any corporation --

15   A    Nothing.

16   Q    -- with Mr. Espinal?

17   A    No.

18   Q    When did you first meet Carlos Oaxaca?

19   A    I think first week in the when we start the work.

20   Q    Did you decide how much Carlos would be paid?

21   A    No.

22   Q    Do you know who decided that?

23   A    Paru.

24   Q    Did you pay Carlos?

25   A    Never.

Proceedings                                                    106

1    Q     Were you in charge of Carlos?

2    A     No.

3    Q     Did you tell him when to come in and when to leave?

4    A     No.

5    Q     And what were Carlos' responsibilities in his job?

6    A     So, because we working like a crew worker.  He's doing

7    his job, I do my job and Oaxaca do one job.  So, that's all we

8    do.

9    Q     So, what was Carlos' job?

10   A     Carlos work making the kitchen side.  He doing like the

11   fried chicken and making the sandwich, the burger.  And Juan

12   Espinal making the pizza and taking the order for customer.  I

13   making the salad, coffee and the register money.

14   Q     Were you in charge of supervising either Mr. Espinal or

15   Mr. --

16   A     No, no.

17   Q     -- Oaxaca?

18   A     We don't have any supervisor at that time.

19   Q     Did either of them supervise you?

20   A     No.

21   Q     Did you have the authority to hire employees?

22   A     No.

23   Q     Did you have the authority to fire any employees?

24   A     No.

25   Q     Did you ever receive any pay other than your salary?

VB        OCR        CRR

```
                        Proceedings                      107
```

1    A    Never.

2    Q    Did you ever keep the profits of the restaurant?

3    A    No.

4    Q    Did you ever make any agreement with Hudson Side Cafe

5    that you would pay them any amounts?

6    A    No.

7    Q    What would happen to the money that the restaurant would

8    make each day?

9    A    So that's the one that we save for the boss, the Paru.

10   He comes to pick it up, every afternoon, evening.

11   Q    Did you ever make deposits for Hudson Side Cafe?

12   A    I don't do.

13   Q    Did you ever pay any bills for the restaurant?

14   A    No, I don't pay myself anything.

15   Q    Did you ever pay on behalf of Hudson Side Cafe?

16   A    No.

17   Q    Did Hudson Side Cafe ever have you sign any employment

18   agreement?

19   A    No.

20   Q    Did they ever give you a document stating how much you

21   would be paid?

22   A    No.

23   Q    Did they have you sign any documents --

24   A    No.

25   Q    -- to work for them?  Did they ever give you a written

Proceedings                                                          108

1    statement of how much you were paid?

2    A    No.

3    Q    Did you see any posters in Hudson Side Cafe about the

4    minimum wage and the overtime?

5    A    No, I don't see any poster.

6    Q    I'm going to show you a document that's been marked as

7    Defendant's Exhibit E.

8              THE COURT:  Defendant's Exhibit E.

9              MR. ANDROPHY:  Defendant's Exhibit E.

10   Q    Do you recognize that document?

11   A    This check I give to the Shahin, that he asked for when

12   the loan, personal loan, so I give him that money.  No

13   actually my check.  This is my wife check.

14   Q    Okay.  So, the name on the check, is that your wife's?

15   A    Yeah, this is my wife, right.

16   Q    And was she your wife at the time that that check was

17   written?

18   A    Because the Shahin need some money for I don't know,

19   somehow he asked for me.  So they need some money, so he needs

20   some money.  So he say help me, so favor me.  So, because he

21   go, he always in, a good friend, my good customer, so that's

22   why I asked for my wife can you give some money to help this

23   guy.  Then he give to that -- she give me this money to give

24   to Shahin.

25   Q    Did you understand what the purpose of that money was?

Proceedings                                                      109

1    A    That's a personal loan.  I know him, take for the

2    personal loan.

3    Q    Was that loan repaid to you?

4    A    Yeah, that, he give me the cash back, yeah.

5    Q    And how was that loan repaid?

6    A    So, he pay like a little by every weeks, little bit, he

7    finish everything.

8    Q    Did he pay in cash or by check?

9    A    Cash.

10   Q    You mentioned that this was a loan to Shahin.  Can you

11   explain, who is Shahin?

12   A    The first guy he talked to here today.

13   Q    Okay.  Is that the same person as Mohammed?

14   A    Kabir.

15   Q    Mohammed S. Kabir?

16   A    Mohammed S. Kabir, yes.  His nickname, I think, Shahin.

17   Q    Okay.

18             THE COURT:  I'm a little confused.  The first worker

19   was also called Shamim?

20             MR. ANDROPHY:  I think there's two people here with

21   similar sounding names, so maybe we can...

22             THE COURT:  So, Mohammed Kabir --

23             THE WITNESS:  He's also nickname is Shahin.

24             THE COURT:  Shahin, okay.

25             THE WITNESS:  So, I don't know his Kabir name.  I

Proceedings                                                    110

1    know they call Shahin so that's how I talk to him Shahin.

2    Q    Just to clarify, is that the same person you said was

3    working at Papo's Chicken when you started?

4    A    No, he's Shamim, this is Shahin.  That's two person.

5         THE COURT:  Oh, okay, all right.

6         MR. ANDROPHY:  Okay.

7    Q    I'm going to give you another document, it's Plaintiff's

8    Exhibit 7.  Do you recognize the document that I've given you

9    and specifically the second page?

10   A    This is the W-2 they give to me for the, my tax return.

11   Q    And who did you receive that from?

12   A    The middle guy, I don't know his name.  He is, he is,

13   he's sitting there.

14   Q    Okay.

15        THE COURT:  Can you just state for the record who

16   that gentleman is?

17        MR. MOULINOS:  This gentleman?

18        THE WITNESS:  Yes.

19        MR. MOULINOS:  Mr. Sain.

20        THE WITNESS:  I don't know his name, but he give to

21   me.

22        THE COURT:  Mr. Sain -- S-A-I-N.  All right.

23   Q    In August 2012, did you personally have a checking

24   account?

25   A    No.

Proceedings                                                        111

1    Q    Did you personally have any savings?

2    A    No.

3    Q    Do you know, did your wife have a checking account?

4    A    She has checking account, yes.

5    Q    Do you know approximately how much money she had in her

6    account?

7    A    Five, six thousand dollars, maybe.

8    Q    Did you have any other assets?

9    A    No.

10   Q    Did you ever have a meeting with Mr. Kabir or Shahin and

11   Paru Khan in the basement of Papo's Chicken?

12   A    No, I don't have any.

13   Q    Did you ever have any meeting with Mr. Kabir and Paru at

14   a Burger King?

15   A    No.

16   Q    Why did you stop working at Papo's Chicken?

17   A    Because I don't make enough money to survive, so that's

18   why I give up that job.

19   Q    After you left Papo's Chicken, did you ever work with

20   Mr. Espinal or Mr. Oaxaca?

21   A    No, no.

22   Q    What did you do after leaving Papo's Chicken for work?

23   A    I was working in restaurant.  Like, a food runner.

24   Q    Did you manage the restaurant?

25   A    Never.

Proceedings                                                  112

1    Q    Before working at Papo's Chicken, did you ever manage any

2    business?

3    A    Never.

4              MR. ANDROPHY:  No further questions.

5    CROSS EXAMINATION

6    BY MR. MOULINOS:

7    Q    Good afternoon, Mr. Alam.

8    A    Yes, sir.

9    Q    If I direct your attention to Plaintiff's Exhibit 7, do

10   you have a copy of that?

11   A    This form?

12             THE COURT:  The two forms?

13   Q    The W-2.

14   A    Yes.

15   Q    How much pages is it?  I have only one page, am I missing

16   something?

17             MR. ANDROPHY:  It's double-sided, I think this is --

18             MR. MOULINOS:  I apologize, I apologize, okay.  I

19   apologize.  Okay, okay, no issue with Exhibit 7.

20   Q    I'm a little puzzled, Mr. Alam, you barely begin to work

21   for Hudson Side Cafe in the same exact week that you begin,

22   you issue -- you cause your wife to issue a check for $4,300

23   denominated as rent.  Now, did your wife know Mr. Kabir?

24   A    I know Mr. Kabir, but my wife don't write it on anything

25   is there.  Only I tell her to give to him amount and sign.

Proceedings                                                    113

1    And I give to that much money for them.  But all I write down,

2    I think they write it, not me.

3    Q    The question was, did your wife know Mr. Kabir?

4    A    Mr. Kabir is my friend, so I know Mr. Kabir, but my wife,

5    I tell her to my Kabir one of friend, so he need help to some

6    money, so that's why she help me to give him money.

7    Q    The question again, Mr. Alam is, did your wife know

8    Mr. Kabir?  I didn't ask for the other stuff.

9    A    My wife doesn't, no, he come to my fruit stand, so my

10   wife sometimes is there, so that's why she knows the Kabir,

11   too.

12   Q    I did not understand.  Your wife knew Mr. Kabir before

13   this issuance of this check?

14   A    She saw one, two days the Kabir at my fruit stand.

15   Q    I didn't understand you.  Mr. Kabir knew your wife?

16             THE COURT:  She met him one or two times at the

17   fruit stand.

18             MR. MOULINOS:  Oh.

19   Q    Since 2007?

20   A    No 2007.  2012.

21   Q    Okay.  And how much --

22   A    2007, Mr. Kabir.

23   Q    And how much was going to be your beginning salary at the

24   defendant's pizza place?

25   A    How much my salary?

Proceedings                                                                114

1   Q    Yes.

2   A    Three hundred fifty.

3   Q    Per week?

4   A    Weeks.

5   Q    So, in other words, you go in there to work from 7:00 in

6   the morning until 11:00 o'clock at night, you have no money,

7   you come from selling fruits in the street and just like that,

8   you ask your wife to issue all her savings, which is close to

9   what you said, $5,000, just to help Mr. Kabir?

10  A    Because winter is coming.

11  Q    I didn't ask you.  Is that true?

12  A    Winter is coming, so that's why I thinking to why I still

13  working the outside.  Better to working the inside.  So,

14  that's why I like to go work there.

15  Q    I understand, but who in his right mind working for $350

16  a week says to the wife issue this man $4,000?

17         MR. ANDROPHY:  Objection.

18  A    Because they allow, they got pay me more, but they no pay

19  me more.  So because my wife also works, and she help me,

20  that's why I issued the money.

21         THE COURT:  Wait just one second.

22         MR. MOULINOS:  Okay.

23         THE COURT:  If your attorney objects, you should

24  stop and the Court will make a ruling.

25         I will permit that one question, but I don't want

Proceedings                                                      115

1    you to harass the witness.
2              MR. MOULINOS:  No, Your Honor.
3    Q    Now, I also understood you said Mr. Kabir paid this
4    amount of 4,300 little by little, over time.  Did I hear
5    right?
6    A    This no overtime, this my money he take from me, so he
7    give me back.
8    Q    So, when did he pay it back?
9    A    He give me back the in between while I work there at that
10   time.
11   Q    I'm not understanding.  You were there only until
12   October.
13   A    Two months.  Yeah, he give me between these two months.
14   Q    Oh, so in two months he paid you back the 4,300?
15   A    Yes.
16   Q    Little by little?
17   A    Like weeks.  Week by weeks he give me.
18   Q    So, how much money was he giving you a week, if anything?
19   A    One week thousand, another week 700, like this.  He mix
20   it up always.
21   Q    Why don't we get specific and you tell me the exact
22   amounts he paid you and when.  Let's do it this way.
23   A    Every weeks he pay me like, a thousand dollars.
24   Q    Oh, now it's exactly a thousand, not 1,700.  It's exactly
25   a thousand?

```
                    Proceedings                      116
```

1    A    I don't say 1,700.  I say 700, to a thousand dollars, he

2    pay me.

3    Q    Can you give us the dates when he paid you and how much?

4    A    I don't have any date specific.  I don't write it down

5    every day.

6    Q    But he paid you by October?

7    A    He paid me my money.

8    Q    And why would the check say rent?

9    A    That's not my wife write it down.  I don't write it down.

10   Shahin knows better.

11   Q    But that's your wife's signature?

12   A    I said it's my wife's signature.

13   Q    Okay.  And isn't this your wife's script?  Handwriting?

14   A    This not my wife handwriting.

15   Q    How do you know?

16   A    I know better my wife handwriting.

17   Q    Okay.  Now, isn't it true that really this was the first

18   month's rent pursuant to a deal that you had with Espinal and

19   Paru in the turnover of a business?

20   A    No.

21   Q    It was generosity on your part to help a friend?

22   A    No.

23   Q    It wasn't?

24   A    No.

25   Q    Then what was it?

Proceedings                                    117

1   A    This the money I give him the loan for Shahin, not Paru,

2   nobody else.  Only Shahin I give him the money.

3   Q    When this canceled check returned, did you ever approach

4   anybody and say what is this, what is this writing Kabir?  I

5   gave you the money as a loan and now you write Hudson Side

6   Cafe, you write rent, what is this?

7   A    Because I knew my money is back, so I don't ask for

8   anything because I get my money back.

9   Q    And Kabir was supposed to be your friend?

10  A    Used to be my friend.

11  Q    No longer a friend?

12  A    I don't see him long time.

13  Q    When is the last time you saw Mr. Kabir?

14  A    I saw when I work in the Hudson cafe.

15  Q    Meaning, when this check was given?

16  A    I give him the -- when I start.  Like, when they have

17  shut down the Health Department.  After that, I give him the

18  money.

19  Q    If the loan, if this amount of 4,300 was meant to be a

20  loan, why didn't you give it in cash?  You were dealing with

21  everything in cash, why a check?

22  A    Because this my wife money.  That's why she give me the

23  check.  This not my money.  If my money, I give him cash.

24  Q    Now, at about this time in August of 2012, except for you

25  and your wife, were there any other people in your family?

Proceedings                                118

1    Any children, any grandparents or anything?

2    A    What happened?

3    Q    Did you have a family in August 10th, 2012, other than

4    your wife living with you?

5    A    Me and my wife and my daughter.

6    Q    And you had a daughter?

7    A    Yes.

8    Q    Now, you cause your wife to issue a $4,300 check, which

9    is essentially all your savings, knowing fully well the only

10   thing you're going to get there is $350 a week from Mr. Paru.

11   Didn't that strike you a little funny?

12   A    They told me -- they don't tell me the $350 they gave me.

13   When I saw in my envelope, I open, I saw 350, I asked them, so

14   this no good enough for me.  So, now we open again after

15   Health Department, just new open.  So, wait little bit, wait

16   little bit.  So, I can't handle, so that's why I gave up after

17   two months.

18   Q    Okay.  So, let's analyze what you just said.  Without

19   knowing your salary, you go to work for a week, you open the

20   envelope and you see $350?

21   A    I saw they give me $350.

22   Q    And you were upset; correct?

23   A    Because --

24   Q    Were you upset?

25   A    Because --

Proceedings                                                119

1    Q    The question, sir, is were you upset when you opened the

2    envelope in one week hard work and you see 350?

3    A    I answer because I ask him how much you going to give me.

4    He say wait for little bit, I give you more.  So, that's why I

5    listen to them, so that's why I wait.

6    Q    Oh, you were just listening to who?  Who's them?

7    A    Because I only give up my work at the fruit business, so

8    now I have a new job, so if I leave this one, so I have a

9    nothing job.  So what I should do?

10   Q    Why don't you quit that day when you saw 350 and you go

11   back to your fruit business?

12   A    How I go, because I give to return everything, so how I

13   go to do it.

14   Q    You were only out of work for a week.

15   A    I am not own the business.

16   Q    Sir, why didn't you go back to the fruit business instead

17   you stayed all the way to October?

18   A    Because the fruit business is, the permit no is mine.

19   The Health Department take back the permit.  I can't work

20   without permit.

21   Q    I don't understand.  What is this with the permit?

22   A    Because when I work the fruit stand pushcart, there's a

23   one permit number in the permit.  This is not my own.  I take

24   for somebody else.  So, he take it back, his pushcart.

25   Q    Are you saying that you were working as a street vendor,

Proceedings                                                120

1   not with your license, but with somebody else's license?

2   A    License is mine, permit not mine.

3   Q    I see.

4   A    I don't even know the vendor.

5   Q    I see.  So, you were violating the law technically; is

6   that right?

7               MR. ANDROPHY:  Objection.

8   Q    You were violating the law?

9               MR. ANDROPHY:  Objection.

10  A    I not violating.  I work with somebody else.

11              THE COURT:  I'll permit the answer.

12              THE WITNESS:  What he say?

13              MR. MOULINOS:  The Judge permitted the answer.  So,

14  what did you say?

15              THE COURT:  He answered.

16              THE WITNESS:  I did not violate any law.

17  Q    I also think, I think I also heard you testify previously

18  that you knew Mr. Kabir at least since 2007 and you felt he

19  was a friend to you.  Did I understand that correct?

20  A    Mr. Kabir tell you here he know me in 2009, so how you

21  know Mr. Kabir I know from 2007?

22  Q    I'm asking you.  I'm trying to get it straight.

23  A    He said 2007, so how you tell me I know him 2007?

24  Q    He testified 2009 is when he first met you?  Is that

25  accurate, 2009 is when you met?

Proceedings                                        121

1    A    He tell me, I don't know.  He come in my customer, I have

2    a lot of customer, I don't have date for anybody.  I know him

3    my customer, he's coming to buy fruit.  Lot of people coming

4    buy fruit.  I know lot of people.  Not only Kabir.

5    Q    How long did you continue selling fruits after you met

6    Mr. Kabir in 2009?  Or thereabouts?

7    A    2009 to 2012.

8    Q    And that was your full-time job?

9    A    That is the one, my job.

10   Q    Was this a profitable job?

11   A    Anyway, better than nothing.

12   Q    How much were you making, on an average, per week selling

13   fruits in the street?

14   A    Depend how much can I sell.

15   Q    Yeah, yeah, give me the depend.

16   A    Can make 400, 350, 400, 500.

17   Q    Let's go from the top to the bottom.  So, it wasn't that

18   bad of a business.  I mean, you were making 500 in some weeks,

19   right?

20   A    Sometimes business good, people buy then.

21   Q    And other times, people did not buy fruits?

22   A    So, I might make less money.

23   Q    What is the least you made?  You said less, you made

24   less, so what is the average then?

25   A    Three to five hundred.

VB        OCR        CRR

Proceedings                                                    122

1    Q    Okay.  My difficulty is why would you give up a three to

2    five hundred per week job to go work 16 hours a day for $350 a

3    week, six days a week?  I got difficulty here.

4    A    Because winter coming.  The winter very hard to stand

5    outside, so winter I'm not making every day money, so much

6    better working the inside store, so that's why I go there.

7    Q    And you said that at some point Mr. Kabir begged you,

8    these are your words, he came to you begging you to work for

9    him in Hudson Cafe; is that correct?

10   A    He's coming.  He offer me, not me.

11   Q    But the word you used is came to me begging me to work.

12   What did you mean by begging you to work at the Hudson Cafe

13   Pizza?

14   A    What I say?

15   Q    I believe you used the words begging you to work there.

16            MR. ANDROPHY:  Objection, I don't recall him using

17   that word.

18            MR. MOULINOS:  That's the word he used.

19            THE COURT:  He did use that word.

20            MR. ANDROPHY:  Okay.

21   Q    What do you mean by he was begging you to work for him?

22   A    I don't know, I don't say anything that kind of.

23   Q    You didn't say that?

24   A    No.

25   Q    All right.  Now, what qualifications did you have for

Proceedings                                                    123

1    Mr. Kabir to be so insistent for you to go work for this pizza

2    place?

3    A    Because he saw that my customer service, sir.

4    Q    Your customers were what?

5    A    He see how I treat the customer, how I good the customer.

6    Q    Oh.  So, you had a good presentation with customers?

7    A    Right.

8    Q    But you did not know how to do pizza, did you?

9    A    I say I no make pizza.  I work cash register and making

10   salad, making coffee and making ice-cream.

11   Q    So, he hired you, in essence, to be the front

12   presentation for the restaurant, for the pizza place?

13   A    They give me the front job, so I do.  I work there.

14   Q    Including cash register on top of it?

15   A    Right.

16   Q    So he trusted you?

17   A    Because I trust him, that's why I give money for him.

18   Q    I understand.  By the way, was it Mr. Kabir that offered

19   you the job or something else?

20   A    Mr. Kabir offer me.

21   Q    Do you know if Mr. Kabir had any ownership interests or

22   any involvement with this business?

23   A    How I know he always tell me, he said he has a business.

24   Never showed me any papers.  Just talk with he.

25   Q    Okay.

Proceedings                                                    124

1    A    I have three business, one candy store, one coffee shop,

2    one is pizza shop, so he always tell me this.  So, I know he's

3    a big man, he's a big man.

4    Q    I know.  From August the 10th, 2012, until August the

5    last day at work --

6              MR. ANDROPHY:  October.

7              THE COURT:  It's October.

8              MR. ANDROPHY:  Do you mean October?

9              MR. MOULINOS:  Yeah, yeah, what did I say?

10             MR. ANDROPHY:  You said August to August.

11             MR. MOULINOS:  I apologize.

12   Q    From the first day you worked there, presumably the 10th

13   of August, '12, to mid-October that you quit, how many times

14   did you see Mr. Kabir in the store?

15   A    Lot of times.

16   Q    How many is a lot?  One, ten, fifty a hundred?

17   A    I don't have it like a specific date.  He coming lot, I

18   know.  He's coming seven, eight, ten.  I don't -- really, I

19   don't know.  He coming lot of times.

20   Q    A lot of times?

21   A    Yes.

22   Q    What did he do when he went in there?

23   A    Because they have something to do downstairs office.

24   They always come, hi, hello, how are you, then they go

25   downstairs.  I don't know what they do down the stairs.  They

VB        OCR        CRR

Proceedings                                              125

1    have office, personal office in downstairs.

2    Q     Who is they?

3    A     Owners.  The all Paru.  They coming the store, they talk

4    little bit, then they go, the owner going down the stair

5    office.  They sitting there, they meeting there.

6    Q     They meaning Mr. Paru, Mr. Kabir, others.

7    A     All of them.  All owner.

8    Q     The owners?

9    A     All owners.

10   Q     How do you know who were the owners?

11   A     Because I, up to today, I know that Kabir also own.

12   Today he's not part of that.

13   Q     What does Mr. Kabir tell you to get you interested in

14   giving up the fruit business and go into working at this

15   place?  You tell me what he said to you.

16   A     He say why you the winter working the -- come work with

17   me.  I need a good person like you, one person.  You have

18   anybody, bring to me please, so whoever work for me, they

19   don't know how to run the business, they don't know how to

20   work, so please, come and work for me.

21   Q     And your fruit experience was sufficient for Mr. Kabir to

22   invite you over and run the business?

23   A     Because he knows I used to work in deli, too.  So that's

24   why he tell me, so he know how to work in the deli.

25   Q     So, before August the 10th, 2012, before that date, how

VB        OCR        CRR

Proceedings                                                    126

1    many times did you meet Mr. Kabir to discuss anything that

2    concerns this pizzeria?

3    A    I no meet with him.  He come to my fruit stand to buy

4    fruit, then he talk to me little bit for every single day for

5    his life, his business, doing this, that.

6    Q    So, he was opening himself?

7    A    He coming to me going to him.  He come to me.

8    Q    I see.  At all times?

9    A    I don't know where he live, where his house.  He come to

10   on the subway, he saw I'm selling the fruits, he buy some

11   fruits, then he stood next to me, he talk to me.

12   Q    Mr. Kabir is a rich man, you said?  Lot of businesses?

13   A    He say he has three business, so that's why.  So, three

14   business means he's good, you know.  I'm not really, I don't

15   know he rich or not rich.

16   Q    I see.  So, he would come to you and discuss prospects of

17   employment and business with you?

18   A    No.  He come to buy fruits.  Then, he has a little

19   conversation about his life and this.  He always talk to me

20   the good business, so tired, I'm making very good business

21   today, like this.  He always tell me things.

22   Q    And what time of the day, typically, you would see

23   Mr. Kabir?

24   A    Like around after 6:30, between 6:00, 7:00.

25   Q    Is that coming and going up the subway?

Proceedings                                                      127

1    A    Yeah, yes, subway, right.

2    Q    Did you meet Mr. Kabir with Mr. Espinal at any time?

3    Ever?

4    A    Ever?

5    Q    Ever.  Prior to getting to work there?

6    A    No, Kabir coming to my fruit stand, he help me sometime.

7    Mr. Espinal sometime bring for my fruits.  So, he saw sometime

8    the Kabir there.

9    Q    I see.  So, Espinal and you would see Mr. Kabir at the

10   fruit stand?

11   A    He saw in Espinal in the fruit stand.

12   Q    Did Mr. Kabir also invite Mr. Espinal to come work for

13   him?

14   A    No, he tell me, you have any person good worker for me

15   who knows how to make pizza, so I need that person.

16   Q    And you recommended Mr. Espinal?

17   A    Because of my friend, he's a worker also pizza place long

18   time ago.  So, I know he know how to make pizza.

19   Q    And did you recommend Mr. Espinal to Mr. Kabir?

20   A    I tell him, yes, I have one friend, he know how to make

21   pizza.

22   Q    And that was sufficient for Mr. Kabir to hire Mr. Espinal

23   along with you?

24   A    He say yeah, he say he going to hire us.

25   Q    But you both started the same day, you and Mr. Espinal?

VB        OCR        CRR

Proceedings                                      128

1    I see.  So, the hours that you worked while you were there was

2    7:00 o'clock in the morning until 11:00 p.m., six days?

3    A    Right.

4    Q    Paid in cash?  Was that remuneration for these hours paid

5    in cash?

6    A    I don't understand.

7    Q    Or check.  Were any check given to you?

8    A    Nothing check.

9    Q    For the amount of hours that you worked there?

10   A    No check for me.  Only cash.

11   Q    When you say counter work was part of your job

12   description, what do you mean by counter work?  What is that?

13   A    Counter work in the inside the deli.  I work in the

14   making salad, coffee, sandwich.

15   Q    So?

16   A    Making soda, fountain soda in back.  I have ice-cream, I

17   make ice-cream too.

18   Q    How do you make ice-cream?

19   A    There's a scoop ice-cream.

20   Q    Oh, the scooping of ice cream?

21   A    Yeah, very easy to make.

22   Q    I see.  After you quit working for this establishment in

23   October of 2012, what kind of work did you do?

24   A    I food runner.

25   Q    What is that?

VB        OCR        CRR

```
                    Proceedings                      129
```

1    A    I deliver it, the food.

2    Q    You deliver food.  So, you became a delivery person?

3    A    Yes.

4    Q    Why didn't you go back to the fruit stand business in

5    another location, let's say?

6    A    Because I don't get any more the permit, so how I can

7    work?

8    Q    And how much did you earn in the beginning of this food

9    running business per week?

10   A    I tell you business good, up to three to $500 I make

11   week.

12   Q    I see.  And how many ours did you work when you started

13   doing the food run business?

14   A    Four to like -- hour is like 12:00 is afternoon and

15   finish like 8:00 o'clock in the night, evening.

16   Q    So, that was per hour, not for tips?

17   A    This not for tips.  This is my food selling the fruits.

18   So, people give the tips selling the fruits?  I don't

19   understand.

20   Q    I'm saying after you left the pizzeria that we're dealing

21   with, the Hudson Side Cafe pizza, you went into --

22   A    Sorry, I work food delivery, not fruits.  Not fruits.

23   Food.

24   Q    Food delivery, that's what I said.

25   A    You make me confused, the food and fruits.

Proceedings                                           130

1   Q     Oh, I apologize. And what was the average weekly salary

2   doing food running?

3   A     Because depend on the tips.  So, my boss pay like

4   five-sixty-five the hour and I get the tips for customer.  So,

5   around like, I making like, 12, $15 hour.

6   Q     And after October of 2012, did you have any opportunity

7   to see either Mr. Kabir or Mr. Espinal?  Did you see them ever

8   again after quitting the pizzeria?

9   A     No, after quit, I didn't have any chance to go there

10  because I working there full-time.

11  Q     And by that time, you had received all the loan money you

12  had given to Mr. Kabir; correct?

13  A     In between how long is there, he pay me already my money.

14  Q     Is there any reason why he paid you back in cash as

15  opposed to check?

16  A     Because he know better than me why he give me cash.

17  Q     What do you think?

18  A     I don't know.  Because he make cash money, so maybe

19  that's why he give me cash money.

20  Q     Did you ever have any nephew or somebody who we respect

21  and would call nephew that was in business with you prior to

22  the fruit business?

23  A     Never, ever.

24  Q     Did you have any business whatsoever with Mr. Espinal

25  prior to working for this establishment?

Proceedings                                    131

1   A      Never.

2   Q      Why would Mr. Espinal be at your fruit stand many times?

3   A      Because he is my good friend and he drives around there,

4   so I need some transportation to sometime, I have to pay for

5   somebody, sometimes he help me.  So, that's why he come to the

6   drop my fruits.

7   Q      Why do you need transportation?  He was in the

8   transportation business?

9   A      My fruit is the warehouse, so I bring to my spot, so I

10  need the transportation to bring it.  Sometime he help me to

11  bring that stuff to my spot to sell fruits.

12  Q      Is it safe to say that you were friendly with

13  Mr. Espinal?

14  A      Sometimes.

15  Q      During this period of time?

16  A      Sometime he help me.  When I call, he's available, free,

17  he help me always.

18  Q      So, you did have some business association?

19  A      Not really.

20  Q      I see?

21          MR. MOULINOS:  No further questions, Judge.

22          THE WITNESS:  Thank you.

23          THE COURT:  No, wait one second.

24          Mr. Androphy, do you have redirect?

25          MR. ANDROPHY:  I may have.  If I may have a minute

Proceedings                                              132

1    or two?

2              THE COURT:  All right.

3              MR. ANDROPHY:  We have no redirect.

4              THE WITNESS:  Thank you so much.

5              (Witness excused.)

6              MR. ANDROPHY:  Your Honor, I think I may have

7    neglected to ask for admission of Plaintiff's Exhibit 7 while

8    the witness was up, but.

9              THE COURT:  They are all admitted.

10             MR. ANDROPHY:  Okay.

11             THE COURT:  To the extent, as we discussed at the

12   beginning of these proceedings.  I will consider them to the

13   extent that people mention them and point out to me their

14   relevance.

15             MR. ANDROPHY:  Thank you, Your Honor.

16             If I could just have a three-minute bathroom break.

17             THE COURT:  Okay.  We'll take a short break.

18             (Recess taken.)

19

20             (Continued on following page.)

21

22

23

24

25

Proceedings                133

1          (Whereupon, court resumed as follows:)

2          MR. MOULINOS:  Judge, may I ask one little thing?

3          THE COURT:  Sure.

4          MR. MOULINOS:  I would request that you give me

5     leave, permission, to reopen the record for only one more

6     question.  I noticed that the caption of the case and the W-2

7     form are two different names.  I just want to clear it up for

8     the record.

9          THE COURT: Is this with respect to Mr. Oaxaca?

10         MR. MOULINOS:  No.  With the gentleman who just

11    testified.

12         THE COURT:  Mr. Alam?

13         MR. MOULINOS:  With Mr. -- known Halibul Islam and at

14    the same time Habibul Alam.  The gentleman who just testified;

15    just to clear this thing up because now I'm confused.

16         MR. ANDROPHY:  We admittedly have some typo's in the

17    caption if Mr. Alam needs to clarify that, I have no problem

18    with that.

19         MR. MOULINOS:  No more than three questions, Judge.

20         THE COURT:  Okay. Well --

21         MR. MOULINOS:  Very briefly.

22         THE COURT: Certainly.  Maybe we could just stipulate

23    to that, but you want to -- I'll permit it through

24    questioning.  Why don't you -- Mr. Alam, could you please

25    come up, again?

```
                      Proceedings                      134


1           MR. MOULINOS:  Sir, what is your legal name?

2    A.  Habibul Alam.

3    Q.  And how did we become Halibul Islam as plaintiff in this

4    lawsuit?

5    A.  Ask the guy in the middle, him.  The guy come in, ask him.

6    Q.  He is not your lawyer is he?

7    A.  No.  He -- my name when working there, I gave my name to

8    him.

9    Q.  You mean to tell me the correct name, your correct name,

10   is Habibul Alam?

11   A.  Right.

12   Q.  In the W-2.

13   A.  Yes.

14   Q.  However, when the case was started, this very case that

15   you sued on, you're known as Habibul Islam.

16   A.  Habibul Alam.

17   Q.  How does an "Islam" become an "Alam"?

18           MR. ANDROPHY:  May I state for the record, the

19   complaint says "Alam".  That's the caption in the complaint.

20           THE COURT:  I think there are few typos, not only

21   with respect to Mr.  Alam's name, but also with respect to Mr.

22   Oaxaca's name.

23   BY MR. MOULINOS:

24   Q.  Are you ever known as Habibul Islam?

25   A.  No.
```

Proceedings                                                135

1    Q.  Ever?

2    A.  Never ever.

3    Q.  You have always been Habibul Alam?

4    A.  Yes.

5    Q.  And your status in this country reflects that name?

6            MR. ANDROPHY:  Objection.

7    BY MR. MOULINOS

8    Q.  So the caption is incorrect, then?

9            MR. ANDROPHY:  Your Honor, Mr. Moulinos is -- I

10   don't know what caption he's referring to.  The complaint says

11   Habibul Alam.  The answer and counterclaim I'll note, which is

12   plaintiffs' exhibit 2 filed by the defendants says Habibul

13   Islam.  I don't know how counsel expects Mr. Alam to explain

14   how defense counsel used the incorrect name on the answer and

15   counterclaim, but the complaint filed document number one in

16   this case is correct.  It's Mr. Alam, not Mr. Islam.

17           MR. MOULINOS:  I apologize to the Court.  That is

18   correct.  It maybe must have been my incorrect naming of this

19   gentleman throughout.  I see the complaint, and it does say

20   "Alam", so I apologize.

21           THE COURT:  Yes.

22           MR. MOULINOS:  Okay.  My mistake.

23           THE COURT:  I was trying to clear it up without

24   having to make Mr. Alam come back.

25           MR. MOULINOS:  All right.  I am known to make mistake

Proceedings                                                    136

1     and apologize.

2            THE COURT: All right.

3            MR. ANDROPHY:  Plaintiffs call Juan Espinal.

4     **J U A N    E S P I N A L,**

5            called by The Plaintiff, having been first

6            duly sworn, was examined and testified

7            as follows:

8            THE DEPUTY CLERK:  Please state your name for the

9     record.

10           THE WITNESS:  My name is Juan Espinal.

11           THE DEPUTY CLERK:  Could you spell that for the court

12    reporter, please?

13           THE WITNESS:  J-U-A-N; last name:  E-S-P-I-N-A-L.

14    DIRECT EXAMINATION BY MR. ANDROPHY:

15    Q.  Good afternoon, Mr.  Espinal.

16    A.  Good afternoon.

17    Q.  Did you ever work for a restaurant known as

18    Papo's Chicken?

19    A.  Yes.

20    Q.  And when did you begin working there?

21    A.  That was the first week of August 2012; first, second

22    week.

23    Q.  Immediately before going to work at Papo's Chicken, what

24    did you do for work?

25    A.  Well, I didn't -- been working in the previous jobs, but

Proceedings                                                    137

1    the very latest job that I used to do was driving, was

2    delivery person, basically.

3    Q.  And who did you work for as a delivery person?

4    A.  It's a bakery called "All Night --

5    Q.  How did you find your job at Papo's Chicken?

6    A.  I was referred by my friend, Alam.  He told me that

7    someone was looking for -- to work in pizzeria.

8    Q.  How did you know Mr.  Alam?

9    A.  Well, I know Mr.  Alam for awhile ago, a long time ago. I

10   would say since 2000, 2001.  We used to work for the same deli

11   back then.

12   Q.  Were you ever business partners with Mr.  Alam?

13   A.  No.

14   Q.  After Alam mentioned to you that Papo's Chicken was

15   looking for someone to work, what did you do next concerning

16   possibly working there?

17   A.  Well, since I only used to work kind of part-time job as a

18   driving, I assume that this job will be probably much better

19   than what I was doing as a driver.

20   Q.  Did you meet with anyone to discuss possibly working at

21   Papo's Chicken?

22   A.  Yeah.  I met -- well, it was the second week of June.  I

23   met Alam and Mr.  Kabir.

24   Q.  Where did you meet them?

25   A.  By the fruit stand on 40 Street located on Queens

Proceedings                                                    138

1   Boulevard under the subway -- train line.

2   Q.  And did anyone tell you about the Papo's Chicken business

3   at that time?

4   A.  Well, he mentioned to me that they had some employees, and

5   the business going down because of miss -- care about their

6   employees.  They were looking to hire someone to know or have

7   kind of a little bit of experience on the pizzeria field.

8   Q.  Who told you that?

9   A.  Mr.  Kabir.

10  Q.  Is that Mr.  Kabir the gentleman who testified earlier

11  this morning?

12  A.  The first person that testified.  So far right now I know

13  his last name, but I always know as Shamin or Shahin.  I'm

14  confusing with the --

15  Q.  Okay.  Did the you know Mr.  Kabir from before?

16  A.  No.  I saw him couple of times buying fruits because I

17  used to be with Alam.  Sometimes I spend a few hours with him.

18  Q.  Okay.  So at that meeting or that discussion at the fruit

19  stand, did Shahin say he wanted people to purchase the

20  restaurant?

21  A.  No.

22  Q.  Did he say he wanted people to run the restaurant and

23  receive profits?

24  A.  No.

25  Q.  What did he say about what he was looking for the business

WCR      OCR      RPR

Proceedings                                                139

1    for the restaurant?

2    A.  He was looking for a good employees to care about his

3    business.

4    Q.  Did he hire you at that -- in that discussion?

5    A.  No.  He told us that if we would like to go and see the --

6    where the store was located, he could after we close in the --

7    after Alam closed his fruit stand, he said if you guys want, I

8    could take you with my car, show you the place.  I want you

9    two guys take a look how the place looks like.

10   Q.  So did he do that, did he take you to the restaurant?

11   A.  He did.

12   Q.  And what happened then?

13   A.  Well, he wait outside.  He told Alam and myself to go

14   inside, order something, and he says you guys will see what

15   kind of employees I have, and that's what we did, we went to

16   --

17   Q.  Okay.  What happened next with regard to you possibly

18   working at the restaurant?

19   A.  After that, we came back.  He drop me at 40 Street same as

20   Alam, and he says we will -- I will let you know, think about

21   if you really wanted to work with me and let Alam know that so

22   he will get in touch with me.

23   Q.  And did you get -- did he get in touch with you after

24   that?

25   A.  Yeah.  Probably, it was like enough -- the month of June;

Proceedings                                                      140

1   June or starting July.  He said that his business was shut

2   down -- well, that's what Alam told me the business was shut

3   down because of health department, and now he really needs

4   someone to work for the reopening.

5   Q.  And then when did you next meet with Mr.  Kabir?

6   A.  At the working place.

7   Q.  Was that when you began working?

8   A.  Yes.

9   Q.  Did you speak to him at all between the last discussion

10  you mentioned and beginning work.

11  A.  Well yeah.    I spoke to him I was asking him about my

12  salary.  He mentioned that he would pay me $400 a week.

13  Q.  And just so we're clear who told you that?

14  A.  He told me that, yes.

15  Q.  "He" being "who"?

16  A.  Mr.  Kabir.

17  Q.  Okay.  All together how many times did you meet with Mr.

18  Kabir before you began working at Papo's Chicken, if you

19  recall?

20  A.  It was only one time that I met him that, you know, I saw

21  him, but we barely have a conversation, like hi, how are you,_

22  and that's it.  Only that was the first time when I saw him

23  and we went to the place.  That was when we had the

24  conversation.

25  Q.  Before beginning to work at Papo's Chicken, did you meet

Proceedings                                                      141

1   with anyone else who was involved in the restaurant?

2   A.  No.

3   Q.  Did you ever have a meeting with, together with Mr.  Alam,

4   with Mr.  Kabir and Mr.  Paru in the basement of Hudson Side

5   Cafe?

6   A.  No.

7   Q.  Did you ever have a meeting with them in a Burger King?

8   A.  No.

9   Q.  Did Mr.  Kabir tell you that he was -- strike that.  What

10  did Mr.  Kabir tell you about who were the owners of Papo's

11  Chicken?

12  A.  He said he was the owner.  He run two more places in

13  Brooklyn.  He has I believe three or four more partners,

14  including his brother.

15  Q.  Did you meet any of those other partners before you

16  started working at Papo's Chicken?

17  A.  No.

18  Q.  Did you meet any of them when you began working at Papo's

19  Chicken?

20  A.  Was Mr.  Paru.

21  Q.      When did you meet with Mr. Paru?

22  A.      Was the same date, when I started working on there.

23  Q.  And did you have any discussion with Mr.  Paru?

24  A.  No.  He just asked me few questions about what do I know

25  in regards to the pizzeria.

Proceedings                                          142

1    A.   And what were you paid while you worked at Papo's Chicken?

2    A.   I used to pay $400 cash; they used to pay me.

3    Q.   And who paid you?

4    A.   At the very beginning, it was Mr. Kabir for the first I

5    would say two, three weeks.

6    Q.   What happened after those first two or three weeks?

7    A.   After those three weeks, Paru used to pay me.

8    Q.   Did the amount that you received ever change?

9    A.   No.  It was the same.

10   Q.   Did you ever ask for a raise?

11   A.   I mentioned to them few times.  They told me that the

12   business was kind of slow, they will as soon as business

13   started picking up, they will raise my salary.

14   Q.   Who did you have that conversation with?

15   A.   Mr. Paru.

16   Q.   Was that by telephone or in person?

17   A.   Person.

18   Q.   Did you -- strike that -- did you decide yourself how much

19   you would be paid?

20   A.   No.  They offered me -- they told me how much I am going

21   to get paid.

22   Q.   Did you decide how much anyone else would get paid?

23   A.   No.

24   Q.   How often would Paru come, come and work at the

25   restaurant?  I'm sorry.  Come to the restaurant.

Proceedings                                                      143

1    A.  He used to come mostly every day for few hours.

2    Q.  Approximately when during the day would he come?

3    A.  Normally, he used to go there in the evenings like between

4    I would say five, six, seven, eight, stay two hours.

5    Q.  And what would he do at the restaurant?

6    A.  First thing that he used to come, he used to come and

7    speak to Alam and myself, asking for how was the sale, looking

8    for the money.  Alam pass him the envelope that he used to

9    count from the sales, give it to him.  He used come and eat,

10   try the pizza or the chicken, and then from there he used to

11   go to the basement.

12   Q.  Do you know what he did in the basement?

13   A.  No.

14   Q.  Is there anything else you saw him do?

15   A.  No.  Sometimes he used to take orders over the phone.

16   Q.  When you first started working at Papo's Chicken, who else

17   worked with you?

18   A.  At the very beginning used to be two guys, two workers

19   from their country.  The other guy that used to delivery, I

20   don't really remember his name, but the other one I know his

21   name was Shahin(Phonetic).

22   Q.  And how long did they work at the restaurant after you

23   started?

24   A.  They were there for two weeks.

25   Q.  Did the restaurant hire anyone else when they left?

Proceedings                                    144

1    A.   They hired Carlos Oaxaca.

2    Q.   Do you recall when Mr. Oaxaca began working there?

3    A.   I believe it was middle of August, probably the end August

4    somewhere.

5    Q.   How did Mr. Oaxaca come to be hired?

6    A.   Well, he was looking for a job, he was passing by.  He

7    asked me if do I know if they are hiring or they need any

8    person to work.  I told him I do not, you know, I don't know,

9    but if he wants to leave his information so when the owner

10   comes I could pass it to him, and he will decide whether we

11   need someone, they need someone or not.

12   Q.   Then what happened next concerning Carlos Oaxaca working

13   for Papo's Chicken?

14   A.   Well, Mr. Paru told me that after, it was like two days

15   after, he says, you can give him a call, this person that he

16   comes to looking for job, give him a call and tell him to come

17   and meet me the next day in the morning so I could discuss

18   with him, you know, the job and stuff look that.

19   Q.   Okay.  Did you then call Carlos?

20   A.   I did call him, yes.

21   Q.   And did he come to the restaurant?

22   A.   Yes, he did.

23   Q.   And what happened when he came to the restaurant?

24   A.   When he came, I believe it was like, I don't remember,

25   somewhere around seven, eight, somewhere there in the morning,

Proceedings                                                    145

1    and Mr.  Paru was there.  He came and he started talking, but

2    since he doesn't understand too much English, I was helping to

3    translate what Mr.  Paru wants to tell him.

4    Q.  Do you recall what Mr.  Paru told -- have you translate to

5    tell Carlos Oaxaca?

6    A.  For the best of more of my knowledge, whatever I

7    understood, I tried to translate to Carlos.

8    Q.  Okay.  Did you do anything in that discussion besides

9    translate between Carlos and Mr.  Paru?

10   A.  No.

11   Q.  Did you make the decision to hire Carlos?

12   A.  No.

13   Q.  Did you decide how much Carlos would be paid?

14   A.  No.

15   Q.  Did you ever have authority to hire any employees?

16   A.  No.

17   Q.  Did you ever have authority to fire any employees?

18   A.  No.

19   Q.  Did you as part of your job supervise any other employees?

20   A.  No.

21   Q.  Did anyone supervise you?

22   A.  No.

23   Q.  What was Carlos Oaxaca hired to do at Papo's Chicken?

24   A.  He was hired to basically prepare the food since Papo's

25   Fried Chicken is kind of a fast food, so he used to do the

Proceedings                                           146

1   fry, you know, make the French fries, chicken, cheeseburgers,

2   and stuff like that, and washing dishes.

3   Q.        What did Mr. Alam do at the restaurant?

4   A.  He used to be cashier taking the money from every customer

5   comes to purchase, making ice cream, salad.

6   Q.  And what did you do?

7   A.  I used to make the pizza, serve the pizza, and sometimes

8   take orders over the phone, and when the deliveries used to

9   come if I'm not busy at the pizzeria, I used to bring the

10  products to the basement.

11  Q.  Other than your salary, did you receive any pay from the

12  owners of Hudson Side Cafe?

13  A.  No.

14  Q.  Did you take any of the profits of Hudson Side Cafe?

15  A.  No.

16  Q.  Did you ever make any agreement with the owners of Hudson

17  Side Cafe that you would run the business and keep the

18  profits?

19  A.  No.

20  Q.  Do you know what happened to the money that Hudson Side

21  Cafe would receive from sales?

22  A.  Honestly, I never asked them what they do with their money

23  because it is their money.

24  Q.  Did you keep that money?

25  A.  No.

Proceedings                                                    147

1   Q.  Did you ever see who kept that money?

2   A.  Well, Mr. Paru used to come and pick the money, grab the

3   money and go, but, honestly, I don't know, whether he's taking

4   home or he put it in the basement.

5   Q.  I am going to show you a document that's marked by the

6   defendants as Exhibit G.  Do you recognize that document?

7   A.  Yes.

8   Q.  What is it?

9   A.  Time Warner, I would say a bill, a contract.

10  Q.  And is your name on that document?

11  A.  Yes.

12  Q.  Why is your name on the document?

13  A.  Okay.  This people, they used to call and calling,

14  basically, and giving us -- every time they call, they are

15  looking for the owner or the manager, and every time they used

16  to call, if the owner is not here, the manager is not here.

17  So when Mr. Paru used to come, I used to tell him this is

18  Time Warner Cable called -- just give him notes that on the

19  calls.  Sometimes they are looking for him, and I mentioned to

20  him that Time Warner Cable called and they asking -- basically

21  offering a package, that he could save money.

22      So he told me, you know what, next time when they call if

23  you want, you can just tell them to send you, fax you over an

24  agreement and you can sign and tell them to give it because

25  I'm too busy running my two business.

```
                       Proceedings                    148
```

1    Q.  So did you sign those papers?

2    A.  I did.

3    Q.  And did you -- you did make that decision to do that on

4    your own?

5    A.  No.  I call him and I told him, I explained to him

6    everything, even I show him the page, and I told him to fill

7    it out, he just put it on the side.  He told me, you know

8    what, just leave it like that.  Next thing they call up again,

9    I told him, listen, people they are calling up.  He said, if

10   you have time just fill it out and fax it over to them.  You

11   can put your name and sign, it's not going to be a problem.

12            THE COURT: Who's the "him" you are talking about?

13            THE WITNESS:  I'm sorry?

14            THE COURT:  Who did you call?

15            THE WITNESS:  Mr. Paru.

16            THE COURT: Okay.

17   BY MR. ANDROPHY:

18   Q.  Did you write the title president on those papers?

19   A.  Just because the person that they offering this package,

20   it has to be someone that is authorized to do this.  So when I

21   call Mr. Paru, I said they are asking to put some title in

22   there.  He said you can just put president and just sign and

23   fax it to them.

24   Q.  Were you in fact the president of Hudson Side Cafe, Inc.?

25   A.  No.  I have no legal papers with Hudson Side Cafe.

Proceedings                                                149

1    Q.  Do you have any title of an officer of Hudson Side Cafe,
2    Inc.?
3    A.  No.
4    Q.  Were you a shareholder of Hudson Side Cafe Inc.?
5    A.  No.
6    Q.  Did you ever sign checks for Hudson Side Cafe Inc.?
7    A.  I did quite a few times early on.
8    Q.  And did you decide to do that on your own?
9    A.  No.  Everything was approved by Mr. Paru.
10   Q.  Why did you sign checks for Hudson Side Cafe?
11   A.  Because deliveries used to come, there was no cash money,
12   so the delivery mans, they used to say, let us know -- it used
13   to be a COD, if it's not cash or checks on the time the
14   delivery arrives, we will leave.
15       So at that time I called Mr. Paru, and I said, sir, you
16   know, the delivery is here, we need the stuff to continue
17   selling, but you don't leave anything here.  He was like the
18   checkbook is under the counter, you know, you can just give
19   him a check and it's fine.  It is fine with me as long as you
20   just keep the invoice and show to me.
21   Q.  Did you ever go or speak to the bank that Hudson Side Cafe
22   used to get permission to be someone who can sign for the bank
23   account?
24   A.  No.
25   Q.  Did you ever fill out any forms so that you would be

WCR     OCR     RPR

Proceedings                                                    150

1    someone who could sign on behalf of Hudson Side Cafe, Inc.?

2    A.  No.

3    Q.  Did anyone at Papo's Chicken ever give you a document

4    stating how much you would be paid?

5    A.  No.

6    Q.  Did anyone ever ask you to sign any documents in order to

7    work for Papo's Chicken?

8    A.  No.

9    Q.  When you were paid, did you receive any statement of what

10   you were being paid?

11   A.  No.  Everything was cash.

12   Q.  Did you ever see any posters about the minimum wage In

13   Papo's Chicken?

14   A.  They never have no papers on the wall, there was nothing,

15   no records or nothing in there.

16   Q.  I'm giving you a document that's been marked as

17   Plaintiffs' Exhibit 7.  Do you recognize the second page or

18   for those who have just one page the reverse side of the

19   document.

20   A.  Yes.  It's a W-2.

21   Q.  And who provided that to you?

22   A.  Was one of his partners, I think his name is Mohammed or I

23   don't really know his name because I saw him a few times.

24   Q.  When did you stop working at Papo's Chicken?

25   A.  It was probably the first week of February 2013.

Proceedings                                                       151

1   Q.  Why did you stop working?

2   A.  The reason why is because I never see any increase on my

3   salary.

4   Q.  When you stopped working, was Mr. Alam still at the

5   restaurant?

6   A.  No.  He left like probably second week or middle of

7   October.

8   Q.  Was Carlos Oaxaca still at the restaurant?

9   A.  Yes, he was there.

10  Q.  After you stopped working at Papo's Chicken, what did you

11  do for work, if anything?

12  A.  I went back to my previous job that I used to do, the

13  delivery, driving, you know, kind of delivery person.

14  Q.  Is that for the bakery?

15  A.  That's for the bakery, yes.

16  Q.  Were you a manager of that business?

17  A.  Right now I'm -- I have like authority to kind of manage

18  driving people, where they working right now at the place.

19  Q.  How long have you had that authority?

20  A.  Probably like seven, eight months ago, since I am very

21  hard working person and I always offer the best of myself, so

22  the owner decide to give me a little chance to manage, you

23  know, kind of drivers.

24  Q.  Did you ever have that type of authority when you worked

25  there before working at Papo's Chicken?

Proceedings                                                    152

1    A.  No.

2    Q.  Did you ever manage any business?

3    A.  No.

4    Q.  Have you ever owned any business?

5    A.  I had a partnership, which was a bread distribution back

6    in 2004.

7            MR. ANDROPHY:  Okay.  No further questions.

8    CROSS-EXAMINATION

9    BY MR. MOULINOS:

10   Q.  Good afternoon, Mr. Espinal.

11   A.  Good afternoon, sir.

12   Q.  When you started to work at this pizza place, I think you

13   mentioned there were two others who worked there for about two

14   weeks.

15   A.  Yes.

16   Q.  Do you know who fired them?

17   A.  May I have some water, please?

18   Q.  Of course.

19   A.  Thank you.  I'm ready.

20   Q.  These two people that you found there who were fired two

21   weeks later, do you have any idea who fired then?

22   A.  Nope.

23   Q.  Could it be that you fired them?

24   A.  What you mean?

25   Q.  I don't know.  I'm asking you.

Proceedings                                             153

1    A.  Oh.

2    Q.  Did you fire these two people who were there two weeks

3    after you started to work?

4    A.  No, sir.

5             MR. ANDROPHY:  Objection.  There's been no testimony

6    that they were fired.

7             THE COURT:  It's sustained.

8    BY MR. MOULINOS:

9    Q.  Do you know why these other two people who were there

10   before you got there ceased to work further for this pizzeria?

11   A.  Excuse me?

12   Q.  Do you know why they were no more working there after two

13   weeks of you being there?

14   A.  Those two people, they were the two persons when at the

15   beginning of the two week, the second week of June, we went

16   with Mr. Kabir to look at the place.  Those two workers,

17   those are the workers that used to work there making salads

18   without gloves.  So probably I think that was the reason they

19   got fired from the owner.

20   Q.  Not by you?

21   A.  Not by me, sir.

22   Q.  Isn't it a fact that these two were Bangladeshis, and you

23   wanted to bring in a Hispanic to work so you fired them and

24   you bring in Mr. Carlos; isn't that the truth?

25   A.  No, sir.  That is not the truth.

Proceedings                                                   154

1   Q.  We'll find out.  Now, you mentioned before about a
2   contract involving Time Warner Cable in Defendant's Exhibit G;
3   do you remember testifying about that?
4   A.  Yes.
5   Q.  What was the company that was used before to provide cable
6   service to this establishment; do you recall?
7   A.  I believe it was Verizon.
8   Q.  It is not that you believe, you know for sure it was
9   Verizon; isn't that a fact?
10          MR. ANDROPHY:  Objection.  Argumentative.
11          THE COURT:  I'll permit that question.
12          MR. MOULINOS:  And you were not happy with Verizon --
13          THE COURT:  He did not answer that.
14          MR. MOULINOS:  I'm sorry.
15          THE COURT:  Would you ask it again?
16  BY MR. MOULINOS:
17  Q.  Okay.  Wasn't the company Verizon, and you are sure of
18  that?
19  A.  It was Verizon.
20  Q.  Okay.  And wasn't it a fact that you were not happy with
21  Verizon, and you wanted to switch to a more fancy operation
22  for the store?
23  A.  Why I should not be happy if it's not my store.
24  Q.  Okay.  Let's go back to the cable contract.  You signed
25  it, didn't you?

Proceedings                                                    155

1    A.  I did.

2    Q.  And you said at the bottom you were the president?

3    A.  Yes, I did.

4    Q.  You signed not in one spot, several spots.

5    A.  Yes.  And now I understand why Mr.  Paru told me that it's

6    fine with me to sign and put the president because I know from

7    fact that probably in the future that would be something

8    against me, you know.

9    Q.  And you had no authority to be the boss there for nothing;

10   am I correct?

11   A.  You are correct.

12   Q.  Paru was directing everything?

13   A.  Yes, sir.

14   Q.  Every day of the week?

15   A.  Basically, everyday he used to come.

16   Q.  Well, Mr.  Carlos Oaxaca said he was there definitely

17   seven days a week.  Was Mr.  Oaxaca wrong?

18   A.  Well, I used to work --

19           MR. ANDROPHY:  Objection.  Mr.  Moulinos is

20   testifying here.  He can't speak for what Mr.  Oaxaca --

21           THE COURT: Ask questions, please.

22   BY MR. MOULINOS:

23   Q.  You signed this document as the president?

24   A.  I did.

25   Q.  And the date is September 7, 2012?

Proceedings                                                    156

1    A.  Correct.

2    Q.  Isn't this roughly one month after you commenced being

3    there?

4    A.  Yes.

5    Q.  And the service that you ordered could have put into a lot

6    of debt the corporation; is that correct?  You increased the

7    service, you increased the obligation of Hudson's Cafe,

8    correct?

9    A.  Well, yeah, but that was under Mr.  Paru approval.

10   Q.  If Mr.  Paru was there almost on a daily basis, why would

11   you need to call him and tell him, hey, why don't we upgrade

12   the cable service, the guy is here, why don't you let me sign,

13   or let me sign, or, yeah, just sign as the president.  Why

14   didn't you have some patience and let Mr. Paru sign the

15   document; was there a reason?

16   A.  There was a reason because the company used to call like

17   almost everyday and I hand -- I show him the papers, I give

18   him the papers several times.  He told me, yeah, I will review

19   it, and I will sign and you can fax it over.

20        So after several calls I said, listen, these people are

21   driving me crazy, they've been calling everyday.  So you

22   already read the contract, what are you going to do?  Should I

23   just get rid of this or what are you going to do?  He said,

24   you can just sign, you know, sign and fax them over.

25   Q.  And he told you this over the telephone?

                      Proceedings                        157

1    A.  Over the phone.

2    Q.  Well, wasn't that morning or that afternoon there before

3    you took the initiative to sign as the president?

4    A.  I believe it was in the morning.

5    Q.  Okay.  If you were there in the morning, why couldn't you

6    wait 'til next morning to see Mr. Paru so he can sign this

7    thing?

8    A.  He had -- at that point I don't really think about I'm

9    going to get into all this situation.  If I knew I am going to

10   get into all this troubles, trust me, I would never sign

11   anything that does not belong to my name.

12   Q.  This was a mistake on your part?

13   A.  I would say, yes.  I made a big mistake that I would never

14   make it again.

15   Q.  I understand.  And you made that mistake because you

16   trusted Mr.  Paru that he meant what he said?

17   A.  That's right.

18   Q.  And if you knew Mr.  Paru as you know him now, you

19   wouldn't be signing this, correct?

20   A.  Correct.

21   Q.  Okay.  By the way after you signed this document, did

22   Warner Cable provide service to the establishment?

23   A.  Yes.

24   Q.  What service did you get?

25   A.  It was phone, cable, --

Proceedings                                               158

1    Q.   Internet?

2    A.   -- and Internet called "Triple Play".

3    Q.   You thought that was a better plan than the Verizon that

4    used to be there before?

5    A.   Well, because according to Mr. Paru when I show him the

6    contract, he told me this is a better deal, and I will fill

7    out the paperwork and I will do it later on.

8    Q.   So that's why you -- based upon the orders of Mr. Paru,

9    you went ahead, you became the president, and you executed

10   this document several times, correct?

11   A.   Yes.  And it was a big mistake.

12   Q.   I understand.  Now, if I may show you Defendants Exhibit

13   A; do you see Defendants Exhibit A, Mr. Espinal?

14   A.   Yes, sir.

15   Q.   Have you seen this document before?

16   A.   Yes, I did.

17   Q.   And on the upper right-hand corner, is that your

18   signature?

19   A.   That's correct.

20   Q.   And would you explain to the Court what is this document

21   that has your signature on it and a lot of inventory on it?

22   A.   This was an inventory like you just say.

23   Q.   It was an inventory.  Why was this necessary with your

24   signature on it?

25   A.   Okay.  Well, basically, three person, we went to the

Proceedings                                                    159

1    basement because the place was shut down by the Health
2    Department.  When they reopen was Mr. Shahin, the other guy
3    who used to work over there, and myself, we went to the
4    basement.  He said since you guys are going to work together,
5    I want you two guys to go downstairs before we open, and I
6    want you two guys check that everything that is on the
7    inventory, I want it to have a track of what is in there, and
8    I want you two guys to check item by item.
9    Q.  I thought before you testified that you never went
10   downstairs with Mr. Alam, Mr. Paru, and Mr. Kabir?  Now, it
11   is there was a meeting; you admit that?
12   A.   It was not a meeting, sir.  It was a check of the
13   inventory that was in the basement, and there was not a
14   meeting because there was a co-worker that used to be there.
15   Q.  How long did it take to draft this Exhibit A which is the
16   inventory sheets?
17        MR. ANDROPHY:  Objection.  There hasn't been any
18   testimony that he drafted this.
19        MR. MOULINOS:  I said draft to -- I didn't say he
20   drafted it.  I said to draft the agreement.
21        MR. ANDROPHY:  Okay.  Withdrawn.
22        MR. MOULINOS:  To put it, reduce it into writing.
23        THE COURT: Do you know how long it took to write-up
24   this inventory?
25        THE WITNESS:  Well, I didn't write this inventory.

Proceedings                                                    160

1   Everything was written, we just went downstairs and checked

2   the quantity and put the check mark in.

3   BY MR. MOULINOS:

4   Q.  And there are some prices per unit there and then to the

5   right in different colors, as well, to the right of it there

6   is the summation, right?  Per item?

7   A.  That's correct.

8   Q.  And you go all the way to the end, six pages later, and

9   there is a writing at the very last page that says $6,019; see

10  that?

11  A.  Yes.

12  Q.  What does that mean, the 6,019?

13  A.  Most probably was -- most probably was the amount of the

14  inventory, but the prices, when we went downstairs and checked

15  the inventory about quantities of each product or each item,

16  prices was not, that was not there.

17  Q.  Since you were an employee, per your testimony, why would

18  you want to be signing an inventory list in such detailed

19  fashion?

20  A.  See, what happened is we went downstairs, the guy says,

21  you know what, we just got to make sure that everything was

22  there.  And since I was a kind of new person in there, they

23  told me, like, you know, well, you could just sign and it's

24  fine.

25  Q.  Oh, so who told you just to sign?

Proceedings                                          161

1    A.  Mr.  Shahin.

2    Q.  "Shahin" meaning "Mr. Kabir"?

3    A.  No.  Shahin, the guy who works over there.

4    Q.  Okay.  Who else was present?

5    A.  The other guy who used to make deliveries.

6    Q.  How about Mr.  Paru?

7    A.  Mr.  Paru wasn't there.

8    Q.  I see.  So you sign a very detailed inventory list with

9    somebody you don't even know who supposedly was just working

10   there and some delivery guy?  Did I hear you right?

11   A.  Yes.  And if you see the first page, it's not the end of

12   the page.  It's not the last page, it's the first page that I

13   signed.

14   Q.  Yeah.  But it says one through six.

15   A.  Yes.

16   Q.  Okay.  So, therefore, there were six pages.

17   A.  All right.

18   Q.  Now, beneath 6,019, there is two more scribbling's.

19   A.  Okay.

20   Q.  One says $3,000 and underneath it says chicken, 1,100; can

21   you please explain to us what these two mean?

22   A.  I have no idea about the chicken, three thousand, and

23   eleven -- or 1,100.  It was not -- like I mentioned to you,

24   numbers was not there.

25   Q.  Oh, these numbers came later?

Proceedings                                                162

1    A.  Yes.

2    Q.  Isn't it a fact that you were given a -- that you paid

3    $3,000 to Mr. Paru and because you purchased chicken for

4    $1,100, that also was given a credit to you, and that would be

5    reflected in other documents that are coming up?  Isn't that

6    the real truth?

7    A.  Do I pay $3,000 to him?

8    Q.  Yes.

9    A.  Not true.

10   Q.  Okay.  However, this is an inventory sheet that was

11   accurate at the time it was made; is that correct?

12   A.  Just the number of the cases, not the prices.

13   Q.  Oh, not the prices?

14   A.  Explain that to you.

15   Q.  Oh, but this is your signature at the very top right?

16   A.  That's correct.

17   Q.  If I may turn your attention to Defendant's Exhibit B; do

18   you recognize the document?

19   A.  Yes.

20   Q.  Is on the very upper right-hand corner your signature?

21   A.  That's correct.

22   Q.  Isn't this a further list of inventory that is from the

23   first floor of the business?

24   A.  To be honest, I don't remember if it was from the first

25   floor or was from the basement.

Proceedings                                                    163

1   Q.  But at the time it was made, was it accurate?

2   A.  There was no prices in there.

3   Q.  I see.  The prices came later?

4   A.  That's correct, sir.

5   Q.  I see.  But the upper right-hand corner is your signature,

6   isn't it?

7   A.  Yes.

8   Q.  And do you recall signing this document?

9   A.  I did.

10  Q.  So it was perfectly fine except for the item unit prices?

11  A.  That is correct.

12  Q.  May I direct your attention, sir, to Defendant's Exhibit

13  C?

14  A.  I don't have any -- which was -- it's here or --

15  Q.  It's the first bank statement.

16  A.  I don't have it.

17  Q.  I give you the entire package there.

18          MR. MOULINOS: May I approach, Your Honor?  You found

19  it?

20          THE WITNESS:  Yes.

21          THE COURT: Is it marked or -- it's not marked.

22          MR. MOULINOS:  It is marked through before it.  It is

23  the exact same document that was marked at the depositions.

24  They all have the identical marking.

25          THE COURT:  No.  The Defendant's Exhibit C here?

Proceedings                                                              164

1               MR. MOULINOS:  Yes.  Because this was placed --

2               THE COURT:  This copy doesn't have that marked.

3               MR. ANDROPHY:  I think the copy he has, if it's the

4    same as mine, I think it might be marked on like the seventh

5    page of the document?

6               MR. MOULINOS:  Yes.  Counsel is correct, Your Honor.

7               THE COURT: Okay.  I'll look at the document.

8               MR. ANDROPHY:  The sixth or seventh page.

9               THE COURT: Could you go and help him, please, find

10   the markings?

11              MR. MOULINOS:  Yeah.  I gave him my copy.

12              THE WITNESS:  Is it Defendant D?

13              MR. MOULINOS:  No.  Defendant's C, that one.

14              THE WITNESS:  Okay.

15              MR. MOULINOS:  Does it say "C" at the bottom?

16              THE WITNESS:  Yes.

17   BY MR. MOULINOS:

18   Q.  You see this bank statement?

19   A.  I see it.

20   Q.  Who's the owner of this bank account?

21   A.  Hudson Side Cafe.

22   Q.  Incorporated?

23   A.  That's correct.

24   Q.  Were you ever a shareholder in that corporation?

25   A.  No, sir.

Proceedings                                    165

1    Q.  A partner?

2    A.  No.

3    Q.  A signatory on it?

4    A.  No.

5    Q.  Why don't we turn our attention, sir, further down where

6    the checks begin?

7    A.  Okay.

8         MR. ANDROPHY:  If I could ask that counsel go back to

9    the table rather than approaching the witness unless there's

10   something that needs to be pointed out.

11        MR. MOULINOS:  Fair enough, Judge.  I just wanted to

12   be close to him if he --

13        THE COURT:  Right.

14        MR. MOULINOS:  -- is not on top of things.  That's

15   all.  I apologize.

16   BY MR. MOULINOS:

17   Q.  Let's look at the page where the actual Defendant's C

18   sticker is.

19   A.  Okay.

20   Q.  Do you see it?

21   A.  I do.

22   Q.  There are checks there, right?

23   A.  What checks?

24   Q.  Check number 1614; see it?

25   A.  Yes.

Proceedings                                                  166

1    Q.  Dated what?  What's the date on that check?

2    A.  9/14/2012.

3    Q.  2012, right?  Payable to who?

4    A.  It says "AB Waste".

5    Q.  Would that be the sanitation company?

6    A.  Probably.  Because I didn't fill out that check.

7    Q.  Well, who signed it?

8    A.  I did.

9    Q.  Why did you sign it since you were never authorized to

10   sign anything?

11   A.  Like I mentioned to you earlier, every time when I --

12   these people used to come, I used to call Mr.  Paru.  He was

13   like, checkbook is under the cash register, you or Alam sign

14   the check, and just give it to the vendor.

15   Q.  You did not realize you were committing forgery of some

16   sort?

17   A.  Honestly, no.

18               MR. ANDROPHY:  Objection.

19               THE COURT: Okay.

20               MR. MOULINOS:  Okay, Judge.  Withdrawn.

21               THE COURT:  Just control yourself, Mr. Moulinos.

22   BY MR. MOULINOS:

23   Q.  But you did sign the check?

24   A.  I did.

25   Q.  Because you called Mr.  Paru, and he authorized you to

Proceedings                                                    167

1    sign your name on the check?

2    A.   That's correct.

3    Q.   Let's move to the next check, sir; do you see it?

4    A.   I did.

5    Q.   What's the number?

6    A.   I would say 16-16, probably.

7    Q.   And it's payable to whom?

8    A.   State Farm.

9    Q.   That is an insurance company, right?

10   A.   That's right.

11   Q.   And the amount is 747, correct?

12   A.   That's correct.

13   Q.   Did you sign it?

14   A.   I did.

15   Q.   Why did why sign an insurance company check?

16   A.   Like I mentioned to you.

17   Q.   What is it?  I'm talking about this check, specifically.

18   A.   The people come, the people looking for checks.  I've been

19   calling Mr. Paru; Mr. Paru says, you know what, give them a

20   check, you know what to do.  I already told you I'm very busy

21   with my business and just sign the check and give it to them.

22   And all these checks were signed and they were made to,

23   basically, pay expenses for their business.  Nothing is for my

24   personal or Alam or anybody else.

25   Q.   I think you were very impatient, and that's why you called

Proceedings                                                            168

1    Mr. Paru because these people were haunting you day-after-day

2    for payment, so you would call up Mr. Paru and say, hey, can I

3    --

4              MR. ANDROPHY:  Objection.

5              MR. MOULINOS:  I'm trying to find out what happened.

6              MR. ANDROPHY:  Mr.  Moulinos is being --

7              THE COURT:  Mr. Moulinos, ask questions.  Please

8    don't make speeches.

9              MR. MOULINOS:  Okay.

10   BY MR. MOULINOS:

11   Q.  Was it your frustration that made you phone call Mr. Paru

12   to get authorization to sign this?

13   A.  No.

14   Q.  You were not frustrated?

15   A.  No.

16   Q.  You just said these people were haunting you daily and

17   daily out --

18             MR. ANDROPHY:  Objection.  That's mischaracterization

19   -- I think that was Mr.  Moulinos' additions.

20             MR. MOULINOS:  Withdrawn, Your Honor.  Withdrawn.

21   Withdrawn.

22   BY MR. MOULINOS:

23   Q.  However, it is a fact you signed the insurance company

24   premium check for $447 on September 22, 2012; yes or no?

25   A.  You said 400?

Proceedings                                      169

1    Q.   And 47.

2    A.   Which check?

3    Q.   Number 1616?

4    A.   That's 747, sir.

5    Q.   Dollars?

6    A.        Yes.  Not 400.

7             THE COURT: Seven-forty-seven.

8    BY MR. ANDROPHY:

9    Q.   Seven-hundred-and-forty-seven?

10   A.   That's correct.

11   Q.   And the check number is 1616?

12   A.   Uh-huh.

13   Q.   And you signed it?

14   A.   Yes.

15   Q.   Payable to State Farm?

16   A.   That's correct.

17   Q.   May we move further into the next exhibit, sir, that would

18   make it "D", another group of -- actually, there's one more

19   bank statement, Defendant's Exhibit D:  Do you see that?

20   A.   Yes.

21   Q.   Okay.  Now, what company's bank statement is that?

22   A.   Hudson Side Cafe, Inc.

23   Q.   And as we said, you were not authorized to sign anything

24   for that corporation, right?

25   A.   That's correct, sir.

Proceedings                                                    170

1    Q.  And this statement is from September 29th, 2012 to October

2    31, 2012?

3    A.  That's correct.

4    Q.  And let's look now at the page where the bank checks

5    begin.  Do you see that page?

6    A.  Yes.

7    Q.  Do we see the first check at the bottom left, number 1618?

8    A.  Yes.

9    Q.  You see that?

10   A.  Uh-huh.

11   Q.  Did you sign that check?

12   A.  I did.

13   Q.  And to whom was it payable?

14   A.  Supreme Poultry, Inc.

15   Q.  Do you know who they were?

16   A.  Chicken company.

17   Q.  Okay.  And the business of Papo's Chicken was to sell

18   chicken, right?

19   A.  That's correct.

20   Q.  So you needed a lot of inventory chicken, correct?

21   A.  Well, they used to sell it.

22   Q.  Sell what?

23   A.  So they need product.

24   Q.  Okay.  Who's "they"?

25   A.  The business.

Proceedings                                                171

1   Q.  Okay.  Did you sign this check?

2   A.  I did.

3   Q.  And how did it come about that you signed this very

4   specific check on October 1st, 2012?

5   A.  I guess I'm going to have to give you the same answers on

6   all these checks.

7   Q.  Let's hear it.  Let's hear it.

8   A.  The same answer is the same.  I called Mr. Paru --

9   Q.  I'm talking about this specific check.

10  A.  Yes.  I called Mr. Paru, and I told him there is no cash.

11  There is not enough cash, what do you want us to do; you want

12  the guys to leave with the product?  We're not going to have

13  chicken to sell or how you going to pay them.  Same.  He keeps

14  saying, I don't -- he keeps saying this:  I don't understand

15  how many times I'm going to explain to you, whenever someone

16  comes, just get the checkbook in there, and give them a check

17  like always you do, give them a check, and get the product.

18  Q.   The same answer goes also for the State Farm check;

19  somebody came in and demanded it on the spot, correct?

20  A.  Yes.

21  Q.  Let's move to check 1617 on the same page.

22  A.  Okay.

23  Q.  Do you see it?

24  A.  Yes.

25  Q.  Is the date on it September 27th, 2012?

Proceedings                                            172

1    A.  That's correct.

2    Q.  Did you sign the check?

3    A.  I did.

4    Q.  And the name of the company is what?

5    A.  Same.  Supreme Company.  The chicken company.

6    Q.  I see.  And underneath that I see another check, number

7    1625, also payable to Supreme?

8    A.  That's correct.

9    Q.  Dated October 5th, 2012?

10   A.  That's correct.

11   Q.  For $372?

12   A.  Yes.

13   Q.  Did you sign it?

14   A.  I did.

15   Q.  Also, let's move to the next page.  Staying on the first

16   column on the left side of the page; do you see check number

17   1630?

18   A.  Yes.

19   Q.  Did you sign the check?

20   A.  Yes, sir.

21   Q.  On October 12th, 2012?

22   A.  That is correct.

23   Q.  To whom is it made payable?

24   A.  Called "AC Metro Distribution"; must be a soda company.

25   Or juice company.

```
                          Proceedings                          173
```

1    Q.  And what do they sell?

2    A.  Juice.

3    Q.  What do they sell?  What do they provide?

4    A.  Juice.

5    Q.  Juice?  Oh, all right.  Let's go to one check underneath

6    that; 1632 is the number of the check.

7    A.  I see it.

8    Q.  What is the date on it?

9    A.  October 20th, 2012.

10   Q.  Payable to whom?

11   A.  "AB Waste System"; must be a probably a garbage company.

12   Q.  And did you sign it?

13   A.  I did.

14   Q.  Why did you sign this check?  This particular check.

15   A.  The guy used to come once -- I believe once a week or once

16   a month.  I can barely remember.  Looks like was once a week

17   or a month, used to come in looking for his check. Sometimes

18   he had the check made, sometimes he doesn't.  Sometimes we

19   used to give him cash if the cash was available.  So Mr. Paru

20   never wants us to pay cash.  He always says, you know, pay

21   them in check.

22   Q.  And Mr. Paru, is this again over the telephone you asked

23   Mr.  Paru what to do with this, and what did he say to you?

24   A.  Yes.  He just keep saying the same thing.  He says, the

25   check is there.  Just you or Alam, whoever is available, just

Proceedings                                    174

1   sign.

2   Q.  So every time that these checks were made by you or rather

3   signed by you, the method of signing the checks was the same.

4   You would call Mr. Paru; Mr. Paru would authorize you to go

5   ahead and sign as though you are an authorized member of the

6   corporation without exception; is that correct?

7   A.  That's correct.

8   Q.  Let's go underneath.  You see check number 1634?

9   A.  Yes.

10  Q.  Dated what?

11  A.  October 16, 2012.

12  Q.  Also payable to Supreme.  I presume --

13  A.  Chicken company.

14  Q.  I presume that is the chicken company.

15  A.  That's correct.

16  Q.  Did you sign the check?

17  A.  I did.

18  Q.  Okay.  So I'm going to assume the answer is the same.  You

19  called Mr. Paru, Paru came back and said, oh, yeah, it's

20  underneath the desk, go ahead and sign it?

21  A.  That's correct.

22  Q.  Okay.  Let's move to the right side.  We got some more

23  checks you signed, didn't you?

24  A.  Basically --

25  Q.      Right now.

Proceedings                                                           175

1   A.  Basically, it's everything is for the business purpose,

2   for that store.

3   Q.  If you knew that the chicken guy is going to show up once

4   a week and Mr. Paru was there everyday or almost everyday,

5   why didn't you tell Mr. Paru, why don't you just pre-sign

6   these checks, have them ready so when Mr. Chicken comes

7   around, the checks are ready to give him?

8   A.  I never thought about -- at that time, I never thought

9   that this, to sign this check is going to cause me all these

10  troubles, all these issues.

11  Q.  What trouble did these checks cause you, sir?

12  A.  Well, so far you've been asking me so many questions about

13  these checks.  If I knew at the very beginning that I'm going

14  to get in -- in some problems like this, I would never have

15  signed any checks, like I mentioned earlier, that does not

16  belong or is not under my name.

17  Q.  So what you're saying, all this trouble that these checks

18  are causing, you mean your credibility today because nothing

19  else happened before today, correct?

20          MR. ANDROPHY:  Objection.

21          THE COURT: Sustained.  Move on.

22  BY MR. MOULINOS:

23  Q.  All right.  Let's go to the next page.   Mr. Espinal,

24  there are three more checks on the page that follows, correct?

25  A.  That's correct.

Proceedings                                                      176

1    Q.  And I assume again it was the same issue with the Supreme

2    Chicken provisions company that you signed three more checks;

3    one number is 1636; the other is 1638; and the other is 1637.

4    All payable to Supreme, presumably, the chicken provisions

5    company, correct?

6    A.  That's correct.

7    Q.  And, again, the testimony is identical to the one before?

8    A.  That's right, sir.

9    Q.  Okay.  May we move, sir, to exhibit further down, it's

10   H-1, which happens to be a slip of deposit of cash for $500.

11   It's H-1; do you see it?

12   A.  H-1; yes.

13   Q.  Do you remember making a deposit for $500 in the bank?

14   A.  Yes.

15   Q.  What was that for?

16   A.  Mr.  Paru called me.  He said since we been sending a lot

17   of checks, we, because I'm the ones, you know, signing the

18   checks, he says I want you to make this cash deposit because I

19   don't want the checks to be bounced, and that's what I did.

20   Q.  So you complied with Mr.  Paru's request --

21   A.  Yes.

22   Q.  -- to go fast to the bank, make a $500 deposit, so all the

23   checks don't bounce?

24   A.  That's correct.

25   Q.  Mr. Paru told you to do that?

Proceedings                                                    177

1   A.  That's correct.

2   Q.  And you went yourself to the bank?

3   A.  That's correct.

4   Q.  Let's look at the next page, the next exhibit, H-2.

5   A.  Okay.

6   Q.  Do you see that?  H-2?

7   A.  Yes.  Uh-huh.

8   Q.  Could you tell us what that is that says paid in full?

9   A.  This is the money that Mr.  Paru sometimes used to take

10  it.

11  Q.  Take it from whom?

12  A.  From the register.

13  Q.  And at the upper left-hand corner, it says Juan

14  Anala(Phonetic)?

15  A.  Yes.

16  Q.  Why would your name be there if you did not handle cash?

17  A.  Because we are the ones sometimes used -- Alam used to be

18  their cash register.

19  Q.  Right.

20  A.  And I used to run, also, take the money when the customers

21  used to come.  So we the ones, we're responsible if any money

22  is missing on the register.  So that way every time he used to

23  come and grab money, we used to write it down.

24  Q.  And further down the page, why is there any mention of

25  credit card on October -- I'm sorry -- on August the 1st to

Proceedings                                          178

1    August 30th for $1,224?  Why is that needed under cash

2    turnover slip?

3    A.  Can you repeat the question, again?

4    Q.  If you see in the middle page of page of this receipt.

5    A.  Yes.

6    Q.  Which says paid in full.  You see it mentions credit card,

7    October 1 to October 30, 2012 --

8    A.  Okay.

9    Q.  -- and it says 1,224?

10   A.  That's correct.

11   Q.  If your only obligation is to turn over the cash to Mr.

12   Paru, why would the credit card deposits be part of an entry?

13   And, furthermore, why does the --

14          MR. ANDROPHY:  Can he ask one question at a time?

15          MR. MOULINOS:  I apologize.  I apologize.

16          THE WITNESS:  To be honest, I don't remember about

17   this credit card, 1,224.  It was -- the credit card must be

18   credit card, it's not cash.

19   Q.  I agree with you.  The question is why would on a

20   turnover of cash to Mr. Paru as you said, there would be a

21   mention of credit card for one month, credit card deposits.

22   Do you have any idea?

23   A.  I don't remember.

24   Q.  And why is the sum precisely 3,500, if you know?

25   A.  Probably wasn't a sum, and there was an add that makes

Proceedings                                                        179

1    3,500.

2    Q.  So you say it was just accidental?

3    A.  I don't think so.  I don't -- honestly, I don't remember.

4    I don't really have a date on here so I don't remember what

5    day was this made.

6    Q.  The date is stated at the bottom, and it says from August

7    1 to August 30th, 2012, and it says paid in full.  Do you see

8    that?

9    A.  I see it.

10   Q.  Why would it say paid in full and what payment was for?

11   A.  Honestly, I don't remember what payment was in full on

12   this 3,500.

13   Q.  Let me see if I can help you.  Isn't this the first

14   month's exchange of numbers on the deal that was between you

15   and Mr.  Alam and Hudson Side Cafe?

16   A.  What do you mean?

17   Q.  I mean wasn't there the deal, you were going to pay to

18   them 3,500, and you would run the show as you please, and this

19   was the first month's adjustment or what do you call it, the

20   first month's reconciliation?

21   A.  We never agreed to pay them any money.

22   Q.  But why is this 3,500 so precisely on the dot?  And he

23   mentions the month of August 2012.

24   A.  You see, on the cash, I could say, like I explained to

25   you, on the cash money that was because Paru used to go there

Proceedings                                          180

1   and get the money, you know; the credit card, I don't really

2   remember what was --

3   Q.  By the way, Mr. Paru would come to the -- to the pizza

4   place, according to your testimony, between five and eight

5   p.m. daily; am I correct?  That's what I heard before?

6   A.  That's correct.

7   Q.  Now, Mr. Carlos Oaxaca stated that this was a 3:00 p.m.

8   average time that he would leave. Which is correct, the 3:00

9   p.m. of Mr. Oaxaca or your five to 8:00 p.m.?  Was Mr. Oaxaca

10  wrong?

11  A.  I don't remember Mr. Oaxaca says Mr. Paru left at 3:00

12  p.m.  Now, to that I know and that I remember, I know he used

13  to go there between five and seven, five and eight.

14  Q.  I also believe I heard you said that Mr. Paru, while he

15  was there, he would also take pizza orders over the telephone.

16  Did you say that or is it my ears?

17  A.  Yes, that's correct.

18  Q.  He would?

19  A.  Yes.

20  Q.  I don't recall hearing Mr. Oaxaca say anything about

21  that?

22          MR. ANDROPHY:  Objection.

23          MR. MOULINOS:  Was he correct or were you correct?

24          THE WITNESS:  Well, because --

25          MR. ANDROPHY:  Objection.  He's --

Proceedings                                      181

```
 1            THE COURT:  Can you ask a question?
 2            MR. MOULINOS:  Okay.
 3            MR. ANDROPHY:  He can only testify to what he's
 4       testifying to.
 5       BY MR. MOULINOS:
 6       Q.  Where did you learn making pizza, sir?
 7       A.  Since I came into this country, my first job was working
 8       in a pizzeria as a cleaner.  So from then I was cleaning and I
 9       was learning how to make sauce and then dough, and from the
10       dough, this guy was teaching me about making pizza.  That was
11       back in '90, '98.
12       Q.  So from 1998 until when did you work making pizza?
13       A.  I been working in a different, all the jobs that I've been
14       having, I've been working in the food business;  restaurants,
15       delis, pizzerias.
16       Q.  But the very last job before you ended up with Hudson Side
17       Cafe was delivering things?
18       A.  Right.  Yes.
19       Q.  For four years you said?
20       A.  No.
21       Q.  How many?
22       A.  For two years or a year.
23       Q.  A year.
24       A.  Two years.
25       Q.  Two years?
```

Proceedings                                          182

1   A.  Yes.

2   Q.  And what was the last salary you were making gross at that

3   job prior to starting to work for the pizzeria?

4   A.  I used to work kind of part-time jobs.  The very last job

5   that I had was on this company, All Natural, I used to work

6   three days.  They used to pay me $300.

7   Q.  $300.  And you were working only three days.

8   A.  That's correct.

9   Q.  And you were doing side jobs, too?

10  A.  Kind of.

11  Q.  And all together for a week, how much were you making,

12  roughly, before starting to work for the pizzeria?

13  A.  Probably, 450.

14  Q.  Four-hundred-fifty?

15  A.  Yes.

16  Q.  Why would you want to leave the 450 jobs that were easy

17  and come here and work 16 hours a day, six days a week, for

18  $400?

19  A.  Who told you it was easy?

20  Q.  That was difficult work?

21  A.  Oh, yes.

22  Q.  More difficult than working for the pizzeria?

23  A.  Well, because I have to buy lunch.  I have to be working

24  on the raining days, hot days.  Getting a risk of having an

25  accident; getting points on my license.

```
                    Proceedings                    183
```

1    Q.  So that's why you gave up all of that hard work to go end

2    up 16 hours a day at this pizzeria for $400 a week, six days a

3    week now --

4    A.  Well, --

5    Q.  -- on your foot; am I correct?

6    A.  That's correct.

7    Q.  And that was easier than the jobs you had before?

8    A.  Because Mr. Kabir told me that it started with $400, and

9    the next month he will increase my salary.

10   Q.  But you found out very quickly the salary never increased

11   by a penny?

12   A.  Because when I spoke to him, he told me don't worry, I

13   will taking care of you.  As soon as the business continue

14   raising, I will, you know, cover you up, whatever money I have

15   to pay you extra, I will definitely pay you.

16   Q.  And it was Mr.  Kabir that told you this or Mr.  Paru

17   because --

18   A.  Mr. Kabir at the very beginning, and after that, Mr. Paru.

19   Q.  Why didn't you quit early on then?

20   A.  Because I have a faith that the business will improve and

21   they will pay me more.

22   Q.  Now, when you first started to work here, wasn't this when

23   the Health Department had shut down this place?

24   A.  It was -- Health Department shut down the place before I

25   start working with them.

Proceedings                                    184

1    Q.   Okay.  And in June of 2012 is when you first were
2    propositioned to work for this place?
3    A.   That's correct.
4    Q.   And you saw it while it was open?
5    A.   Yes.
6    Q.   So you knew eventually that the place had shut down?
7    A.   I don't know if the place is going to be shut down or no.
8    Q.   But you knew it was closed for awhile, right?
9    A.   After that.  The place was closed, probably they shut down
10   in July.
11   Q.   Do you mean to tell me that from June on you had no
12   contact with this place whatsoever?
13            MR. ANDROPHY:  Objection.  That's not what he said.
14            THE COURT:  I'll permit the question.
15            MR. MOULINOS:  Let me rephrase it, Judge, please.
16   BY MR. MOULINOS:
17   Q.   From June to August the 10th, you had no idea what was
18   happening to this place?
19   A.   I told you, middle of June we went there, we look at the
20   place, and after that I never went back to the place.
21   Q.   Until?
22   A.   The first day of my job in --
23   Q.   So you're trying to tell me you never witnessed the place
24   being closed by them for whatever reason?
25            MR. ANDROPHY:  Objection.  I don't understand the

Proceedings                                                185

1    question.

2            THE COURT:  Do you understand the question?  Can you

3    answer that?

4            THE WITNESS:  No.  Can you repeat again?

5    BY MR. MOULINOS:

6    Q.  Did you see this store shut down for any reason after June

7    2012?

8    A.  I passed by because this is where I take the bridge to go

9    to Manhattan when I make my deliveries.

10   Q.  And did you see it closed?

11   A.  I saw the place was closed.

12   Q.  And you had nothing to do with the reopening of the place,

13   correct?

14   A.  Nothing to do with the reopening.

15   Q.  How about Mr. Alam?

16   A.  No.

17   Q.  You people had nothing to do with renovating this place,

18   and putting big signs outside that said grand opening?

19   A.  We don't.

20   Q.  New management?

21   A.  No.

22   Q.  Did you put any signs outside of this store that said

23   under new management?

24   A.  No.

25   Q.  Did Mr. Alam do that?

Proceedings                                                      186

1    A.  No.

2    Q.  So when you got back in August 2012, you found the place

3    open?

4    A.  It was kind of open, but not to the public because it was

5    -- they will teach us what will be the proceed on the

6    business.

7    Q.  And construction was going on, some renovations?

8    A.  No.

9    Q.  Nothing at all?

10   A.  No.

11   Q.  You saw the place just fixed up, correct?

12   A.  That is correct.

13   Q.  And you had nothing to do with the renovations?

14   A.  No, sir.  Why should I?

15   Q.  I am asking you, I don't know.  Did there come a time that

16   you and Mr.  Paru or others upon your leaving the company had

17   another group of inventory made, another inventory sheet

18   written up?

19   A.  That's correct, sir.

20   Q.  Could you please tell us about it?

21   A.  When I told Mr. Paru that I was about to leave because

22   they don't raise me, they don't raise my salary, and I'm

23   getting another job, I told him that I'm going to leave, I

24   want my money that they owe me.  They owe me basically two

25   weeks -- it was kind of a week.

Proceedings                                                187

1        He told me, okay, in order for you to leave, you have to

2    make the inventory and I have to go over with you, make sure

3    how much is there because probably at that time he don't trust

4    me because I told him that I'm going to leave.  So he wants to

5    make sure that, you know, whatever was in there.

6    Q.  And, therefore, you people sat and entered into what is

7    called Defendant's Exhibit I-1, which is almost like the final

8    inventory?

9    A.  That's correct.

10   Q.  Now, do you see at the bottom of the page it says, deposit

11   for store, a thousand-five-hundred?

12   A.  Thousand-five-hundred, yes.

13   Q.  What does that mean?

14   A.  Moot probably has to be a deposit.

15   Q.  Could it be your deposit instead of the $10,000 that had

16   been asked for, your deposit was only a thousand-five-hundred?

17   A.  No.  I don't think so.  I think this was a deposit was

18   made to the bank.

19   Q.  Oh.  Do you see underneath, it says, counter, $4,000?

20   A.  Counter?  Yes.

21   Q.  What is that?

22   A.  But if you see it was crossed off.

23   Q.  I know it was crossed off.  But why was it there in the

24   first place before it was crossed out?

25   A.  I have no idea.

Proceedings                                          188

1    Q.  Do you see underneath, salad bar, $4,000?

2    A.  That's correct.  And you see --

3    Q.  Why was this in the inventory sheet?

4    A.  It's closed.  So if it's closed, it's not part of the

5    inventory.  That's what I think.

6    Q.  I understand that, but somebody wrote it down, and you

7    were present.  And next to it, it says 4,250, when these three

8    numbers are crossed out?

9    A.  Yes.

10   Q.  And to be exactly safe and accurate, isn't this your

11   handwriting on top of it?

12   A.  Yes.

13   Q.  Okay.  So you wrote these numbers.  You said one month

14   free, $3,000; underneath you write, counter, $4,000;

15   underneath you write salad bar, $4,000.  These three numbers

16   are crossed out, and a 4,250 substituted in its place.  Do you

17   see it?

18   A.  I see it.

19   Q.  This is your handwriting.  Would you explain to us what

20   happened with these three numbers that were crossed out?

21   A.  Not the $4,250; the three numbers that I crossed out I

22   believe was part of the inventory at the beginning.

23   Q.  Isn't the real truth that this is how you settled the

24   request you had for them to pay one half of the renovation

25   cost for the salad bar and the counter and the one month free

Proceedings                                                189

1   accommodation you asked?

2   A.  No.

3   Q.  Mr.  Paru rejected it, and you settled the amount at

4   4,250?

5   A.  Not that I remember.  We talk about any settled or

6   anything like that.

7   Q.  All right.  Let's go to the second page.  It begins with

8   expenses, right?

9   A.  Yes.

10  Q.  Why would in an inventory sheet be a discussion about

11  expenses, such as, Con Edison phone, insurance, and inventory?

12  If you're only there working, what business do you have in

13  your own handwriting adjusting these numbers with Mr.  Paru?

14  Could you explain it to me?

15  A.  See, he told me to write all this, all these bills, put

16  them together.

17  Q.  He told you to.  And you just slavishly wrote them down?

18  A.  Well, it's an order.

19  Q.  It's an order.

20  A.  And he's paying me.

21  Q.  I see.  So because he's paying you, you wrote these

22  numbers down to become adjustments, correct?

23  A.  Well, that's correct.

24  Q.  Adjustments of what?

25  A.  When you say "adjustment". what do you mean with

Proceedings                                                  190

1    adjustments?

2    Q.  You tell me because you said, yes, they were meant to be

3    adjustments; to what?

4    A.  Honestly, I didn't understand the question.

5    Q.  Is it the question you don't understand or you don't have

6    an answer?

7              MR. ANDROPHY:  Objection.

8    BY MR. MOULINOS:

9    Q.  So now let's do this again:  In your handwriting,

10   according to you, Mr. Paru directs you to write expenses --

11   Con Edison phone, insurance and inventory for 7,392?

12   A.  That's correct.

13   Q.  And you admit these were meant to be adjustments?

14   A.  At that time I didn't understand you.

15   Q.  Well, now, you do?

16   A.  Yes.  Because I don't see any --

17   Q.  What exactly were they?

18   A.  I don't see any adjustments here.

19   Q.  But you admitted there were adjustments of some sort.

20             MR. ANDROPHY:  Objection.  Mischaracterization.  The

21   witness never used the word "adjustments".  Mr. Moulinos threw

22   it in there.

23             THE COURT:  He did.  He did.  He did.  But just ask

24   your next question, Mr. Moulinos.

25   BY MR. MOULINOS:

Proceedings                                                    191

1    Q.  Mr.  Espinal, we go further down in the very middle of the

2    page, there is some checks there; do you see them?

3    A.  Yes.

4    Q.  Aren't these the checks that the company paid for you and

5    Mr.  Alam as payroll that at the end of your separation, you

6    adjusted amongst yourselves as credit to you?

7    A.  Can you repeat the question again?

8    Q.  Well, you tell me what these middle entries mean:  Check

9    1597; check 1620; check 1619.

10   A.  Can you show me the --

11   Q.  The very middle of Exhibit I-1.  The second page.

12   A.  Are you --

13          MR. MOULINOS:  May I approach, Judge?

14          THE COURT: Are you on I-1?

15          MR. MOULINOS:  Before he saw it --

16          THE COURT:  Yes.  Okay.  You're on that page.  That's

17   the right page.

18          THE WITNESS:  Okay.  Yeah.  But you said there is

19   checks.

20          THE COURT:  Check numbers.

21          MR. MOULINOS:  The check numbers.

22          THE WITNESS:  Oh, check numbers.

23   BY MR. MOULINOS:

24   Q.  Do you know what these numbers were?

25   A.  I was looking for the checks.

Proceedings                                          192

1    Q.  No.  Just tell me what these entries represent in your

2    handwriting.

3    A.  I need to see the checks in order for you to answer it.  I

4    need to see the checks in order for me to answer you what is

5    this amount paid to who.  Because when you say check 1597 --

6    Q.  Let me ask you this:  Is this your handwriting?

7    A.  It is.

8    Q.  Then can you tell us why you wrote this and what was it

9    for?

10   A.  At this time I don't remember.  I need to see the check in

11   order for me to tell you why this check or who this check was

12   wrote to.

13   Q.  I'm asking you if you may to help your recollection, would

14   these checks be the amounts that the corporation had paid for

15   your withholding tax, you and Mr.  Alam, and you were

16   adjusting this at the very last meeting you had with Mr.

17   Paru?

18   A.  You mean this check was paid to us?

19   Q.  No.  It was paid to the government as payroll tax for you.

20   A.  Not that I remember or not that I know.

21   Q.  Let's move down on that page.  It says Health Department,

22   625; you see it?

23   A.  Yes.

24   Q.  Plus 275; plus 250.  In your handwriting.

25   A.  Not the numbers.

WCR        OCR        RPR

Proceedings                                                      193

1   Q.  Do you see them?

2   A.  Yes.  I see Health Department, but the numbers, they're

3   not mine.  And when you say phone and insurance is not my

4   handwriting.

5   Q.  Okay.  Let's assume it's not yours, but the word "Health

6   Department" is yours?

7   A.  Yes.

8   Q.  So could it be that these were fines that you paid to the

9   City of New York for the violations that preexisted the

10  opening of the store; would that refresh year recollection

11  maybe?

12  A.  I may paid this Health Department, but that was part of

13  the -- of fair business.

14  Q.  Why would you enter in the page things that had nothing to

15  do with the turnover of the cash to Mr. Paru and the

16  inventory?

17  A.  Because my name --

18  Q.  Why are we adjusting these numbers?  Is there any idea you

19  may have?

20  A.  No.

21  Q.  Let's go further down.

22  A.  Okay.

23  Q.  Inventory is $6,000; do you see that?

24  A.  Yes.  Uh-huh.

25  Q.  Then it says underneath it, down; I presume it means down

Proceedings                                                    194

1    payment of 3,000.  Then in another entry says, Supreme, 1,100;

2    do you see that?

3    A.  I see it.

4    Q.  And the next number is 1,900; do you see that?

5    A.  Yes.

6    Q.  And do you see now on the front page that number reappears

7    as 1,926; do you see it?

8    A.  Which front page?

9    Q.  On the front page of this exhibit.

10   A.  This?

11   Q.  Do you see that?

12            THE COURT:  No  The first page.

13            THE WITNESS:  I see 1,926.

14   BY MR. MOULINOS:

15   Q.  Isn't this the money that Mr. --

16   A.  And I see on the copy that you was telling me, it's 1,900.

17   Q.  Correct.  Isn't this that you people rounded off the

18   number and you received 1,920 when you left, and you severed

19   the relationship with this company?

20   A.  No.  We never received any cash.  I never received any

21   cash when I left besides my salary.

22   Q.  Oh.  Then what is the significance of the

23   thousand-nine-hundred at the bottom of page two, also known as

24   1,926 at the top of page one?  What --

25            MR. ANDROPHY:  Objection.  There hasn't been any

Proceedings                                                        195

1    testimony that those two numbers are related.

2            THE COURT: Mr. Moulinos, please don't testify.  Just

3    ask the question.

4            MR. MOULINOS:  Okay.

5    BY MR. MOULINOS:

6    Q.  All right.  Let's then stick with the second page, the

7    bottom it says 1,900; do you see it?

8    A.  Yes.

9    Q.  The very last bottom, what they call the bottom line?

10   A.  Uh-huh.  I see it.

11   Q.  What's the significance of the 1,900, sir, in your

12   handwriting?

13   A.  Honestly, I don't remember.  I mean I remember to write --

14   I see the numbers.  I remember to write the numbers, but it

15   doesn't -- why the numbers was there.

16   Q.  And, also, sir, if we now go for a mini-excursion to

17   Exhibit I-2, which is the last one; do you see that?

18   A.  Yes.

19   Q.  Is this a further inventory sheet where that was written

20   up upon your departing Hudson Cafe, Incorporated?

21   A.  That is the inventory that I told you Mr. Paru told me

22   that I have to make in order to get paid my salary.

23   Q.  And that was the $400?

24   A.  Excuse me?

25   Q.  The $400?  Your salary, correct?

Proceedings                                                    196

1    A.  That's correct.

2    Q.  So if you did not do this, they would not have paid you

3    the $400; is that correct?

4    A.  That's correct.

5    Q.  So they were blackmailing you?

6              MR. ANDROPHY:  Objection.

7              MR. MOULINOS:  Sounds like it.

8              THE COURT: Mr.  Moulinos.

9              MR. MOULINOS:  I'm sorry for the word, but I don't

10   know what else to use.  Let me rephrase it with your

11   permission, Judge.

12             THE COURT:  Please do.

13   BY MR. MOULINOS:

14   Q.  They were putting you on pressure; in other words, "they"

15   meaning Mr.  Paru, that if you were not to fill these forms

16   out that way in your handwriting, they would refuse to pay you

17   $400?

18   A.  That's what he told me.  You got to make the inventory --

19   he told me if you remember at the very beginning when you

20   start working with the three guys when you -- I want to make

21   you the same inventory so when you come, I'll take a look, and

22   then I could let you pay a week and we call it even.

23   Q.  Now, if we go back to Exhibit A, the very first one, the

24   first inventory sheet --

25   A.  Okay.

Proceedings                                        197

1    Q.  —— concludes with 6,019 being turned over to you, correct?

2           MR. ANDROPHY:  Objection.  There has been no

3    testimony as to what that 6,019 represents.

4           MR. MOULINOS:  I thought he testified it was

5    inventory turned over to him.

6           THE WITNESS:  It was not to me personally.  It was

7    the business.

8           THE COURT:  It was inventory at the time it was

9    taken.

10   BY MR. MOULINOS:

11   Q.  Oh, then, let me investigate more because I misunderstood

12   the answer, then.  So may we go back to Exhibit A; 6,019 is

13   the conclusion of the inventory on Page 7 of Exhibit A.  Do

14   you see that?

15   A.  Yes.

16   Q.  That means there were $6,019 of merchandise turned over at

17   the time you started the business to work there, correct?

18   A.  To work with them.

19   Q.  To work with them; that's the amount of business inventory

20   that was turned over, correct?

21   A.  Well, like I mentioned to you, numbers was not there, and

22   when I see this after, like I told you, I make a sign, I put

23   the signature without the totals.

24   Q.  So you signed basically a blank document then?

25   A.  Yes.  And that was at the top, and there was only one

Proceedings                                                    198

1    signature on one page.

2    Q.  How about the last exhibit that we've been talking about

3    which is I-1 and I-2; that also was filled out by you in

4    blank?

5            MR. ANDROPHY:  Which document is counsel referring

6    to?

7            MR. MOULINOS:  I-1.  The two-page-document with

8    adjustments that we've been talking about.

9            THE WITNESS:  Yeah, it was.  But there was no

10   signature on there.

11   BY MR. MOULINOS:

12   Q.  I know, but it was your handwriting.

13   A.  Well, yes.

14   Q.  So was it accurate when it was drafted?

15   A.  I think so, yes.

16   Q.  Except for the lower part that had those three lines

17   crossed out; the one month free, the counter expense, and the

18   salad bar expense.  Everything else is accurate, correct?

19   A.  Yes.

20   Q.  In your handwriting, it writes underneath, 12,500,

21   correct?

22   A.  That's correct.

23   Q.  Isn't this the amount you wanted as adjustment from Mr.

24   Paru, and he refused to acknowledge it?

25   A.  What do you mean when you mean adjustment, what do you

Proceedings                                              199

1   mean with that?

2   Q.  You tell me.  What does this --

3   A.  I don't understand the word "adjustment".

4   Q.  Okay.  Then help me understand.  You're right.  Maybe I'm

5   not correct.  You wrote 12,500; what was the significance of

6   writing 12,500 on the first page of this document?

7   A.  It was the add up on this inventory.

8   Q.  Why would you want to add it up since it had nothing to do

9   with you and you were not purchasing a business or buying

10  inventory?  What business did you have adding up numbers?

11  A.  What day was this inventory made?

12  Q.  You tell me when you wrote this page; you wrote it.

13  A.  Yeah, but I don't remember.  I don't remember what the

14  date.

15  Q.  Fine.  But do you remember writing 12,500?

16  A.  Yes.

17  Q.  What was the purpose of writing 12,500?

18  A.  Honestly, at this moment, I don't remember why was that

19  add up, the main purpose on adding up these numbers.

20  Q.  And why is it to the right of the three lines that are

21  crossed out, why does it have 4,250?  What is the significance

22  of that?

23  A.  Like I say, I don't remember because it doesn't -- it is

24  not a description of why 4,250 was there, ad like I told you,

25  this 4,250, I didn't write this.  It's not my numbers.

Proceedings                                           200

1   Q.  On the second page of this Exhibit I-1; do you see it, the

2   second page?

3   A.  Yes.

4   Q.  Do you see at the top, the last line where it says

5   "expenses", there is an inventory 1,900?  On the top, the

6   group, that top group that says "expenses", the fourth entry

7   says "inventory 1,900".

8   A.  Yes.

9   Q.  Isn't this the 1,900 that is coming out of the inventory

10  sheet of Exhibit I-2?

11  A.  You say I-2?

12  Q.  I-2.  Remember at the very bottom concluded with inventory

13  for 1,900?

14  A.  What page are you on?

15  Q.  Bottom of Page 2.

16          THE COURT:  Is it I-2?

17          MR. MOULINOS:  I-2 is --

18          THE WITNESS:  I-2 has no dollars.

19          MR. MOULINOS:  Oh, that's not his?  Oh, I'm sorry.

20  Withdrawn, Your Honor. I have confused the witness.  I

21  apologize.  Withdrawn.

22  BY MR. MOULINOS:

23  Q.  Okay.  So for the last time, do you have any recollection

24  of what document I-1 means?  What does it stand for?

25  A.  Excuse me?

Proceedings                                         201

1    Q.  Do you have any recollection as to why these two pages

2    were drafted?

3    A.  Can I see them?

4    Q.  Yeah.  I-1, those two pages with all the numbers on them.

5    I-1 --

6    A.  Excuse me?

7              THE COURT: I-1.

8              THE WITNESS:  I-1?

9              MR. MOULINOS:  Yeah.  The one I have at the very top,

10   1,926, and then the 2,900 on the second page.

11             THE WITNESS:  1,926.  Okay.

12   BY MR. MOULINOS:

13   Q.  You see that document?

14   A.  Yes.

15   Q.  I still need to know why was this written for?  Do you

16   recall?

17   A.  You're talking about I-1?

18   Q.  Yes.  The two pages, a very detailed document.

19   A.  I'm trying to remember.

20   Q.  May I help you with your recollection?

21   A.  Sure.

22   Q.  Wasn't this drafted at the very last meeting you had with

23   Mr. Paru as reconciliation for the amounts that you owed and

24   he owed you?  In parting your relationship?

25   A.  We never have any agreement or any reconciliation like you

Proceedings                                                    202

1    say.

2    Q.  I see.  So the best theory you have for us today is that

3    you wrote these because Mr. Paru told you if you don't write

4    these things up, you don't get $400?

5    A.  That's correct.  On the inventory, on the last inventory.

6

7           MR. MOULINOS:  Thank you.  No further questions.

8    REDIRECT EXAMINATION

9    BY MR. ANDROPHY:

10   Q.  Mr. Espinal, could you look at Defendant's Exhibit A,

11   please.  Can you clarify what was on this sheet when you

12   signed it?  I'm sorry.  I'll wait for you to find the exhibit.

13          MR. ANDROPHY:  I'm sorry.  May I assist?

14          THE COURT:  Yes, go ahead.

15          MR. ANDROPHY:  I'm just going to make sure you have

16   all the pages.

17   BY MR. ANDROPHY:

18   Q.  Your signature is on the top page; is that correct?  Top

19   of the first page?

20   A.  That's correct.

21   Q.  What was on this page when you signed?

22   A.  It was just the quantities under of each product that we

23   count in the basement, which it took the workers and myself.

24   Q.  So, for example, the first line where it says one Snapple,

25   and then it goes on.  Can you tell us what portions of that

WCR      OCR      RPR

                        Proceedings                              203


1    line of that row was on the page when you signed it?

2    A.  Well, it was the numbers, nine case, and then the other

3    guy -- and there was four, five, and I just did the check

4    mark.

5    Q.  Okay.  Was the 165-fifty on the page?

6    A.  No.  All the numbers were probably wrote after.

7    Q.  Okay.  And is that the same for the rest of the pages in

8    this exhibit?

9    A.  That's correct.

10            THE COURT: Can I suggest that I let him look at the

11   original inventory?  It might assist because that is not a

12   color copy.

13            MR. ANDROPHY:  Certainly.

14            THE COURT: And the reason I'm showing him that is is

15   it fair to say that you're saying that the numbers in red

16   weren't there when you signed it?

17            THE WITNESS:  All the numbers in red, they weren't

18   there.

19            THE COURT:  How about the other numbers?

20            THE WITNESS:  The ones with the blue were there, like

21   1980 --

22            THE COURT:  Okay.

23            THE WITNESS:  You see, there's two inks here.  There

24   is blue, and there is a black.

25            THE COURT:  Were the black ink numbers there?

Proceedings                                                    204

1          THE WITNESS:  Yes.

2          THE COURT:  When you signed it?

3          THE WITNESS:  No.  The black.

4          THE COURT:  So the red ink --

5          THE WITNESS:  The red, too, wasn't there.  You can

6    tell there is a lot of different -- there's two colors in

7    there.  Yes.  And the last, the total, six-thousand-nine,

8    nineteen-and-50 weren't there.  It was in black ink.

9          And if you see my check mark is in the blue with my

10   signature.

11   BY MR. ANDROPHY:

12   Q.  Were you ever shown a copy of this document with those red

13   ink entries before today or before this litigation?

14   A.  No.

15   Q.  Defendant's attorney showed you several checks that you

16   signed.  Did you sign any checks after October of 2012?

17   A.  After October 2012?  I don't think I did sign any checks.

18   I think the last check that I signed was the last statement

19   the defendants showed me, which was for the month of up to, I

20   believe, up to September, October -- end of October.

21   Q.  Right.

22   A.  From November and further down, I didn't.  Not that I

23   remember.

24   Q.  Did you sign all the checks for the business in October?

25   A.  Not all of them.  Few of them because they had a few

Proceedings                                                      205

1    different signatures on some of the checks.  Like, for
2    example, check 1826, not my signature.  Check 1828 is not my
3    signature.  Check 1827 is not my signature.
4    Q.  I'm sorry.  Are you referring to 1626?
5    A.  Oh, I'm sorry, 1626.
6    Q.  Do you know whose signature that is?
7    A.  Honestly, I don't.
8    Q.  Do you know who those checks are made out to?
9    A.  No.  It has a name, Paul, but I don't really know.
10   Q.  Did you ever make payments to Paul, that's listed in those
11   checks?
12   A.  I think I did make one check.  I don't remember if it was
13   Paul or somebody else.  Nope.  I don't really know the person
14   Paul, and like I said, that is not my signature, including the
15   first check, which is 1696.
16   Q.  Is that 1596?
17   A.  Or 1596.
18   Q.  Okay.  Do you know who signed that?
19   A.  No.  It looks like it's the same that signed those other
20   three checks.
21   Q.  Okay.  Turning to Defendant's Exhibit H-2.
22   A.  Okay.
23   Q.  Do you know who prepared this document?
24   A.  I did prepare the amounts on the cash and credit card.
25   Q.  Okay.  Do you know who wrote at the bottom from 8/1 to

Proceedings                                                     206

1    8/30/'12?

2    A.  I believe it was me.

3    Q.  Okay.  Do you know who wrote "paid full"?

4    A.  Paid in full -- no.  But seems to be my handwriting, so it

5    must be me.

6              (Continues on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                                  207

1    (Continuing)

2    Q    Turn to Exhibit I-1.

3    A    Okay.

4    Q    Can you clarify, starting with the first page, which

5    things you wrote on this document?  So, start with on the

6    first page where it says 1926, did you write that?

7    A    No, that was not my numbers?

8    Q    Do you know who wrote that?

9    A    No, not even the top one, the 1347.

10   Q    Do you know who wrote that?

11   A    No.

12   Q    Okay.  Now, starting where it says cash money and down,

13   did you write those?

14   A    I did.

15   Q    The notations to the side where it says Paru $900 and

16   Paru $200, and there's a mark and some things crossed out on

17   the side, do you know who wrote those?

18   A    No.  I think it was -- no, I don't remember who was it.

19   Q    Okay.

20        MR. MOULINOS:  Judge, do you want us to continue

21   tomorrow?  That's okay if you want.

22        THE COURT:  That might be a good idea.

23        If you just have a few questions, I think I can

24   make it.

25        MR. ANDROPHY:  It's going to be less than five

VB        OCR        CCR

Proceedings                                                    208

1          minutes.

2                THE COURT:  I think I'll be fine.

3                MR. ANDROPHY:  Okay, thank you, Your Honor.

4    Q    In the bottom section starting with deposit store, what

5    did you write there?

6    A    One thousand five hundred.

7    Q    Okay.  And the numbers to the side of that, did you write

8    those?

9    A    No.

10   Q    On the second page, at the top where it says eleven five

11   forty-five, did you write that?

12   A    No, that's not my number.

13   Q    Where it says 9,185 on the top in the box that's

14   partially written on, did you write that?

15   A    No.

16   Q    For expenses, did you write that section?

17   A    Expenses, I did.

18   Q    Okay.  And then, the next section, with check numbers,

19   did you write that?

20   A    I did.

21   Q    And then, underneath that, in that bottom section, can

22   you tell us which portions you wrote and which portions you

23   did not write?

24   A    The phone insurance and -- phone, insurance and the

25   numbers next Health Department I didn't wrote.

Proceedings                                    209

1    Q     Okay.

2    A     Even the numbers 17 -- 1,7934, I didn't wrote those

3    numbers.

4    Q     Okay.

5              MR. ANDROPHY:  I have no further questions for the

6    witness.

7              MR. MOULINOS:  No further questions, Your Honor.

8              THE COURT:  Okay.

9              We will conclude for the day and start at 10:00.

10             MR. MOULINOS:  10:00 o'clock tomorrow, 10:30, Judge?

11   What's better for you?

12             THE COURT:  10:00 is fine.

13             MR. MOULINOS:  Did the plaintiff rest so far?

14             MR. ANDROPHY:  Yes.  I think for the efficiency

15   purposes -- yes, plaintiffs rest.  We reserve the right to

16   call rebuttal.

17             MR. MOULINOS:  Okay, thank you.

18             THE COURT:  Okay.

19             MR. ANDROPHY:  Mr. Alam is not going to be able to

20   be here tomorrow due to work.  He's not a witness for

21   tomorrow, so I don't anticipate that's a problem.  I just want

22   to make sure that the Court and Mr. Moulinos are aware of

23   that.

24             THE COURT:  That's fine with the Court.

25             Mr. Moulinos?

Proceedings                                210

1              MR. MOULINOS:  I'm sorry?

2              MR. ANDROPHY:  Mr. Alam is not going to be here

3      tomorrow.

4              MR. MOULINOS:  I have no problem, no problem.

5              MR. ANDROPHY:  Okay.

6              MR. MOULINOS:  No problem.

7              MR. ANDROPHY:  Thank you.

8              MR. MOULINOS:  In fact, if you want to excuse the

9      others, I'm okay, too.  No objection.

10             MR. ANDROPHY:  Okay.

11             MR. MOULINOS:  I know people got to work.

12

13             (Matter adjourned to Wednesday, February 25th at

14      10:00 a.m.)

15

16                            oooOooo

17

18

19

20

21

22

23

24

25

Proceedings                                    211

1                          INDEX

2    WITNESS:                                      PAGE:

3              MOHAMMED KABIR

4                   DIRECT EXAMINATION        4

5                   CROSS-EXAMINATION         36

6              CARLOS OAXACA

7                   DIRECT EXAMINATION        43
                    CROSS-EXAMINATION         54
8                   REDIRECT EXAMINATION      91

9              HALIBUL ALAM

10                  DIRECT EXAMINATION        95
                    CROSS-EXAMINATION         112
11                  RECROSS-EXAMINATION       134

12             JUAN ESPINAL

13                  DIRECT EXAMINATION        136
                    CROSS-EXAMINATION         152
14                  REDIRECT EXAMINATION      202

15

16                        EXHIBITS

17

18                  7              132

19

20

21

22

23                  *    *       *     *

24

25

Proceedings                                              212

1                        C E R T I F I C A T E

2                I, Wendy C. Ricard, Official United States Court

3        Reporter in and for the Eastern District of New York, do

4        hereby certify that the foregoing proceedings were taken

5        down in shorthand at the time and place aforesaid,

6        transcribed under my personal direction and supervision,

7        and that the preceding pages represent a true and correct

8        transcription, to the best of my ability and

9        understanding.

10

11

12

13                        _____

14                        Wendy C. Ricard, RPR

15                        Official U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25