UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

CARLOS OAXACA, HALIBUL ALAM and JUAN
ESPINAL,

               Plaintiffs,

      - against -

HUDSON SIDE CAFE INC. (d/b/a ZACK'S
PIZZA AND PAPO'S CHICKEN), MOHAMMAD
SAIN and PARU KHAN,

             Defendants.

- - - - - - - - - - - - - - - - - - -X

<u>FINDINGS OF FACT AND</u>
<u>CONCLUSIONS OF LAW</u>

13-CV-2698 (MDG)

GO, United States Magistrate Judge:

    Plaintiffs Carlos Oaxaca ("Oaxaca"),[1] Halibul Alam ("Alam")

and Juan Espinal ("Espinal") brought this action against defendants

Hudson Side Cafe Inc. ("Hudson Side"), Mohammad Sain ("Sain") and

Peru Khan ("Khan")[1] alleging violations of the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. § 201 <u>et seq.</u>, and  the New York Labor Law

("NYLL"), §§ 190 <u>et seq.</u> and 650 <u>et seq.</u>, to recover unpaid

overtime wages, spread-of-hours pay, and other statutory damages.

---

   [1]  In the Complaint, Plaintiff Carlos Oaxaca's surname is spelled
"Guajaca."  <u>See</u> DE 1.  Since he testified at trial that his name is
"Carlos Oaxaca" and his name is so spelled in the joint pretrial
order filed ("JPTO") (DE 17), this Court will refer to him as
"Carlos Oaxaca" and the Complaint is deemed amended to reflect the
correct spelling of his name.

    Similarly, defendant Khan's first name is misspelled in the
Complaint and Answer as "Peru."  However, Khan's first name is
spelled "Paru" in the defendants' list of witness in the JPTO and
he testified at trial that his first name is spelled "P-A-R-U."
Trial Transcript at 214; DE 17 at 11.  This Court will refer to him
as "Paru Khan" and the Complaint and Answer are deemed amended to
reflect the correct spelling of defendant Khan's first name.

After the parties consented to proceed before this Court for trial and entry of judgment, this Court held a bench trial and sets forth below the findings of facts and conclusions of law based on the testimony and evidence received at trial.

## PRIOR PROCEEDINGS

Plaintiffs commenced this action on May 2, 2013. In their Complaint, plaintiffs alleged that they were employed to work a fast food restaurant that defendants owned and operated under the name "Zack's Pizza and Papo's Fried Chicken" ("Papo's"). See DE 1 at 1-2. In their answer, defendants asserted a counterclaim against plaintiffs for breach of contract, claiming that the plaintiffs were not their employees, but, rather, had acquired Papo's pursuant to an oral purchase agreement and operated the restaurant as owners. See DE 5.

On June 12, 2014, plaintiffs filed a letter requesting a pre-motion conference before the Honorable Eric N. Vitaliano to discuss their contemplated motion for summary judgment dismissing defendants' counterclaim. Plaintiffs argued that the Statute of Frauds barred defendants from bringing a breach of contract claim regarding an oral agreement that could not be performed within one year. See DE 13. Denying plaintiffs' request for a pre-motion conference, Judge Vitaliano directed defendants to show cause why their counterclaim should not be dismissed. See electronic order dated 7/1/14. In response, defendants withdrew their counterclaim. See DE 15.

After completion of discovery, this Court conducted a two-day bench trial at which all three plaintiffs, defendants Sain and Khan and Mohammed Kabir, a non-party, testified. Plaintiffs filed post-trial submissions, but defendants did not.

Based on my review of the testimony and other evidence presented at trial, I set forth below my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and grant judgment in favor of defendants as to the claims of plaintiffs Alam and Espinal and in favor of plaintiff Oaxaca against defendants Hudson Cafe and Khan.

## SUMMARY OF EVIDENCE

The parties have stipulated that defendant Hudson Side Cafe, Inc. owned and operated a restaurant doing business under the name "Zack's Pizza and Papo's Chicken" located at 48-11 Vernon Boulevard, Long Island City, New York (the "Restaurant"). See Joint Stipulated Fact ("Stip. Fact") No. 4, JPTO at 6. The parties do not dispute that all three plaintiffs worked at the Restaurant for varying periods of time beginning August 2012 until April 2013, but present very different views of their relationships.

I briefly summarize the testimonies here, and set forth my findings of fact in the following section. Plaintiffs testified that they were paid employees of defendants and worked at the Restaurant. Plaintiff Alam testified he had been asked by Mohammad Kabir, who had been a customer at Alam's fruit stand, to work at the Restaurant and Alam, in turn, recruited his friend, plaintiff

Espinal.  Trial transcript[2] at 97, 127.  These two plaintiffs testified they started working in the beginning of August 2012 and worked from 7:00 a.m. to 11:00 p.m. six days a week.  Tr. 52, 102-03, 182.  Alam was paid $350 a week for working as a cashier and preparing foods at the counter.  Tr. 52, 101, 103, 146.  Alam stopped working at the Restaurant in mid-October, while Espinal, who was paid $400 a week for making pizza, left in February 2013.  Tr. 136, 140, 142, 195-96.  Plaintiff Oaxaca testified he went into the Restaurant to seek employment and was hired by Kabir in the second week of August to work as a cook.  Tr. at 47, 54-55, 145-46, 150.  He was paid $600 a week and worked from 7:00 a.m. to 11:00 p.m., seven days a week.  Tr. 47-48, 49, 84-85.  After he complained about not getting a raise, Oaxaca testified that Khan reduced his work hours to 10:00 a.m. to 11:00 p.m., but kept his salary at $600 per week.  Tr. 48, 85.  He stopped working in April after he was injured in an accident at the Restaurant.  Tr. 54.

All three plaintiffs testified that defendant Paru Khan was in charge of restaurant operations and was there several hours each day to collect monies.  Tr. 46, 50, 96-98, 88-100, 103-04; 142-43.  He set the work schedules of the plaintiffs and instructed them on what to do.  Tr.  47, 48 76, 101.  Khan also determined how much each plaintiff would be paid and paid them in cash each week.  Tr. 49-50, 84, 101, 105, 142.  Khan would also check on whether there was sufficient food to operate the restaurant.  Tr. 104.

_____

[2]  The transcripts of the trial are docketed as DE 22 and 28. Future citations to the transcript will be "Tr." followed by the page number on the transcript.

In contrast, defendants claimed that Alam or Espinal had agreed to purchase and operate the Restaurant. Kabir testified that he told Alam about a restaurant that his brother had a restaurant he could not handle and wanted to sell. Tr. 13-15. After discussions involving Kabir, Alam, Espinal, Khan and Sain, Khan and Sain testified that they reached an agreement with Alam and Espinal on the purchase terms. Tr. 222, 235, 274-75, 279, 292. However, both Khan and Sain testified that Oaxaca was not involved in any meetings they had with Alam and Espinal. Tr. 234-35, 324. Alam and Espinal began operating the business in August, but Alam left the business in October 2012 because he was not making sufficient money. Khan also testified that Espinal called in January 2013 to say that he wanted to give back the business. Tr. 245-46. The two met at the Restaurant, at which time Espinal made another inventory and stopped working in the middle of February. Tr. 247.

## FINDINGS OF FACT

In making findings of facts in a bench trial, the court should find facts by determining the credibility of the witnesses and evaluating the exhibits received in evidence. Jupiter v. United States, No. 05 CV 4449, 2013 WL 4432227, at *4 (E.D.N.Y. Aug. 15, 2013); see also Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp., 2 F. Supp. 3d 192, 200 (D. Conn. 2014). "[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence

is evenly balanced." <u>Kosakow v. New Rochelle Radiology Assocs.</u>, 274 F.3d 706, 731 (2d Cir. 2001); <u>see</u> <u>Fulop v. Malev Hungarian Airlines</u>, 244 F. Supp. 2d 217, 223 (S.D.N.Y. 2003).

The evidence at trial was, at best, sparse -- hampered both by the fact that English was not the primary language of the witnesses and by insufficient presentation.  I did not find the testimony of any witness entirely credible; sometimes testimony by a witness conflicted with the testimony of other witnesses for the same side or was internally inconsistent, particularly as to the dates of events, and unclear much of the time.

Nonetheless, I find that the critical aspects of the testimonies of defendants' witnesses more credible than the testimonies by plaintiffs Alam and Espinal, and more persuasively corroborated by some of the exhibits presented.  In particular, this Court found that the documents evidencing payments made by Alam and Espinal to defendants, the contracts and checks that Espinal signed on behalf of Hudson Side, and a closing inventory that Espinal prepared before ceasing to work at the Restaurant supported the defendants' contention that Alam and Espinal had acquired and operated the Restaurant business.  I did not find Espinal, who signed and prepared most of the documents, credible. Moreover, although all three plaintiffs testified that Khan visited the Restaurant daily, gave instructions and directed work, they were not consistent as to when Khan appeared at the Restaurant and tried to exaggerate Khan's involvement in the daily operations of the Restaurant.  <u>See</u>, <u>e.g.</u>, Tr. 79, 81.  However, as to Mr. Oaxaca,

under either side's version of the facts, there is no dispute Mr. Oaxaca worked as an employee of Hudson Cafe from mid-August 2012 until April 24, 2013.  Accordingly, I make the following findings of fact.

At all relevant times, defendants Mohammad Sain and Paru Khan were 25% shareholders of defendant Hudson Side Cafe, Inc.,[3] a corporation organized under the laws of New York, that owned and operated the Restaurant on Vernon Boulevard, Long Island City, under the name Zack's Pizza and Papo's Chicken.  Pl. Exh. 8; Stip. Fact No. 4.  The Restaurant sold pizza, fried chicken, fries, hamburgers and salads.  Tr. 44.  From 2007 to 2012, plaintiff Halibul Alam sold fruits and vegetables from a cart located at 40th Street and Queens Boulevard, under the elevated subway tracks.  Tr. at 95, 99.  Plaintiff Juan Espinal and Alam were good friends and had known each other since 2000 or 2001 when they worked together at a deli.  Tr. 101, 137.  Espinal, who drove a delivery van, sometimes helped Alam transport fruit.  Tr. 101, 130-31.

Alam first learned about the Restaurant in discussions with Mohammad Kabir, who had been a regular customer at Alam's fruit cart stand since 2009.  Tr. at 5-6, 12-13, 95.  Sometime in 2012, Kabir called Mr. Alam to say that his brother, MD Asaduzzaman, was interested in selling the Restaurant, which had been losing money. Tr. 12-13, 36, 96-97 (Alam admitting to having a discussion about the Restaurant).  In the middle of June, Kabir took the Alam and

---

[3]  The remaining shares in Hudson Side are owned by M.D. non-parties:  MD Asaduzzaman, Mohammad Mahbub and Mohammad Mollah. Pls.' Exh. 8.

Espinal, to whom Alam had introduced to Kabir, to visit the Restaurant. Tr. 5, 18, 97, 127, 137-39, 153, 184. Alam, who had had prior experience in the food business, observed two workers preparing food without gloves, and told Kabir that was a reason for the Restaurant's problem. Tr. 18, 97, 139, 143, 152-53. Espinal also had experience making pizzas. Tr. 127, 181. In late June 2012, defendant Paru Khan met with plaintiffs Alam and Espinal at Mr. Alam's fruit stand to discuss the sale of the business. Tr. 20, 98, 127, 315.

The Health Department closed the Restaurant at the end of June. Tr. 30, 218. Sometime thereafter, Alam, Espinal, Kabir, Khan and defendant Mohammed Sain then met at Burger King, and reached an oral agreement to sell the operations of business to Alam and Espinal, for $10,000 and payment of $3,500 for the inventory, and payment of rent and expenses. Tr. 20, 24-26, 29, 218-19, 274-74, 333. Alam and Espinal later went to Khan's work place to say they could not pay the full $10,000 and wanted to pay $1,000 a month. Tr. 27-29, 221-23. Khan, after obtaining Sain's approval, agreed the Alam and Espinal could pay $1,000 a month for the $10,000 deposit, as well as the rent of $3,500, plus expenses. Tr. 222, 235, 274-75, 279, 292. They further agreed that they would share the cost of renovations to the Restaurant. Tr. 219, 274-75. The agreement was not reduced to writing. Tr. 279. While the Restaurant was shut, Khan gave the two plaintiffs access to fix the Restaurant and Espinal installed a new counter and salad bar. Tr. 233, 253, 292.

At the end of July, Khan met with Espinal at the Restaurant,[4] and Espinal and a worker named Shamin, who used to work at the Restaurant, took an inventory. Tr. 159, 223-24. Shamin wrote out the items inventoried on six pages of a yellow legal sized pad and a one page letter sized sheet, and Espinal checked off the items. Tr. 158-59, 161, 224-26, 235-38; Exhs. A and B. Khan wrote the prices in red to the right of each item and Espinal signed the inventory after having checked the inventory sheets.[5] Tr. 159, 225-26. Alam was started working at the Restaurant at the same time as Espinal. Tr. 99-100, 104. At that time, there were two other workers (described by plaintiffs as being from the same country as defendants) who worked at the Restaurant for two weeks. Tr. 104-05, 143.

---

[4] Both Alam and Espinal denied having any meetings or discussions about buying the Restaurant. Espinal testified that he had met Kabir at Alam's fruit stand only to talk about working at the Restaurant and visited the Restaurant with Alam and Kabir. Tr. 138-39. Other than Kabir, he did not meet any one else involved with the Restaurant until he met Khan on his first day of work. Tr. 140-41, 183, 184-85. However, Alam testified that he had a meeting with Khan and Alam at the fruit stand in June. Tr. 98-99. Neither provided a credible explanation why they would be willing to wait a month to work at the Restaurant after it was shut down by the Health Department after their visit. Although Alam claimed that the reason he terminated his fruit stand business to work at Papo's was because winter would be coming, he testified he had returned his fruit cart and license two weeks before he started working at the Restaurant in August, months before the start of winter and while the Restaurant was closed. Tr. 98, 114.

[5] Espinal admitted he signed the upper right-hand corner of each page but claimed that the prices and amount of cash payments were written on the inventory after he signed it. Tr. 162-63. On the last page of the longer inventory, Khan subsequently wrote "3,000," which reflected a cash payment for the inventory, and "chicken 1,100," which reflected a payment Espinal paid for monies owed while the restaurant was closed. Tr. 227-28.

Carlos Oaxaca went into the Restaurant looking for a job on a Monday in the second week of August 2012 and, after discussing with Espinal about his experience working a grill and other experience,[6] was hired and began working at the Restaurant a few days later. Tr. at 104-05, 144, 45-46, 61-62. Oaxaca observed another worker working at the Restaurant who left a few days after Oaxaca started. Tr. 73. Oaxaca was paid $600 a week and, arriving at the Restaurant at 7:00 a.m. every day, worked by himself until Espinal and Alam arrived by 10:00 a.m. Tr. 51. Oaxaca worked in the kitchen making fried chicken sandwiches, while Espinal made pizzas and took calls for deliveries and Alam worked at the cash register and made salads at the counter. Tr. 51-52, 105-06, 146. However, Espinal also worked at the register, and Alam took phone orders. Tr. 52. The Restaurant operated with three people for the duration of Oaxaca's employment. Tr. 51.

In August, Alam gave Khan a check for $4,300 dated August 10, 2012, which was drawn from his wife's bank account, made to the order of "Hudson Side Cafe" and bore a notation of "rent."[7] Tr.

---

[6] Espinal testified that he took Oaxaca's application to Khan, who asked Espinal to call and arrange a meeting with Oaxaca. Tr. at 144. This conflicted with Oaxaca's testimony that he received a call that the job was available and met Espinal and Khan on his first day of work. Tr. 45-46. In any event, Espinal translated in discussions between Oaxaca and Khan. Tr. 46-47, 49, 145.

[7] Alam claimed that he gave the check as a loan to Kabir because of a close relationship. However, the check was made to Hudson Side, and, as Alam testified, Khan was at the Restaurant on his first day of work and was in charge. Tr. 99, 104. The check was drawn from an account of Alam's wife, which contained $5,000-$6,000 at the time, because Alam did not have a checking account. Tr. 108-09, 232. I did not believe that Alam would make such large loan to someone with whom he literally had a passing relationship.

108, 285; Exh. E. The check was a payment to defendants for rent and expenses owed to Hudson Cafe's landlord. Tr. 285. On August 7, 2012, Espinal made a deposit of $500 into Hudson Side's bank account. Tr. 176; Exh. H-1. Besides this deposit, plaintiffs Alam and Espinal also paid amounts toward the agreed $3,500 monthly rent owed to Hudson Side, as reflected in a receipt for $3,500 written by Espinal that he gave Khan in early September. Tr. 205-06, 235-38, 294, 296; Exh. H-2. The receipt contained five entries: two entries for cash payments to "Peru" in the amounts of $60 and $500, a deposit of cash of $500, a cash payment of $136 to "garbage company" and $1,224 for "credit card 8-01 to 8-30-12." See Exh. H-2. Espinal also wrote "Juan & Alam" in the box for "sold by" at the top of the receipt and the words "PAID FULL" at the bottom. Tr. 177, 205-06. Some of the amounts were credits for amounts paid by Espinal and Alam to vendors owed money by Hudson Side when the Restaurant was closed. Tr. 35, 236; Exhs. H-1, H-2. The amount for "credit card" reflected the payments made by Restaurant's customers which were directly deposited into Hudson Side's bank account in August. See Exh. H-2; Tr. at 235, 237-38, 285. However, despite the notation "Paid Full" written on the receipt, the actual sum of amounts listed on the receipt was $2,920. See Exh. H-2.

About three weeks after the Restaurant reopened, Sain went to the Restaurant where he met with Alam and Espinal regarding their request that Hudson Side list them on the corporate payroll. Tr. 316, 325. Alam and Espinal told Sain the amount of salary they

wanted the company payroll to reflect each week. Tr. 317.

In September and October 2012, Espinal signed some checks for vendors of the Restaurant drawn from the Hudson Side bank account at J.P. Morgan Chase Bank. See Exh. C and D (Chase bank statements for Hudson Side for periods ending September 28, 2012 and October 31, 2012). In September 2012, Espinal signed two checks drawn from Hudson Side's account to "Avid Waste" and "State Farm." See Exh. C. In October 2012, he signed 11 checks for Supreme Poultry, as well as one check to AZ Metro Distributors and one check to Avid Waste System, Inc. drawn from the Hudson Side bank account. See Exh. D. Hudson Side had previously opened an account with the poultry company and permitted orders to continue being made through Hudson Side. Tr. 303-04. However, Hudson Side continued to pay rent directly to the landlord and never advised the landlord that Espinal and Alam were in charge of the Restaurant. Tr. 284, 287-89. Alam and Espinal never signed checks made to the landlord and had to obtain permission before writing any other check when using the Hudson Side bank account. Tr. 201-02.

On September 7, 2012, Espinal signed a contract for new telephone, internet service and cable service with Time Warner Cable. Tr. 147-48; Exh. G. He signed the contract as President of Zack's Pizzeria on September 7, 2012 and indicated the business was choosing to use Time Warner to provide local telephone service.[8]

---

[8] Espinal claimed that he felt pressured by daily calls from a Time Warner agent and got Khan's approval before signing the contract. Tr. 156. However, I did not believe Espinal's testimony that he felt pressured to sign the contract immediately,

(continued...)

See Exh. G.  At that time, Hudson Side had an existing business account with Verizon under a promotion program that ran through December 2012 for telephone and internet service at a lower monthly cost than the Time Warner service.  Compare Exh. F (Verizon bill reflecting monthly charge of $124 per month) with Exh. G (Time Warner contract reflecting monthly charge of $180.17).  The September and October 2012 Chase bank statements of Hudson Side did not showing any payments made to Time Warner.  See Exhs. C, D.

Alam quit working at the Restaurant in mid-October 2012 because he was not making enough money there.  Tr. 102, 111, 87, 297-98.  At the end of January 2013, Oaxaca asked for a raise but, instead, his hours were shortened from 10:00 a.m. to 11:00 p.m., for a 13 hour work day, with his salary of $600 per week kept the same.  Tr. 48-49, 85.  There was no time clock or sign-in sheet to keep track of his hours worked.  Id. at 50.  Oaxaca received his salary in cash from Khan and never received wage statements.  Tr. 50, 53-54, 83.  There were no notices posted in the Restaurant about wage laws.  Tr. 53-54.

Also at the end of January 2013, Espinal called Khan to say that since business had been very slow, he (Espinal) was looking for another job and had been working at night doing deliveries for

_____

[8](...continued)
particularly in light of his testimony, as well as the testimony of the other plaintiffs, that Khan was at the Restaurant on a daily basis and, as Espinal testified, he had previously discussed and shown Khan the contract.  Tr. 157.  Also, some of the checks Espinal signed were made to utility and insurance companies, businesses not likely to be pressuring a restaurant for immediate payment.  See Exhs. C and D.

a bakery.  Tr. 245-46.  Espinal asked Khan to take back the business, but Khan told him that he needed to wait at least two months.  Tr. 245-46.

In the first week of February, Espinal met with Khan at Restaurant and wrote out two documents that the parties called inventories.  Tr. 177, 187-89, 247; Exhs. I-1, I-2.  One document, which was four pages long, did appear to be an inventory and consisted of a list of food items, some supplies and their values.  See Exh. I-2.  The other document consisted of what appeared to be a listing of assets and liabilities of the Restaurant.  See Exh. I-1.  On the first page, under a heading of "Cash Money," there are nine items listed totaling $7,721, including "month December," "Delivery.com," "cash box, " "C C money," two entries labeled "Peru," "inventory," and "Beginning Balance."  Id.  This list was followed by a column with four items:  $1,500 for "deposit store," $3,000 for "one month free," $4,000 for "counter," $4,000 for "salad bar," with a total of $12,500. Tr. I-1.

As Khan testified, the first page of Exhibit I-1 listed credits to be given for return of the Restaurant, but he crossed out the amounts claimed for free rent, counter and salad bar and reduced the credit for those items to "$4,250.00" because he had not agreed to the counter and salad bar Espinal had installed and plaintiffs had operated the Restaurant for a shorter period than expected.  Tr. 254, 305; Exh. I-1.  The word "Expenses" was written at the top of the second page of Exhibit I-1, followed by a list of four expenses:  Con Edison ($4,875.00), telephone ($242.00),

insurance ($375.00) and inventory ($1,900.00). <u>See</u> Exh. I-1; Tr. 254-55. Below that list was another list with five lines containing check numbers and amounts, and two lines with notations of "inf" for $34.00, presumably the fee charged by Hudson Side's bank for returned checks, as reflected in the two bank statements admitted into evidence. <u>Compare</u> Exh. I-1 with Exhs. C and D. At the bottom of the second page of Exhibit I-1, Espinal wrote a column beginning with $6,000 (which was labeled "Inventory"), from which 3,000 for "down" and 1,100 for "Supreme" were subtracted, for a remainder of $1,900.00. Tr. 195; Exh. I1.

I did not find credible Espinal's testimony that he was forced to prepare the inventories in to be paid his wages owed. Tr. 177. Instead, I find that he prepared Exhibit I-1 as an accounting with respect to the return of the Restaurant business to defendants. There was no reason why that Espinal would include many of the items on Exhibit I-1 in preparing an inventory, particularly the entries for "Deposit Store," "One Month Free," "Counter" and "Salad Bar." Nor is it likely he would have had knowledge of any free rent or any deposit for the store had he been simply an employee of the Restaurant. That would also be the case as to the list of numbers which Espinal wrote at bottom part of the second page Exhibit I-2 for the cost of the unpaid inventory, <u>see</u> Tr. 195, which was identical to the list written by Khan when Alam and Espinal first took over operations ($6,000 less a $3,000 down payment received from Espinal and $1,100 paid to Supreme Poultry). Tr. 257-58; <u>compare</u> Exh. A at 6 with Exh. I-1 at 2.

Espinal stopped working at the Restaurant during the first week of February.  Tr. 150.  Oaxaca stopped working at the restaurant after the left side of his face was burned in an accident on April 24, 2013 and resulted in his hospitalization for a day and a half.  Tr. 54, 65, 319.  After he was released from the hospital, Oaxaca called Khan to ask for money that was owed to him.  Tr. 65.  Khan told him that Shahin, one of the owners of Hudson Side, would come to his house to speak with him the following day.  Tr. 65, 67-68.

## CONCLUSIONS OF LAW

Plaintiffs bear the burden of proof on their claims and on the issue of damages.  Plaintiffs must prove by a preponderance of the evidence that defendants did not adequately compensate employees as required by the FLSA and the New York Labor Law.  See Reich v. S. New England Telecomm. Corp., 121 F.3d 58, 67 (2d Cir. 1997) ("[plaintiff] must produce sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated and produce sufficient evidence to show the amount and extent of that work 'as a matter of just and reasonable inference.'") (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946)).  Plaintiffs must also prove the amount of damages by a preponderance of the evidence.

Although the parties have stipulated to the requirements of the FLSA and NYLL, they have not stipulated to coverage under these statutes.  See JPTO at 6-10.  Whether the parties are covered by

the FLSA or NYLL is "an element that a plaintiff must establish in order to prove liability." Monterossa v. Martinez Rest. Corp., No. 11-CV-3689 (JMF), 2012 WL 3890212, at *3 (S.D.N.Y. Sept. 7, 2012) (quoting Benitez v. F & V Car Wash, Inc., 11-CV-1857 (DLI) (SMG), 2012 WL 1414879, at *1 (E.D.N.Y. Apr. 24, 2012)). A plaintiff seeking protection under the FLSA as a "covered employee" must show that he is "employed in an enterprise engaged in interstate commerce or in the production of goods for interstate commerce." Allison v. Closette Too, L.L.C., No. 14-CV-1618 (LAK)(JCF), 2015 WL 9591500, at *7 (S.D.N.Y. Apr. 20, 2015), adopted by, 2015 WL 5333930 (S.D.N.Y. Sept. 14, 2015) (quoting Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 120 (E.D.N.Y. 2011)) (internal alterations omitted). An "enterprise engaged in commerce" is defined under the FLSA as a business that 1) "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and 2) "whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(I), (ii); see also Jacobs v. N.Y. Foundling Hosp., 577 F.3d 93, 96-97 (2d Cir. 2009). "Engagement in interstate commerce, either by an employee or by the employer as a whole, is a prerequisite for liability for the FLSA's overtime requirement." Ethelberth v. Choice Sec. Co., 91 F. Supp. 3d 339, 353 (E.D.N.Y. 2015).

There was no evidence presented that the plaintiffs or any

other employee working at the Restaurant were engaged in interstate commerce nor was there any showing that Hudson had annual gross sales even closely approaching $500,000.  The only evidence of the sales and receipts of the Restaurant are reflected in the bank statements of Hudson Side, which showed that the corporation received total deposits and additions of $7,863.60 in September 2012 and $9,477.97 in October.  <u>See</u> Exhs. C, D.  Even assuming that Restaurant operations resulted in receipts are double or triple the amounts reflected in the bank statements and extrapolated over one year, the gross sales of the Restaurant would not reach even half of the $500,000 FLSA threshold.  Thus, plaintiffs' claims under the FLSA must be dismissed for failure to show enterprise coverage.  <u>See</u> <u>Salustio v. 106 Columbia Deli Corp.</u>, 264 F. Supp. 3d 540, 551 (S.D.N.Y. 2017).

**<u>Liability under the New York Labor Law</u>**

However, because the "NYLL does not require that a defendant achieve a certain minimum in annual sales or business in order to be subject to the law," plaintiffs may be able to recover under the NYLL.  <u>Li v. Leung</u>, No. 15-CV-5262 (CBA)(VMS), 2016 WL 5369489, at *8 (E.D.N.Y. June 10, 2016), <u>adopted as modified by</u>, 2016 WL 5349770 (E.D.N.Y. Sept. 23, 2016) (internal citation and quotation marks omitted); <u>see</u> <u>also Coulibaly v. Millennium Super Car Wash, Inc.</u>, No. 12-CV-4760 (CBA)(CLP), 2013 WL 6021668, at *7 (E.D.N.Y. Nov. 13, 2013).  Although plaintiffs claim that defendants violated the minimum wage and overtime requirements under the FLSA and the

NYLL, they seek in their post-trial memorandum damages only for unpaid overtime and liquidated damages. See Pls.' Proposed Findings of Fact and Conclusions of Law at 11-14. Thus, this Court will address only plaintiffs' overtime claims under the NYLL.

The applicable regulations covering the "hospitality industry," which covers restaurants and hotels, provide that "[a]n employer shall pay an employee for overtime at a wage rate of 1 ½ times the employee's regular rate for hours worked in excess of 40 hours in one workweek. N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.4; see also id. § 146-3.1 (definition). Under the NYLL, "[e]mployee" is defined broadly to include "any individual employed or permitted to work by an employer in any occupation ..." NYLL § 651.4. Likewise, "employer" is broadly (and circuitously) defined to include "any person ... employing any individual in any occupation, industry, trade, business or service" or "any individual ... acting as employer." Perez v. Merrick Deli & Grocery, Inc., No. 13 CIV. 5166 (ILG) (JO), 2015 WL 4104790, at *2 (E.D.N.Y. July 8, 2015) (quoting NYLL § 651(6); see also Irizarry v. Catsimatidis, 722 F.3d 99, 118 (2d Cir.2013) (quoting the definition of "employer" in NYLL § 190(3) and NYLL § 651.6)).

In determining whether an individual or entity can be considered an "employer" under the FLSA or NYLL, courts ordinarily focus on the "economic reality" of the relationship between the purported employer and the workers in question. Barfield v. N.Y. City Health & Hosp. Corp., 537 F.3d 132, 141-142 (2d Cir. 2008) (citing Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33

(1961)); see also Franco v. Jubilee First Ave. Corp., No.
14-CV-07729, 2016 WL 4487788, at *5 (S.D.N.Y. Aug. 25, 2016)
(noting that courts in the Second Circuit employ the economic
reality test to determine employer status under both the FLSA and
NYLL) (collecting cases).  Although the New York Court of Appeals
has not addressed whether the tests for "employer" status are the
same under the FLSA and NYLL, "district courts in this Circuit have
interpreted the definition of employer under the [NYLL] co-
extensively with the definition used by the FLSA."  Shear v. Food
Scope Am., Inc., 297 F.R.D. 114, 134 (S.D.N.Y. 2014) (internal
quotation marks omitted).

The issue of whether a defendant is an employer under the FLSA
or NYLL usually arises in the context of a dispute over whether an
individual in a company employing a plaintiff can be liable.  In
any event, "the overarching concern [in determining whether an
individual is an employer] is whether the alleged employer
possessed the power to control the workers in question, with an eye
to the 'economic reality' presented by the facts of each case."
Herman v. PSR Security Services, Ltd., 172 F.3d 132, 139 (2d Cir.
1999) (internal citations omitted); see also Zheng v. Liberty
Apparel Co., 355 F.3d 61, 71 (2d Cir. 2003) (determining whether an
entity is an employer "is to be based on the circumstances of the
whole activity, viewed in light of 'economic reality'" (internal
citation and quotation marks omitted)). In determining whether an
individual is an employer, courts should consider "'whether the
alleged employer (1) had the power to hire and fire the employees,

-20-

(2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 308 (S.D.N.Y. 2011) (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)); Ho v. Sim Enters., 2014 U.S. Dist. LEXIS 66408, at *26 (S.D.N.Y. 2014) (examining requirements under New York law).  These factors are non-exclusive, and a court is "free to consider any other factors it deems relevant to its assessment of the economic realities." Zheng, 355 F.3d at 71-72.

As discussed above, I find that Alam and Espinal had agreed to acquire the operations of the Restaurant and began operating the business in August 2012.  Thus, they were not employees under the supervision of any person or entity as to the conditions and terms of their employment.  While the demands of operating the Restaurant resulted in their working long hours, no other person or entity set their hours or controlled their activities at the Restaurant. Thus, I find that Alam and Espinal are not covered employees for purposes the New York Labor Law.

On the other hand, there is no dispute that Oaxaca worked an employee at the Restaurant for the duration of his employment.  He He was paid $600 per week and worked more than ten hours each day and 40 hours each week, even after his hours were reduced by three hours each day in late January 2013.  Therefore, I find that plaintiff Oaxaca is an employee under the NYLL and entitled to recover damages for unpaid overtime wages, spread of hours pay and

liquidated damages under the NYLL in amounts to be discussed below.

Next, this Court must determine whether any of the defendants are liable as employers. The Second Circuit "has treated employment ... as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." Irizarry, 722 F.3d 104. As the court recognized, "we have 'identified different sets of relevant factors based on the factual challenges posed by particular cases.'" Id. (quoting Barfield, 537 F.3d at 141-42).

Notwithstanding my finding that Alam and Espinal took over operations of the Restaurant in August 2012 and thus were not employed by Hudson Side, Hudson Side had a different relationship as to other employees. Plaintiffs introduced at trial two quarterly employment taxes filed by Hudson Side with New York State Department of Taxation for the last two quarters of 2012 and W-2 forms to Alam, Espinal and two other workers for wages in 2012. See Exhs. 5, 6 and 7. Although Sain testified that Hudson Side made these filings as a favor to accommodate the request of Alam and Espinal, by making these filings with taxing authorities, it was confirming that it had reported proper wages and withheld pay, as reflected on the tax filings, Thus, by representing to governmental authorities that it was an employer during the time that Alam and Espinal worked, Hudson Side presumably maintained relevant records regarding the employees of the Restaurant and had back-up employment and financial records. In any event, Hudson Side admittedly continued to maintain financial control of

Restaurant operations to the extent of insuring that rent would continue to be paid directly to the landlord. Thus, I find that Hudson Side was "acting as an employer" under the NYLL for the duration of Oaxaca's employment, in the absence of any written documentation that Hudson Side had completely turned over operations to Alam and Espinal.

As to the individual defendants, Khan and Sain, because I find that they had no role in operating the Restaurant while Alam and Espinal were there, they are not individually liable for unpaid overtime for the period from the commencement of Oaxaca's employment to the time Espinal left. However, there is no dispute that Hudson Side regained operational control over the Restaurant from the time Espinal left in February until at least April 24, 2013 when Oaxaca stopped working due to an injury.

Applying the <u>Carter</u> factors, I find that Khan is liable as an employer, along with Hudson Side, for the time period after Espinal left until Oaxaca ceased working after he was injured. Certainly, based on Oaxaca's undisputed testimony, Khan set Oaxaca's his work schedule, physically gave him his pay, and was "in charge of the Restaurant," at least for the time after Espinal left. Tr. 47, 48, 50, 52. While I was not persuaded by the testimonies of the plaintiffs as to Khan's role while Espinal worked at the Restaurant, Oaxaca's testimony is undisputed that Khan was in charge after Espinal left. Notably, after Oaxaca was injured in an accident at work, Khan was the person Oaxaca called to discuss wages that were owed to him, suggesting that Oaxaca had more

extensive contact with Khan. Tr. 65. Thus, I find that Khan is liable as an employer under the NYLL because Khan was not only a corporate officer of Hudson Side, but exerted control over Hudson Side's operations after Espinal left the Restaurant. <u>Irizarry</u>, 722 F.3d at 104 ("to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment").

In contrast, Defendant Sain was responsible only for reporting Hudson Side's employees income to the government for tax purposes and maintaining records of plaintiffs' employment. Tr. 312, 317-18, 325, 329. There is no evidence, that Sain had the power to hire and fire the employees, supervised and controlled employee work schedules or conditions of employment, or determined the rate and method of their payment. Thus, I do not find him individually liable under the NYLL.

**Damages under the NYLL**

As discussed above, the NYLL provides for recovery of unpaid overtime wages, as well as for liquidated damages, as the parties have stipulated. N.Y. Lab. Law § 663(1). In order to calculate damages, the court must first determine the "regular hourly rate" received by plaintiff. As the parties have stipulated, under New York regulations that apply to the hospitality industry, "the employee's regular rate of hourly pay shall be calculated by dividing the employee's total weekly earnings . . . by the lesser of 40 hours or the actual number of hours worked by that employee during the work week." <u>see</u> JPTO at 7, ¶ 10 (quoting 12 N.Y.C.R.R.

§ 146-3.5(b)).

Oaxaca testified that he initially worked 16 hours every day from 7:00 a.m. to 11:00 p.m., but the hours were changed in late January 2013 to 10 a.m. to 11 p.m., or 13 hours a day. Although I did not find Oaxaca's testimony entirely credible that he worked such long hours for over eight months without any break or change in schedule, his testimony regarding his hours is not challenged by defendants. Accordingly, I determine Oaxaca's damages based on his testimony and calculate his hourly rate based on 40 hours of work per week for the flat amount of $600 that he was paid. Therefore, Oaxaca's regular rate was $15.00 per hour ($600 per week/40 hours).

Since Oaxaca worked 112 hours each week from August 15, 2012[9] until January 30, 2013, he is entitled to overtime pay of $1,620.00 each week for 25 weeks, for a total of $40,500 ($22.50 per overtime hour * 72 hours overtime per week * 25 weeks). From January 31, 2013 to April 24, 2013, Oaxaca worked 91 hours per week and is entitled unpaid overtime wages of $1,147.50 each week for 12 weeks for a total of $13,770.00 ($22.50 per overtime hour * 51 hours overtime per week * 12 weeks). In light of my finding that Hudson Side is liable for unpaid overtime wages for the entire period of Oaxaca's employment, it is liable for the total amount of unpaid overtime pay of $54,270. However, Khan is liable for unpaid overtime only for the 11 weeks of Oaxaca's employment from February

---

[9] Because Oaxaca testified he first went to the Restaurant on a Monday in the second week of August and began working a few days later, this Court finds that August 15, 2012 is an appropriate start date for calculating damages.

6, 2013 to April 24, 2013 for $12,622.50.

Oaxaca seeks unpaid spread of hours compensation throughout his term of employment. Under the New York "spread of hours" regulations, a restaurant worker working more than ten hours a day is entitled to "receive one additional hour of pay at the basic minimum hourly rate." N.Y. Comp. Codes R. & Regs. tit. 12 § 146-1.6. During the relevant time period, the New York minimum wage was $7.25 per hour. See Joint Stipulations of Law (DE 17) at ¶ 2. Since, as discussed, Oaxaca worked more than 10 hours each day of his employment, he is entitled to recover from Hudson Side spread of hours pay in the amount of $1,841.00 ($7.25 * 254 days). See, e.g., Xochimitl v. Pita Grill of Hell's Kitchen, Inc., 2016 WL 4704917, at *7 (S.D.N.Y. 2016) (awarding spread of hours pay). However, Khan's liability is only $558.25 for the 77 day period between February 6, 2013 and April 23, 2013.

Plaintiffs also seek liquidated damages under both the FLSA and New York Labor Law. In light of my conclusion that the plaintiffs are not entitled to recover under the FLSA, they cannot recover liquidated damages under that statute. However, as the parties stipulated in the JPTO, an employee is entitled to recover liquidated damages under the NYLL unless the employer can establish a good faith basis for having failed to pay the required wages. See JPTO at 9 (citing N.Y. Lab. Law § 198(1-a) (liquidated damages may be awarded where "the employer's failure to pay the wages required by this article was willful...."). The burden is on the employer to prove a good faith basis to believe that its

underpayment of wages was in compliance with the law to avoid imposition of liquidated damages.  See N.Y. Lab. Law § 663; Joint Stipulation of Law at ¶ 15.  Liquidated damages are calculated at a 100% rate of the underpayments.  See id.

In light of my finding that Alam and Espinal operated the Restaurant until February 6, 2013 and were obligated to pay wages to Oaxaca, this Court finds that defendants' failure to compensate Oaxaca for overtime and spread of hours pay during this earlier period of Oaxaca's employment was not wilful.  However, there is no evidence that defendants acted in good faith for not paying required overtime or spread of hours pay after Espinal and Alam stopped working at the Restaurant.  On the contrary, defendants neither presented any evidence regarding how they paid Oaxaca, nor did they dispute Oaxaca's testimony regarding his salary and the number of hours he worked each day.  Thus, I award Oaxaca liquidated damages under the New York Labor Law against Hudson Side and Khan in the amounts awarded for unpaid overtime wages and spread-of-hour pay from February 6, 2013 through April 24, 2013 of $13,180.75

Plaintiff also seeks prejudgment interest on unpaid overtime and spread of hours pay owed under the NYLL.  Although federal courts have long recognized that prejudgment interest may not be awarded in addition to liquidated damages for violations of the FLSA, Thomas v. iStar Fin., Inc., 652 F.3d 141, 150 n.7 (2d Cir. 2011), the Second Circuit has also held that "[p]re-judgment interest and liquidated damages under the Labor Law are not

functional equivalents" and thus may both be awarded for violations of state wage laws.  Reilly v. Natwest, 181 F.3d 253, 265 (2d Cir. 1999).  Plaintiff Oaxaca is thus entitled to prejudgment interest for unpaid overtime and spread of hours pay.

Section 5001 of New York's Civil Practice Law and Rules governs the calculation of prejudgment interest for violations of the Labor Law.  See Pavis v. Around the Clock Grocery, Inc., 2005 WL 4655383, at *5 (E.D.N.Y. 2005).  Courts ordinarily apply a statutory interest rate of nine percent per annum in determining prejudgment interest under New York law. N.Y. C.P.L.R. § 5004. Section 5001(b) sets forth two methods of calculating prejudgment interest.  First, interest may be calculated from "the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b).  However, "[w]here . . . damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."  Id.  To that end, courts have "wide discretion in determining a reasonable date from which to award pre-judgment interest." Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994). Plaintiff Oaxaca seeks interest from the midpoint of his employment.  See PLS.'s Post-Hearing Mem. at 11.  I find that the midway point between the beginning and end of Oaxaca's term of employment is a "reasonable intermediate date" for purposes of calculating prejudgment interest.  Pavis, 2005 WL 4655383, at *8; see also Liu v. Jen Chu Fashion Corp., 2004 WL 33412, at *5 (S.D.N.Y. 2004) (adopting counsel's "midpoint of the accrual of

damages" date).  The midpoint date between August 15, 2012 and

April 24, 2013 is December 19, 2012.  Accordingly, I award Oaxaca

$29,331.45 for prejudgment interest accruing from December 19, 2012

to October 9, 2018 (2120 days x $13.84/day) on the amounts owed by

Hudson Side and at a daily rate of $13.84 until entry of judgment.

However, since March 21, 2013 is the midpoint between February 6,

2013 and April 24, 2013, I find that Khan is jointly liable for

prejudgment interest only for the period from March 21, 2013 to

October 9, 2018 of $6,591.10 (2028 days x $3.25) and at a daily

rate of $3.25 until entry of judgment.

Plaintiff also seeks damages under the New York Wage Theft

Prevention Act ("WTPA") for defendant's failure to provide weekly

wage statements and an annual notice.  The WTPA requires employers

to provide employees with a wage notice containing information

about rate of pay and tip allowances to employees at the time of

hiring and annually on or before the first of February thereafter.

See NYLL § 195(1)(a)); Jian Xin Zhang v. Great Sichuan On 3rd Ave.,

Inc., No. 15-CV-4558 (JGK), 2018 WL 4625800, at *1 (S.D.N.Y. Sept.

26, 2018).  In amending the New York Labor Law,[10] the WTPA provided

employees not receiving the notice of certain wage information the

right to collect damages of $50 per week up to $2,500.  See N.Y.

Labor Law §§ 195(1-a), 198(1-b) (2014).  In addition, an employee

who is not provided a statement of wages for each work week is

_____

[10] The statute was amended again effective February 27, 2015 to
require the employer to furnish such notice only at the time of
hire.  See Guaman v. Krill Contracting, Inc., 2015 WL 3620364, at
*4 n. 5 (E.D.N.Y. 2015) (quoting N.Y. Lab. Law § 195(1)(a)); 2014
N.Y. Sess. Laws News of N.Y. Ch. 537 (A. 8106-c) (McKinney's).

entitled to damages of $100 per week up to $2,500.  See id. §§ 195(3), 198(1-d) (2014).  Oaxaca's testimony was undisputed that he was never provided a written notice of his pay rate.  Since I find that defendants were not operating the Restaurant when Oaxaca was hired and did not take over operations under after February 6, 2013, they are not liable for failing to provide the requisite notice at the time of hiring and the annual notice due February 1. However, defendants are liable for not providing proper wages statements for the following 11 weeks that Oaxaca worked after Espinal stopped working at the Restaurant.  Therefore, Oaxaca is owed $1,100 for the failure of Hudson Side and Khan to comply with these two provisions of the WTPA.

In sum, I award plaintiff Oaxaca damages against defendants Hudson Side Cafe Inc. and Paru Khan, jointly and severally to the extent indicated in the following chart:

| SUMMARY OF NYLL DAMAGES AWARDED TO OAXACA | | |
|---|---|---|
| Defendant Liable | Hudson Side | Khan |
| Unpaid Overtime | $  54,270.00 | $  12,622.50 |
| Unpaid Spread of Hours Pay | 1,841.00 | 558.25 |
| Subtotal | 56,111.00 | 13,180.75 |
| Liquidated Damages | 13,180.75 | 13,180.75 |
| Failure to provide weekly wage statement | 1,100.00 | 1,100.00 |
| Total | $  70,391.75 | $  27,461.50 |
| Interest thru 10/9/18 | $  29,331.45 | $   6,591.10 |

## **CONCLUSION**

For the foregoing reasons, I dismiss the claims brought by plaintiffs Halibul Alam and Juan Espinal, and all claims brought by plaintiffs against defendant Mohammad Sain. However, I find that plaintiff Carlos Oaxaca is entitled to recover damages and interest from defendants Hudson Side Cafe Inc. and Paru Khan.

Therefore, judgment shall be entered as follows:

(1) in favor of defendants against plaintiffs Habibul Alam and Juan Espinal;

(2) in favor defendant Mohammad Said against all plaintiffs.

(3) in favor of plaintiff Carlos Oaxaca against (a) defendant Hudson Side Cafe Inc. in the total amount of $70,391.75, plus prejudgment interest in the amount of $29,314.45 through October 9, 2018 and at a daily rate of $13.84 the entry of judgment; and against Paru Khan, who shall be jointly and severally liable with Hudson Side Cafe, Inc. on the said judgment against Hudson Side Cafe, Inc., but only to the extent of $27,461.50, plus prejudgment interest in the amount of $6,591.10 through October 9, 2018 and at a daily rate of $3.25 until the entry of judgment.

**SO ORDERED.**

Dated:  Brooklyn, New York
        October 8, 2018

                            /s/_____
                            MARILYN D. GO
                            UNITED STATES MAGISTRATE JUDGE